ORAL ARGUMENT NOT YET SCHEDULED

NO. 21-5016 (CONSOLIDATED WITH NO. 21-5018)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF NEW JERSEY, *et al.*,
*Plaintiffs-Appellants*,

v.

JULIE SU, in her official capacity as
Acting Secretary of the United States Department of Labor, *et al.*,
*Defendants-Appellees*.

On Appeal from a Final Order of the
U.S. District Court for the District of Columbia
(Honorable Timothy J. Kelly)

OPENING BRIEF OF APPELLANTS
PUBLIC CITIZEN HEALTH RESEARCH GROUP,
AMERICAN PUBLIC HEALTH ASSOCIATION, AND
COUNCIL OF STATE AND TERRITORIAL EPIDEMIOLOGISTS

Michael T. Kirkpatrick
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
mkirkpatrick@citizen.org

May 15, 2023

*Counsel for Public Citizen Health Research Group, American Public Health Association, and Council of State and Territorial Epidemiologists*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.     Parties and Amici

Public Citizen Health Research Group, American Public Health Association, and Council of State and Territorial Epidemiologists were the plaintiffs in Civil Action No. 19-166 in the district court and they are appellants in this Court. The State of New Jersey, the State of Illinois, the State of Maryland, the Commonwealth of Massachusetts, the State of Minnesota, and the State of New York were the plaintiffs in Civil Action No. 19-621 in the district court and they are appellants in this Court.

Defendants in both cases in the district court were R. Alexander Acosta, in his official capacity as U.S. Secretary of Labor; Patrick Pizzella, in his official capacity as Acting U.S. Secretary of Labor; Eugene Scalia, in his official capacity as U.S. Secretary of Labor;[*] the U.S. Department of Labor; and the Occupational Safety and Health Administration. Loren Sweatt, in her official capacity as Acting Assistant Secretary of Labor for Occupational Safety and Health, was an additional defendant in Civil Action No. 19-621.

---

[*] Each Secretary or Acting Secretary was substituted for his predecessor pursuant to Fed. R. Civ. P. 25(d).

i

The appellees in this Court are Julie Su, in her official capacity as Acting U.S. Secretary of Labor; Douglas L. Parker, in his official capacity as Assistant Secretary of Labor for Occupational Safety and Health;[†] the U.S. Department of Labor; and the Occupational Safety and Health Administration.

No amici curiae or intervenors have appeared in the district court or in this Court.

### B.    Rulings Under Review

The rulings under review are the order and memorandum opinion entered by Judge Timothy J. Kelly on January 11, 2021, granting defendants' motion to dismiss in Civil Action No. 19-166, and defendants' motion for summary judgment in Civil Action No. 19-621, and denying plaintiffs' motions for summary judgment in both cases. The opinion of the district court is reported at 513 F. Supp. 3d 10 (D.D.C. 2021). The order and opinion under review are included in the joint appendix at 2133–62.

### C.    Related Cases

This consolidated appeal arises from the district court's entry of the same order and opinion in two separate cases: *Public Citizen Health Research Group v. Pizzella*, No. 19-166, and *State of New Jersey v. Pizzella*, No. 19-621. These cases

---

[†] Julie Su and Douglas L. Parker are substituted as appellees in this Court pursuant to Fed. R. App. P. 43(c)(2).

have not previously come before this Court. The undersigned is not aware of any related cases as defined by Circuit Rule 28(a)(1)(C).

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick


## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1, plaintiffs-appellants Public Citizen Health Research Group, American Public Health Association, and Council of State and Territorial Epidemiologists state that they have no parent companies and no publicly held company has any ownership interest in them. The general purpose of the organizations, as relevant to this litigation, is to promote occupational health by, among other things, using information reported to government agencies and made available to the public, or obtained under FOIA, to analyze threats to worker health and safety and develop solutions.

## TABLE OF CONTENTS

**Page(s)**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................. i

RULE 26.1 DISCLOSURE STATEMENT............................................ iii

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY.................................................................. xiii

INTRODUCTION ............................................................. 1

STATEMENT OF JURISDICTION.............................................. 3

STATUTES AND REGULATIONS............................................. 3

STATEMENT OF ISSUES ................................................... 3

STATEMENT OF THE CASE................................................ 4

     A. Statutory and regulatory background ........................... 4

     B. The Electronic Reporting Rule ................................. 6

     C. OSHA's suspension of the deadline to submit Form 300 and 301 data........................................................... 10

     D. The Rollback Rule and this litigation.......................... 12

     E.  OSHA's subsequent proposed rule........................... 15

SUMMARY OF ARGUMENT ............................................... 16

STANDARD OF REVIEW ................................................... 17

iv

ARGUMENT ............................................................................ 18

I.    The public health organizations have standing. ..................................... 18

    A.    The public health organizations have suffered an informational injury............................................................................. 18

    B.    Informational injury can be established where disclosure would be required by FOIA. ....................................................... 21

II.   OSHA violated the APA by rescinding key aspects of the Electronic Reporting Rule........................................................... 25

    A.    OSHA's conclusion that the Rollback Rule is needed to protect worker privacy is arbitrary and capricious......................................... 27

        1.    The Electronic Reporting Rule posed no risk to worker privacy................................................................. 27

        2.    OSHA failed to provide a reasoned explanation for disregarding its previous determination that the Electronic Reporting Rule protected worker privacy................................................... 30

    B.    The Rollback Rule is arbitrary and capricious because OSHA failed to consider the benefits of collecting Form 300 and 301 data for purposes other than OSHA enforcement. ........................... 37

    C.    The Rollback Rule is arbitrary and capricious because OSHA failed to consider and respond to major substantive comments. ....... 40

        1.    OSHA did not provide a sufficient justification for disregarding the additional benefits of data collection for enforcement, compliance, and training as articulated by federal and state government partners. ..................................... 41

        2.    OSHA did not adequately address the comments stating that the agencies' findings contradicted the conclusions of the National Academies of Sciences' report. ................................ 46

      D.    OSHA's assertions regarding cost savings do not justify rescinding the reporting requirements of the Electronic Reporting Rule. ................................................................... 52

CONCLUSION ...................................................................... 54

CERTIFICATE OF COMPLIANCE ...................................................... 55

CERTIFICATE OF SERVICE ............................................................ 56

ADDENDUM

    5 U.S.C. § 553 ............................................................ ADD-1

    5 U.S.C. § 706 ............................................................ ADD-3

    29 U.S.C. § 651 .......................................................... ADD-4

    29 U.S.C. § 657 .......................................................... ADD-6

    29 U.S.C. § 673 .......................................................... ADD-8

    29 C.F.R. § 1904.7 ....................................................... ADD-9

    29 C.F.R. § 1904.29 .................................................... ADD-18

    29 C.F.R. § 1904.32 .................................................... ADD-21

    29 C.F.R. § 1904.41 .................................................... ADD-23

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986) ........................................................... 19

*Air Alliance Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ........................................................ 33

*Animal Legal Defense Fund v. USDA*,
   935 F.3d 858 (9th Cir. 2019)............................................................. 22

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) ......................................................................... 47

*Butte County, California v. Hogen*,
   613 F.3d 190 (D.C. Cir. 2010) .......................................................... 47

*Campaign Legal Center v. FEC*,
   31 F.4th 781 (D.C. Cir. 2022) ..................................................... 17, 21

*Cement Kiln Recycling Coalition v. EPA*,
   493 F.3d 207 (D.C. Cir. 2007) .......................................................... 40

*Cigar Association of America v. FDA*,
   964 F.3d 56 (D.C. Cir. 2020) ............................................................ 17

*Citizens for Responsibility & Ethics in Washington v. Executive Office of the
   President*,
   587 F. Supp. 2d 48 (D.D.C. 2008) .................................................... 22

*Center for Investigative Reporting v. DOL*,
   No. 18-2414, 2020 WL 2995209 (N.D. Cal. June 4, 2020)................ 10

*Delaware Department of Natural Resources & Environmental Control v. EPA*,
   785 F.3d 1 (D.C. Cir. 2015) ......................................................... 40, 43

*Department of Air Force v. Rose*,
   425 U.S. 352 (1976) ......................................................................... 34

*Electronic Privacy Information Center v. United States Department of Commerce*,
    928 F.3d 95 (D.C. Cir. 2019) ............................................................. 21

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ................................................................... 26, 39

*Ethyl Corp. v. EPA*,
    306 F.3d 1144 (D.C. Cir. 2002) ................................................. 19, 20

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ...................................................... 26, 27, 30, 39

*FEC v. Akins*,
    524 U.S. 11 (1998) ............................................... 18, 19, 20, 21

*Friends of Animals v. Jewell*,
    828 F.3d 989 (D.C. Cir. 2016) ............................................... 21, 24, 25

*Friends of Blackwater v. Salazar*,
    691 F.3d 428 (D.C. Cir. 2012) ........................................................ 26

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ................................................. 47, 53

*Holland-Rantos Co. v. U.S. Department of Health, Education & Welfare*,
    587 F.2d 1173 (D.C. Cir. 1978) ...................................................... 52

*Horsehead Resource Development Co., Inc. v. Browner*,
    16 F.3d 1246 (D.C. Cir. 1994) ........................................................ 36

*International Union, United Mine Workers of America v. Mine Safety & Health Administration*,
    626 F.3d 84 (D.C. Cir. 2010) ........................................................ 52

*Judicial Watch, Inc. v. Office of Director of National Intelligence*,
    No. 17-508, 2018 WL 1440186 (D.D.C. Mar. 22, 2018) .................................... 23

*Lilliputian Systems, Inc. v. Pipeline & Hazardous Materials Safety Administration*,
    741 F.3d 1309 (D.C. Cir. 2014) ................................................. 40, 41

*Louisiana Federal Land Bank Association, FLCA v. Farm Credit Administration*,
    336 F.3d 1075 (D.C. Cir. 2003) ........................................................... 40

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 18

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) .......................................................... 25

*Motor Vehicle Manufacturers Association of U.S. v. State Farm Mutual
    Automobile Insurance Co.*,
    463 U.S. 29 (1983) ................................................................. 26, 39, 47

*Nader v. FEC*,
    725 F.3d 226 (D.C. Cir. 2013) ............................................................ 21

*National Shooting Sports Foundation, Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ............................................................ 46

*NRDC v. U.S. EPA*,
    859 F.2d 156 (D.C. Cir. 1988) ...................................................... 36, 40

*Nuclear Energy Institute, Inc. v. EPA*,
    373 F.3d 1251 (D.C. Cir. 2004) .......................................................... 52

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................... 19, 21, 22

*Prison Legal News v. Samuels*,
    787 F.3d 1142 (D.C. Cir. 2015) .......................................................... 35

*Public Citizen v. Department of Justice*,
    491 U.S. 440 (1989) ........................................................................... 18

*Public Citizen v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ............................................................ 40

*Public Citizen v. Carlin*,
    2 F. Supp. 2d 1 (D.D.C. 1997) ............................................................ 22

*Public Citizen Foundation v. DOL*,
   No. 18-117, 2020 WL 9439355 (D.D.C. June 23, 2020)..................................... 10

*Public Citizen Health Research Group v. Acosta*,
   363 F. Supp. 3d 1 (D.D.C. 2018) .................................................. 11, 20, 23, 29, 34

*Public Citizen Health Research Group v. Pizzella*,
   No. 18-1729, 2019 WL 4711457 (D.D.C. Sept. 26, 2019)................................. 12

*Sierra Club v. EPA*,
   863 F.3d 834 (D.C. Cir. 2017) ............................................................... 40, 44, 45

*Sorenson Communications Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) ....................................................................... 31, 35

*Sturm, Ruger & Co., Inc. v. Chao*,
   300 F.3d 867 (D.C. Cir. 2002) ................................................................................ 5

*Thompson v. Clark*,
   741 F.2d 401 (D.C. Cir. 1984) ............................................................................. 41

*Waterkeeper Alliance v. EPA*,
   853 F.3d 527 (D.C. Cir. 2017) ............................................................................. 18

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ....................................................................... 25, 26

**Statutes**

5 U.S.C. § 552(a)(2)(D) ......................................................................................... 22

5 U.S.C. § 706(2)(A)............................................................................................... 26

28 U.S.C. § 1291 ....................................................................................................... 3

28 U.S.C. § 1331 ....................................................................................................... 3

29 U.S.C. § 651(b) .................................................................................................... 4

29 U.S.C. § 657(c) .................................................................................................... 4

29 U.S.C. § 673(a) ................................................................ 4

29 U.S.C. § 673(e) ................................................................ 4

52 U.S.C. § 30101 ............................................................... 21

**Rules**

Federal Rule of Appellate Procedure 4(a)(1)(B) ..................... 3

**Regulatory Materials**

29 C.F.R. § 1904 ................................................................. 5

29 C.F.R. § 1904.0 .............................................................. 5

29 C.F.R. § 1904.29(b)(6) .................................................. 35

29 C.F.R. § 1904.29(b)(7) .................................................. 34

29 C.F.R. § 1904.32(b) ........................................................ 5

29 C.F.R. § 1904.32(b)(2) .................................................. 20

29 C.F.R. § 1904.35(b)(2) .................................................... 1

29 C.F.R. § 1904.35(b)(2)(v) ............................................. 33

29 C.F.R. § 1904.39 ........................................................... 39

30 C.F.R. § 50.20 .............................................................. 32

Occupational Safety and Health Administration,
  36 Fed. Reg. 12,612 (July 2, 1971) ................................... 5

Occupational Safety and Health Administration, Final Rule, Occupational Injury
  and Illness Recording and Reporting Requirements,
  66 Fed. Reg. 5915 (Jan. 19, 2001) ................................... 35

Occupational Safety and Health Administration,
  79 Fed. Reg. 56,130 (Sept. 18, 2014) .................................................................. 6

Occupational Safety and Health Administration, Final Rule, Improve Tracking of
  Workplace Injuries and Illnesses,
  81 Fed. Reg. 29,624 (May 12, 2016) ............. 1, 5, 6, 7, 8, 9, 10, 19, 23, 29, 30, 32
                                               33, 34, 35, 37, 38, 39, 40, 46, 54

Occupational Safety and Health Administration, Final Rule, Improve Tracking of
  Workplace Injuries and Illnesses: Delay of Compliance Date,
  82 Fed. Reg. 55,761 (Nov. 24, 2017) ..................................................................... 9

Occupational Safety and Health Administration, Proposed Rule, Tracking of
  Workplace Injuries and Illnesses,
  83 Fed. Reg. 36,494 (July 30, 2018) ................................................. 10, 38, 48, 49

Occupational Safety and Health Administration, Final Rule, Tracking of
  Workplace Injuries and Illnesses,
  84 Fed. Reg. 380 (Jan. 25, 2019) ............... 1, 14, 27, 28, 30, 32, 33, 35, 36, 37, 38
                                               39, 41, 43, 45, 48, 49, 50, 51, 53, 54

Occupational Safety and Health Administration, Proposed Rule, Improve Tracking
  of Workplace Injuries and Illnesses,
  87 Fed. Reg. 18,528 (Mar. 30, 2022) ........................................................... 15, 20

U.S. Department of Labor, *Delegation of Authority and Assignment of
  Responsibility to the Assistant Secretary for Occupational Safety and Health*,
  77 Fed. Reg. 3912 (Jan. 25, 2012) ..................................................................... 4, 5

# GLOSSARY

APA                 Administrative Procedure Act

FOIA                Freedom of Information Act

JA                  Joint Appendix

NIOSH               National Institute for Occupational Safety and Health

OSHA                Occupational Safety and Health Administration

PII                 Personally Identifiable Information

USDA                United States Department of Agriculture

**INTRODUCTION**

In May 2016, the Occupational Safety and Health Administration (OSHA), a component of the Department of Labor under the authority of the Secretary of Labor, issued a final rule titled "Improve Tracking of Workplace Injuries and Illnesses," 81 Fed. Reg. 29,624 (May 12, 2016) (the Electronic Reporting Rule). That rule required establishments with at least 250 employees to submit electronically certain work-related injury and illness data recorded on OSHA Forms 300 and 301. When OSHA promulgated the Electronic Reporting Rule, it announced that it would post the data on its website in order, among other things, to enable public health organizations to identify and analyze threats to worker health and safety and to develop solutions. OSHA explained that the Form 300 and 301 data collected under the Electronic Reporting Rule would not include personally identifiable information and would be subject to release under the Freedom of Information Act (FOIA). Notably, a separate, pre-existing rule requires employers to provide these records upon request to employees, former employees, and their representatives. 29 C.F.R. § 1904.35(b)(2).

In January 2019, OSHA issued a final rule entitled "Tracking of Workplace Injuries and Illnesses," 84 Fed. Reg. 380 (Jan. 25, 2019) (the Rollback Rule), which rescinded key provisions of the Electronic Reporting Rule. In announcing the Rollback Rule, OSHA asserted that, no matter the benefits of information collection

1

and sharing for worker health and safety, OSHA should not collect the information at all unless it could eliminate any possibility of inadvertent disclosure of erroneously submitted personally identifiable information.

In two related cases consolidated in this appeal, three public health organizations—Public Citizen Health Research Group, American Public Health Association, and Council of State and Territorial Epidemiologists—and six states challenged the Rollback Rule under the Administrative Procedure Act (APA). As alleged in the public health organizations' complaint, OSHA's rescission of key aspects of the Electronic Reporting Rule was arbitrary and capricious. The district court held that the public health organizations had not suffered an injury sufficient to support standing and dismissed their case without reaching the merits. In the related case, the court reached the States' merits arguments but granted summary judgment for OSHA.

While this appeal was pending, OSHA again reversed course and issued a notice of proposed rulemaking to reinstate the requirement that covered establishments submit their Form 300 and 301 data electronically. The notice stated OSHA's intention to post the data on its website and confirmed that, once collected, the data is available under FOIA. Although the proposed rule, if issued as a final rule, would reinstate key provisions of the Electronic Reporting Rule rescinded by the Rollback Rule, OSHA has not issued a final rule and has repeatedly missed its

2

target dates for doing so. In the meantime, the public health organizations continue to be harmed by the Rollback Rule.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction to consider the public health organizations' claims under 28 U.S.C. § 1331. The court entered a final order and memorandum opinion dismissing their claim on January 11, 2021, for lack of standing. Joint Appendix (JA) 2133–62. The public health organizations timely appealed on January 25, 2021. Amended Notice of Appeal, ECF No. 27, JA2168; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are contained in an addendum bound with this brief.

## STATEMENT OF ISSUES

I.      Whether the public health organizations have Article III standing to bring their APA challenge.

II.     Whether OSHA's rescission of the requirement that covered establishments submit electronically certain information recorded on OSHA Forms 300 and 301 violated the APA.

3

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

The Occupational Safety and Health Act was enacted in 1970 "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b), by, among other means, "providing for appropriate reporting procedures … [that] will help achieve the objectives of this [Act] and accurately describe the nature of the occupational safety and health problem," *id.* § 651(b)(12). To accomplish this goal, the Act authorizes the Secretary of Labor to promulgate regulations requiring employers to "make, keep and preserve, and make available to the Secretary," occupational health records. *Id.* § 657(c)(1); *see id.* § 673(e). The Act further directs the Secretary to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses." *Id.* § 657(c)(2); *see id.* § 673(e). The Act also provides that, "to further the purposes of this chapter, the Secretary ... shall develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics." *Id.* § 673(a). The Secretary delegated these statutory responsibilities and authorities to OSHA. *Delegation of Authority and Assignment of Responsibility to the Assistant Secretary*

4

*for Occupational Safety and Health*, 77 Fed. Reg. 3912 (Jan. 25, 2012); *see Sturm, Ruger & Co., Inc. v. Chao*, 300 F.3d 867, 868 (D.C. Cir. 2002).

Since 1971, OSHA has promulgated regulations "to require employers to record and report work-related fatalities, injuries, and illnesses." 29 C.F.R. § 1904.0; *see* 81 Fed. Reg. at 29,625 (citing 36 Fed. Reg. 12,612 (July 2, 1971)). OSHA requires employers with more than ten employees in most industries to maintain records of occupational injuries and illnesses. *See* 29 C.F.R. § 1904; 81 Fed. Reg. at 29,624. Covered establishments must record each employee injury and illness on a "Log" (OSHA Form 300) and must prepare a supplementary "Incident Report" that provides additional details about each case recorded (OSHA Form 301). At the end of each year, establishments are required to prepare an "Annual Summary Form" (OSHA Form 300A) based on the information in the Log. *See* 29 C.F.R. § 1904.32(b); *see generally* OSHA Forms 300, 300A, and 301, JA0022–25.

Although employers have long been required to complete and maintain OSHA Forms 300, 300A, and 301, and to make them available at the worksite to employees, former employees, and their representatives, OSHA did not collect the forms in a comprehensive or systematic way. 81 Fed. Reg. at 29,632. Rather, OSHA collected the forms during onsite inspections. *Id.* From 1997 to 2012, OSHA received some of the same information through the OSHA Data Initiative, an annual survey through which OSHA requested Form 300A data from approximately 80,000 large

establishments in high-hazard industries. *Id.* at 29,628. Since 2015, OSHA has required employers to submit reports of work-related fatalities and severe injuries, *see* 79 Fed. Reg. 56,130 (Sept. 18, 2014), and those reports are publicly available on its website. *See* https://www.osha.gov/severeinjury; https://www.osha.gov/fatalities.

### B.    The Electronic Reporting Rule

On May 12, 2016, OSHA issued the Electronic Reporting Rule. *See* 81 Fed. Reg. at 29,624. Effective January 1, 2017, the rule required the electronic submission to OSHA of certain information from OSHA Forms 300, 300A, and 301— information that employers were already required to keep. *Id.* at 29,668. In a section entitled "Benefits of Electronic Data Collection," OSHA explained that "[w]ith the information obtained through this final rule, employers, employees, employee representatives, the government, and researchers may be better able to identify and mitigate workplace hazards and thereby prevent worker injuries and illnesses." 81 Fed. Reg. at 29,629.

In issuing the rule, OSHA repeatedly emphasized that it would "post the establishment-specific injury and illness data it collects under this final rule on its public Web site at www.osha.gov." *Id.* at 29,625; *see also id.* at 29,649–50, 29,657, 29,662. OSHA explained that it would make available each of the fields reported

from OSHA Forms 300 and 300A, as well as the fields reported from OSHA Form 301 that do not include personally identifiable information (PII). *Id.* at 29,632.[1]

The Electronic Reporting Rule did not require or even allow employers to submit all the information recorded on Forms 300 and 301. For instance, the rule did not allow the submission of employee name (column B) from Form 300, *see id.* at 29,692; Form 300, JA0022, or the submission of employee name, employee address, name of treating physician or health care provider, or name and address of treating facility (Fields 1, 2, 6, and 7) from Form 301, *see* 81 Fed. Reg. at 29,632; Form 301, JA0025. Under the rule, OSHA would collect but not release information regarding the employee's date of birth, date of hire, or gender, whether the employee was treated in an emergency room, and whether the employee was hospitalized overnight (Fields 3, 4, 5, 8, and 9 of Form 301). *See* 81 Fed. Reg. at 29,632, 29,661–62. The rule also required submission of the information from Fields 10–18 of Form 301. *See id.* at 29,632; Form 301, JA0025. For those fields, the agency pledged to provide "additional guidance … to inform employers not to include personally identifiable

---

[1] OSHA defines "personally identifiable information" as "information [that] can be used to distinguish or trace an individual's identity, such as their name, Social Security number, biometric records, etc. alone, or when combined with other personal or identifying information [that] is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, etc." 81 Fed. Reg. at 29,664 (adopting the definition from a May 22, 2007, OMB Memorandum).

7

information (PII) or confidential business information (CBI) within these fields." 81 Fed. Reg. at 29,659.

OSHA repeatedly emphasized that the fields from Forms 300 and 301 that it would collect and make public "will not include personally-identifiable information." *Id.* at 29,663. OSHA explained that it "has effective safeguards in place to prevent the disclosure of personal or confidential information contained in the recordkeeping forms and submitted to OSHA," *id.* at 29,661, and that it would post information only after the agency conducted a review using "software that will search for, and de-identify, personally identifiable information," *id.* at 29,662.

In issuing the final rule, OSHA explained that making the data available outside the agency would further OSHA's mission of improving worker health and safety through its reputational effects on employers because establishments would want to be seen as safe workplaces by employees, customers, and investors. *Id.* at 29,629. OSHA similarly identified direct benefits for workers, who would be able to access case-specific information anonymously, compare their employers to industry standards, and seek out jobs with employers with established safety records. *Id.* at 29,630–31. In addition, OSHA concluded that the worker safety data would be useful for consumers, businesses, and investors deciding with whom to do business. *Id.* at 29,631. OSHA also noted that the collection and posting requirements of the Electronic Reporting Rule would benefit workplace health and safety professionals

8

looking to target their services to the areas of greatest need, as well as unions, trade groups, and industries hoping to "evaluate the effectiveness" of safety programs. *Id.* Finally, the agency identified benefits for researchers, who could better explore the "distribution and determinants of workplace injuries," and county, state, territorial, and other public health officials, who could use the information to identify "newly-emerging hazards" and otherwise improve "injury and illness surveillance." *Id.*

OSHA concluded that the reporting requirement would "improve the accuracy of" the data itself, because employers would take more care to accurately record their data once they knew that the information would be available for review. *Id.* at 29,631–32. OSHA noted that the Mine Safety and Health Administration, the Federal Railroad Administration, and the Federal Aviation Administration all require the submission of similar injury and illness data and post the data on their websites. *Id.* at 29,632.

In late 2017, following a short extension of the first deadline for submission of Form 300A data, OSHA began collecting Form 300A data and releasing it to the public. *See* Final Rule, Improve Tracking of Workplace Injuries and Illnesses: Delay of Compliance Date, 82 Fed. Reg. 55,761 (Nov. 24, 2017) (moving the deadline to submit 2016 Form 300A data from July 1, 2017, to December 15, 2017).[2] The Form

---

[2] Despite its repeated pledge to release the data collected under the Electronic Reporting Rule, OSHA initially denied FOIA requests seeking the Form 300A data.

(continued)

300A data for calendar years 2016 through 2022 is posted on OSHA's website at https://www.osha.gov/Establishment-Specific-Injury-and-Illness-Data.

### C.     OSHA's suspension of the deadline to submit Form 300 and 301 data

The Electronic Reporting Rule required covered employers to submit 2017 Form 300 and 301 data by July 1, 2018. *See* 81 Fed. Reg. at 29,640. OSHA did not engage in notice-and-comment rulemaking to change that deadline. Instead, in May 2018, OSHA announced on its website that it would not accept submission of 2017 Form 300 and 301 data because OSHA intended to issue a notice of proposed rulemaking to rescind the requirement that covered employers submit Form 300 and 301 data. Two months later, OSHA proposed what would become the Rollback Rule. *See* Proposed Rule, Tracking of Workplace Injuries and Illnesses, 83 Fed. Reg. 36,494 (July 30, 2018).

The public health organizations challenged OSHA's suspension of the Electronic Reporting Rule's July 2018 deadline for submitting 2017 Form 300 and 301 data, which OSHA undertook without notice and comment and without

---

OSHA began posting it, however, after two district courts ordered OSHA to produce the data. *See* Minute Order, *Pub. Citizen Found. v. DOL*, No. 18-117 (D.D.C. July 20, 2020) (ordering release of requested Form 300A data following Magistrate Judge's report and recommendation, 2020 WL 9439355 (D.D.C. June 23, 2020), that summary judgment be granted to the FOIA requester); *Ctr. for Investigative Reporting v. DOL*, No. 18-2414, 2020 WL 2995209 (N.D. Cal. June 4, 2020) (entering summary judgment for the FOIA requester and ordering release of Form 300A data).

providing a reasoned explanation. *See Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 6–7 (D.D.C. 2018). The public health organizations sought a preliminary injunction to enjoin the suspension. *Id.* at 7. OSHA moved to dismiss, arguing, among other things, that the public health organizations lacked standing because their injury would not be redressed by a favorable decision because OSHA would not post the collected information and would withhold it on privacy grounds if it was requested under FOIA. *Id.* at 10.

On December 12, 2018, the district court denied OSHA's motion to dismiss. The court addressed all three elements of standing. First, it held that the public health organizations had suffered injury in fact because they were deprived of information integral to their core activities. *Id.* at 12. Second, it found the causal relationship between the public health organizations' injuries and OSHA's suspension of the submission deadline "quite clear." *Id.* Third, the court held that the public health organizations' injuries were likely to be redressed by a favorable decision. The court explained that, even if OSHA failed to post the data, the organizations could obtain it under FOIA because the data fields from Forms 300 and 301 that covered employers must submit under the Electronic Reporting Rule do not contain PII that would be exempt from disclosure under FOIA. *Id.* at 13–17.

At the same time, the court denied the public health organizations' request for a preliminary injunction, finding that their injury was not *irreparable* because, if

they prevailed on the merits of their claims, "the Court may still declare the earlier suspension of the Rule unlawful, require OSHA to recognize the July 2018 submission deadline, and give [the organizations] the relief they seek—data [from Forms 300 and 301] that employers should have been required to submit to OSHA by July 2018." *Id.* at 21. The public health organizations filed a motion for summary judgment seeking such relief, but OSHA issued the Rollback Rule before the court ruled on the motion. The district court then held that the Rollback Rule rendered the challenge to the suspension moot. *See Pub. Citizen Health Rsch. Grp. v. Pizzella*, No. 18-1729, 2019 WL 4711457, *6 (D.D.C. Sept. 26, 2019).

**D.     The Rollback Rule and this litigation**

The public health organizations are engaged in research and advocacy aimed at reducing or preventing work-related injury and disease. Each would use the Form 300 and 301 data that OSHA would have collected under the Electronic Reporting Rule to identify and analyze the causes of workplace injuries and illnesses and develop solutions.

Public Citizen Health Research Group promotes research-based, system-wide changes in health care policy, including occupational health, and advocates for improved safety standards at work sites. It frequently uses information reported to government agencies and made available to the public, or obtained under FOIA, to analyze threats to human health. It would have used the work-related injury and

12

illness data submitted to OSHA under the Electronic Reporting Rule to analyze threats to worker health and safety and advocate for improved standards. Carome Decl. ¶¶ 3, 7, 11, JA2124–26.

American Public Health Association is a public health advocacy group and professional association that promotes public health policies grounded in research, and it has an Occupational Health and Safety Section with members from a variety of disciplines. Benjamin Decl. ¶ 2, JA2120. It would have used the work-related injury and illness data that was required to be submitted to OSHA under the Electronic Reporting Rule to conduct research on issues of workplace health and safety, collaborate with community-based organizations that educate workers about on-the-job safety, and facilitate health promotion activities related to the workplace. *Id.* ¶ 4, JA2121. The Rollback Rule substantially limits its ability to identify hazards, determine whether hazards are being properly controlled, and develop effective measures to eliminate the hazards and prevent injuries, illnesses, and deaths. *Id.* ¶ 6, JA2122.

Council of State and Territorial Epidemiologists is an organization of member states and territories representing public health epidemiologists. It and its members rely on the type of data required to be reported under the Electronic Reporting Rule to effectively track, investigate, and prevent work-related injury and disease in the United States. Harrison Decl. ¶ 4, 5, 7, JA2129–31. The Rollback Rule reduces the

workplace injury and illness information that would otherwise be available to the organization and its members, impairing their ability to analyze threats to worker health and safety and develop solutions. Workplace injury and illness data submitted to state health agencies from a variety of public and private sources is less complete than the national data set that would have been available but for the Rollback Rule. *Id.* ¶ 9, JA2131.

Accordingly, promptly after OSHA issued the Rollback Rule on January 25, 2019, *see* 84 Fed. Reg. 380, the public health organizations sued. Their complaint alleges that OSHA's rescission of the requirement that establishments with at least 250 employees electronically submit certain information recorded on Forms 300 and 301 violated the APA because OSHA failed to provide a reasoned or rational explanation for reversing its position regarding any risks to worker privacy, failed to consider the benefits of collecting the data for purposes other than OSHA enforcement targeting, and failed to address significant substantive comments. JA2058–68.

The district court dismissed the public health organizations' case for lack of standing. As relevant here, the court held that the public health organizations had not established informational injury because, even if OSHA collected the Form 300 and 301 data in accordance with the Electronic Reporting Rule, the organizations might have to use FOIA to obtain the data if OSHA failed to post the data on its website as

14

promised in the preamble to the Electronic Reporting Rule. According to the district court, the public health organizations cannot rely on FOIA to establish a legal right to the information because FOIA is a statute of general application and an informational injury sufficient to satisfy the injury-in-fact element of Article III standing must be based on a disclosure statute specific to the records at issue.

### E.     OSHA's subsequent proposed rule

On March 30, 2022, OSHA issued a notice of proposed rulemaking that would reverse the aspects of the Rollback Rule challenged here by requiring certain employers to electronically submit Form 300 and 301 data. *See* Proposed Rule, Improve Tracking of Workplace Injuries and Illnesses, 87 Fed. Reg. 18,528 (Mar. 30, 2022). The proposal would reinstate the Electronic Reporting Rule's submission requirement for Form 300 and 301 data, but with two differences as to coverage: whereas the Electronic Reporting Rule required such submissions from all establishments with at least 250 employees, the proposed rule would require submissions from establishments with at least 100 employees but only in designated industries.[3] As with the Electronic Reporting Rule, "OSHA intends to post the data from the proposed annual electronic submission requirement on a public website after identifying and removing information that reasonably identifies individuals directly, such as individuals' names and contact information." *Id.*

---

[3] The proposed rule would also make other changes not relevant to this case.

15

## SUMMARY OF ARGUMENT

**I.** The public health organizations have Article III standing to pursue their claims because unlawful agency action has impinged on their legal entitlement to information that they would use in their work. The informational injury flows directly from OSHA's unlawful action: rescission of the Electronic Reporting Rule's requirement that covered employers submit certain information from Forms 300 and 301. And the injury will be redressed if the Court vacates the Rollback Rule and reinstates the Electronic Reporting Rule.

**II.** OSHA's rescission of the Electronic Reporting Rule's requirement that establishments with 250 or more employees electronically submit certain information from Forms 300 and 301 was arbitrary and capricious. First, OSHA's primary justification for rescinding the requirement—to protect worker privacy—is irrational because the Electronic Reporting Rule provided extensive safeguards to protect personal privacy. In promulgating the Rollback Rule, OSHA failed to provide a reasoned explanation for disregarding its past findings on the sufficiency of those safeguards. Instead, OSHA relied on a series of erroneous assertions to justify abandoning the reporting requirement.

Second, OSHA failed to consider the benefits of collecting Form 300 and 301 data for purposes *other* than OSHA enforcement targeting, despite having relied on such benefits when it promulgated the Electronic Reporting Rule and announced that

16

the data collected would be made public. OSHA ignored those benefits based on its assertion that none of the data would be subject to disclosure under FOIA, but that assertion was both wrong as a matter of law and inconsistent with OSHA's primary justification for the rescission.

Third, OSHA failed to address significant substantive comments. For instance, OSHA ignored comments outlining the past benefits that the agency and its partners had gained from Form 300 and 301 data. OSHA also discounted the findings of a National Academy of Sciences report applauding the Electronic Reporting Rule.

Finally, OSHA's assertion that the Rollback Rule will provide cost savings is unsupported and largely irrelevant because OSHA failed to compare any cost savings to the value of the benefits lost by rescission of the reporting requirements.

## STANDARD OF REVIEW

This Court reviews de novo a district court decision on standing. *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 788 (D.C. Cir. 2022). The Court also reviews de novo a district court's decision reviewing agency action under the APA. *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020).

## ARGUMENT

### I.    The public health organizations have standing.

To establish Article III standing, a plaintiff must show that it has suffered an injury in fact that is fairly traceable to the defendant's challenged conduct and likely to be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Here, the public health organizations have standing because they have suffered a loss of access to information as a direct result of OSHA's unlawful rescission of the Electronic Reporting Rule's requirement that covered employers submit certain information from Forms 300 and 301, and their access to that information will be restored if the Court vacates the Rollback Rule and reinstates the requirements of the Electronic Reporting Rule.

### A.    The public health organizations have suffered an informational injury.

It is well-established that the loss of access to information can constitute an injury in fact sufficient to support standing. *See*, *e.g.*, *FEC v. Akins*, 524 U.S. 11, 21 (1998) (holding that individuals suffered an injury in fact where the challenged agency action interfered with their ability to obtain information); *Pub. Citizen v. Dep't of Justice,* 491 U.S. 440, 449 (1989) (holding that an organization suffered an injury in fact when it was denied access to records that would be disclosed but for the challenged agency action); *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017) (holding that an organization suffered an injury in fact where the

18

challenged agency action reduced the information that would otherwise have been available); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* (*PETA*), 797 F.3d 1087, 1095 (D.C. Cir. 2015) (holding that an organization suffered injury where the agency's allegedly unlawful action deprived the organization of information); *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (holding that organizations had standing where the challenged agency action denied them access to information). This Court has stated a two-pronged standard for considering whether the deprivation of information causes injury in fact: "[A] denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting *Akins*, 524 U.S. at 21). The public health organizations satisfy this standard.

First, FOIA provides the public health organizations a legal right to the information that OSHA would have collected pursuant to the Electronic Reporting Rule, had the agency not unlawfully rescinded it through the Rollback Rule. In the Electronic Reporting Rule, OSHA itself identified FOIA as providing a right to the information that the agency would collect. 81 Fed. Reg. at 29,658–62. OSHA admits that when it collects the forms during inspections, it releases, in response to FOIA

19

requests, copies of Form 300 after redacting column B (employee names) and Fields 10 through 18 of Form 301. 87 Fed. Reg. 18,532; *see Pub. Citizen Health Rsch. Grp.*, 363 F. Supp. 3d at 17 (holding that the data is available from OSHA under FOIA). Indeed, OSHA cannot claim that the information is confidential because it is available upon request, and without restriction on further dissemination, to employees and their representatives. 29 C.F.R. § 1904.32(b)(2).

Second, it is undisputed that the data would help the public health organizations. OSHA admits that disclosure of the Form 300 and 301 data would allow researchers "to identify and mitigate workplace hazards and thereby prevent worker injuries and illnesses," 87 Fed. Reg. at 18,533, "improve research on the distribution and determinants of workplace injuries and illnesses," *id.* at 18,534, "identify patterns of injuries or illnesses that are masked by the aggregated, establishment-level data currently available," *id.,* and improve "their ability to conduct occupational-health studies, as well as identify increasing or emerging hazards," *id.* at 18,542. Each of the public health organizations has submitted a declaration explaining how the information would help them identify and analyze the causes of workplace injuries and illnesses and develop solutions, and how the Rollback Rule has harmed them by making it more difficult for them to do so. [4] *See,*

---

[4] The second prong of the informational injury inquiry has sometimes been described as requiring not simply that "the information would help" the plaintiff,

(continued)

*e.g.*, Carome Decl. ¶ 11, JA2126; Benjamin Decl. ¶ 6, JA2122; Harrison Decl. ¶ 9, JA2131.

> ### B. Informational injury can be established where disclosure would be required by FOIA.

This Court's decision in *PETA* confirms the public health organizations' standing. *PETA* held that the plaintiff had standing where it alleged a deprivation of information that, absent the alleged unlawful agency action, would have been disclosed under FOIA. In *PETA*, the plaintiff organization alleged that the failure of the Department of Agriculture (USDA) to apply its animal welfare regulations to birds violated the APA. 797 F.3d at 1092. The organization argued that it had

---

*Akins*, 524 U.S. at 21; *Ethyl Corp.*, 306 F.3d at 1148, but that denial of access to the information would cause "the type of harm Congress sought to prevent by requiring disclosure," *see Elec. Priv. Info. Ctr. v. United States Dep't of Com.*, 928 F.3d 95, 103 (D.C. Cir. 2019) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)). That formulation, however, has been applied only where the plaintiff relied on a disclosure statute that was "not designed to vest a general right to information in the public." *Id.* For example, the Federal Election Campaign Act, 52 U.S.C. § 30101 *et seq.*, "grants voters a cognizable interest in information used 'to evaluate candidates for public office.'" *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 789 (D.C. Cir. 2022) (quoting *Akins*, 524 U.S. at 21). Thus, a plaintiff asserting informational injury based on that statute must be seeking information related to the plaintiff's "informed participation in the political process." *Id.* (quoting *Nader v. FEC*, 725 F.3d 226, 230 (D.C. Cir. 2013)). Likewise, because section 208 of the E-Government Act "is directed at individual privacy" and protects individuals "by requiring an agency to fully consider their privacy before collecting their personal information," a plaintiff asserting informational injury under that provision must show a harm to their individual privacy. *Elec. Priv. Info. Ctr.*, 928 F.3d at 103–04 (emphasis removed). Such statutes are "fundamentally different" from FOIA, which "grants enforceable rights to information in the general public." *Id.* at 103.

suffered an informational injury because, if USDA applied those regulations to birds, USDA would create bird-related inspection reports that would be posted online, and the organization would use the reports to raise public awareness. *Id.* at 1094–95. USDA inspection reports are posted online pursuant to FOIA's requirement that frequently requested records be made available in an electronic reading room. *See* 5 U.S.C. § 552(a)(2)(D); *see also Animal Legal Defense Fund v. USDA*, 935 F.3d 858, 867–68 (9th Cir. 2019) (holding that organizations sufficiently alleged informational injury where USDA failed to make inspection reports available in its electronic reading room). The Court held that because the challenged agency action prevented the compilation of information that would be disclosed and used by the organization, the organization had suffered an injury in fact. 797 F.3d at 1094–95.

Similarly, *Citizens for Responsibility & Ethics in Washington v. Executive Office of the President*, 587 F. Supp. 2d 48 (D.D.C. 2008), held that the plaintiffs had informational standing to challenge the government's failure to preserve records as required by the Federal Records Act, where the informational injuries flowed from the plaintiffs' inability to use FOIA to obtain the records. *Id*. at 59–61. And in *Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 5–6 (D.D.C. 1997), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999), the court held that the plaintiffs had standing to challenge a regulation promulgated pursuant to the Records Disposal Act, where

22

implementation of the regulation would prevent certain records from being accessible to the plaintiffs through FOIA.

The district court ignored these decisions and instead relied on *Judicial Watch, Inc. v. Office of Director of National Intelligence*, No. 17-508, 2018 WL 1440186 (D.D.C. Mar. 22, 2018)). In *Judicial Watch*, the plaintiff argued that an Intelligence Community Directive required the government to create a document and that, once created, the plaintiff could seek the document under FOIA. The court found that plaintiff had not established that it had suffered an informational injury because it could not show either that the directive required creation of the document or that, once created, the document would be subject to release under FOIA. 2018 WL 1440186, at *1–*3. Here, in contrast, the public health organizations do not seek the creation of anything. Rather, they seek to have OSHA collect extant records as required by the Electronic Reporting Rule, prior to unlawful issuance of the Rollback Rule. And it is undisputed that, once collected, the records would be released under FOIA. *See Pub. Citizen Health Rsch. Grp.*, 363 F. Supp. 3d at 14. Further, whereas in *Judicial Watch* there was "no express or implied interrelation between" the directive and FOIA, 2018 WL 1440186, at *3, the opposite is true here: The preamble to the Electronic Reporting Rule mentions FOIA forty times, and it emphasizes that the Form 300 and 301 data will be made public "in accordance with FOIA." 81 Fed. Reg. at 29,658–62.

23

The district court also cited *Friends of Animals*, 828 F.3d at 992, to support its view that informational standing cannot be based on FOIA, but instead must be based on a disclosure statute that is specific to the information at issue. *See* Mem. Op. 11, JA2146. *Friends of Animals* concerned the Department of the Interior's failure to meet a statutory deadline for making findings in response to the plaintiff's petition to list two tortoise species as threatened or endangered. Under the Endangered Species Act, that agency, in response to a citizen petition asking for a species to be listed as endangered, must first "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 828 F.3d at 990. If it makes a positive finding on that point, then within 12 months of having received the petition, the agency must "make one of three findings with respect to" listing the species as endangered. *Id*. After making a 12-month finding, it must publish certain information in the Federal Register. *Id*. In its lawsuit, Friends of Animals relied on the 12-month findings as the source of its informational injury. *Id*. at 992. The Court, however, held that the plaintiff could not rely on the 12-month findings. The Court explained that the challenged delay concerned the agency's failure to meet the deadline for deciding what type of action was required in response to the petitions, not to a failure to comply with the disclosure requirement—a requirement that would not arise until after the agency made its finding. *Id*. at 993. That is, the "disclosure requirement [the

24

plaintiff] point[ed] to as the source of its informational injury does not impose any obligations on the Secretary until a later time in the listing process." 828 F.3d at 992.

*Friends of Animals*, which turns on the details of the petition process for endangered species, does not support the notion that FOIA cannot support plaintiffs' standing here. Indeed, the plaintiff there neither invoked FOIA as the source of its informational injury nor identified *any* pertinent disclosure obligation, general or specific.

## II. OSHA violated the APA by rescinding key aspects of the Electronic Reporting Rule.

Although the district court did not reach the merits of the public health organizations' APA claim, the parties fully briefed the issue on cross-motions for summary judgment and the court decided the merits of the related case brought by the States. Because the public health organizations have Article III standing, this Court should decide the merits in their appeal as well. The agency record before this Court is just as it would be before the district court on remand, the district court has no comparative advantage in determining whether OSHA's action violated the APA, the Court will consider the merits in resolving the appeal by the States, and an appeal from any district court decision after remand is likely and this Court's review would be de novo. *See Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014); *WildEarth*

25

*Guardians v. Jewell*, 738 F.3d 298, 308 n.4 (D.C. Cir. 2013); *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 n.* (fourth footnote) (D.C. Cir. 2012).

Under the APA, the Court "shall hold unlawful and set aside agency action" that is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious" if the action was not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 43 (1983) (internal quotation marks omitted), and if the record indicates that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *id.* at 43. Where, as here, an agency rescinds the requirements of a rule, it must demonstrate "awareness that it is changing position." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). And it must explain either how circumstances have changed such that the new position is consistent with its original

reasoning, *Fox*, 556 U.S. at 515, or why it is now choosing to "disregard[] facts and circumstances that underlay or were engendered by the prior policy," *id.* at 516.

### A.   OSHA's conclusion that the Rollback Rule is needed to protect worker privacy is arbitrary and capricious.

OSHA's primary justification for rescinding the Form 300 and 301 reporting requirements—to protect worker privacy—is irrational given the evidence in the record. OSHA thoroughly considered privacy concerns when it issued the Electronic Reporting Rule and concluded that the rule—along with other legal requirements—would prevent the disclosure of any PII. In rescinding the rule three years later, OSHA did not explain why it no longer viewed such safeguards as sufficient. Because OSHA's privacy justification for the Rollback Rule "rests upon factual findings that contradict those which underlay its prior policy," *Fox*, 556 U.S. at 515, and because OSHA has provided no "reasoned explanation … for disregarding facts and circumstances that underlay … the prior policy," *id.* at 515–16, OSHA's rescission of the Electronic Reporting Rule is arbitrary and capricious.

### 1.  The Electronic Reporting Rule posed no risk to worker privacy.

In the preamble to the Rollback Rule, OSHA asserted that eliminating the requirement that covered establishments submit certain fields from their Forms 300 and 301 was necessary "[t]o protect worker privacy." 84 Fed. Reg. at 381. Just three years earlier, however, OSHA concluded that the Electronic Reporting Rule provided adequate safeguards to ensure that PII, to the extent it was collected, would

27

not be disclosed. *See id.* at 29,665 (stating that "procedures are in place to ensure that individually-identifiable information, including health information, will not be publicly posted on the OSHA Web site"). Noting that "other government agencies are able to handle v[e]ry large amounts of PII," OSHA pledged to "follow accepted procedures and protocols to prevent the release of such information." *Id.* at 29,660.

First, to eliminate the possibility of release, OSHA determined that it would not even collect several fields of information on the relevant forms. *Id*. at 29,661. OSHA instructed establishments that they should not—and in fact would not be able to—submit personal information from Form 300 (including employee name) and Form 301 (including employee name, employee address, name of the treating physician or healthcare professional, and name and address of the facility where any off-site health treatment was provided). *Id.* at 29,692. In addition, OSHA stated that it would refuse to release—whether in a database on its website or in response to a FOIA request—several other categories of information that might pose a potential privacy risk, such as information under the heading of "[i]nformation about the employee" on Form 301—including the employee's date of birth, date hired, gender, and whether the employee was treated in an emergency room or hospitalized overnight. *See id.* at 29,632; OSHA Form 301, JA0025.

Second, to minimize the chance that reporting establishments would inadvertently include PII in the fields that OSHA intended to release, OSHA stated

that it would "add additional guidance to these instructions to inform employers not to include personally identifiable information (PII) or confidential business information (CBI) within these fields." 81 Fed. Reg. at 29,659. Accordingly, "nothing in the form instructions requires employers to include any identifying information about the employee or the employer there. In fact, the forms specifically instruct otherwise." *Pub. Citizen Health Rsch. Grp.*, 363 F. Supp. 3d at 16.

Third, OSHA intended to use software to scrub the submitted fields of any PII that employers might have mistakenly included despite OSHA's instructions. In the preamble to the Electronic Reporting Rule, OSHA explained that it "plan[ned] to review the information submitted by employers for personally identifiable information. As part of this review, the Agency will use software that will search for, and de-identify, personally identifiable information before the submitted data are posted." 81 Fed. Reg. at 29,662. Further, OSHA pledged to release only the information that it would be required to disclose under FOIA, noting that if a "data field includes any personally-identifiable information, such as a name or Social Security number, OSHA will apply Exemption 6 or 7(c) and not release that information." *Id.* at 29,658.

**2. OSHA failed to provide a reasoned explanation for disregarding its previous determination that the Electronic Reporting Rule protected worker privacy.**

In 2016, OSHA determined that "it has effective safeguards in place to prevent the disclosure of personal or confidential information contained in the recordkeeping forms and submitted to OSHA." 81 Fed. Reg. at 29,661. In issuing the Rollback Rule, however, OSHA did an about-face, stating that it "shares … commenters' concern that collection of data from Forms 300 and 301 poses a risk of the release of PII"—notwithstanding OSHA's acknowledgment that those commenters were under the "*mistaken* impression that employers would be required to submit PII such as name, address, or the name of the treating physician under the prior final rule." 84 Fed. Reg. at 384 (emphasis added). OSHA provided no "reasoned explanation … for disregarding" its prior determination that the risk to worker privacy from the Electronic Reporting Rule was minimal. *Fox*, 556 U.S. at 515–16.

**a.** OSHA's newfound distrust of the protections in the Electronic Reporting Rule rests on an impossibly high standard for preventing inadvertent disclosure. To justify the rollback, OSHA stated that "[n]o commenters provided evidence" to rebut the conclusion that OSHA "would not be able to guarantee that all PII inadvertently submitted to OSHA would be protected from disclosure." 84 Fed. Reg. at 384. In effect, OSHA concluded that unless the many protections built into the Electronic Reporting Rule could "guarantee" a system that is "100% effective," *id.* at 385, the

30

risk of inadvertent disclosure of erroneously submitted PII justified a complete reversal of its earlier conclusion that the safeguards were sufficient. That reversal was irrational.

The risk of disclosure of any PII inadvertently submitted under the Electronic Reporting Rule would be so remote that OSHA's description of the risk depends on a hypothetical series of errors—all of which the agency found, just three years ago, were unlikely to occur. First, employers would have to err by mistakenly submitting information that they are instructed *not* to submit. Such errors would be difficult to commit because OSHA controls the portal and restricts the fields from Forms 300 and 301 that are collected. Second, if an employer erred, OSHA would then have to err as well, by failing to identify and redact the erroneously submitted information. Such errors would also be unlikely because, as explained in the Electronic Reporting Rule, OSHA would use software designed to find and eliminate such information prior to release. Third, OSHA would then have to either fail again to identify the information at the FOIA stage, or a federal court in a challenge to the PII redaction would have to override OSHA's redactions and order the release of inadvertently submitted PII. Because OSHA's decision to abandon the Electronic Reporting Rule "relies on one unsubstantiated conclusion heaped on top of another," it is arbitrary and capricious. *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

Further, OSHA offered no explanation for why the controls it put in place would be any less effective than the systems used by other agencies that regularly collect, analyze, and publish anonymized versions of worker information. For example, the Mine Safety and Health Administration collects extensive PII, including employee names, social security numbers, mailing addresses, and other contact information about injuries and illnesses experienced by mine workers. *See* 30 C.F.R. § 50.20; Preparation and submission of MSHA Report Form 7000-1—Mine Accident, Injury, and Illness Report; https://www.dol.gov/oasam/ocio/programs/pia/msha/MSHA-MSIS.htm. The type of information that OSHA now claims is too personal even to collect—such as a description of what the employee was doing when injured and what the resulting injury was—is not only collected by the Mine Safety and Health Administration but is regularly disclosed on a public website as part of that agency's workplace safety monitoring and reporting. *See* 81 Fed. Reg. at 29,683; Comment of Georges Benjamin, American Public Health Ass'n, JA0559–60 (describing the narrative descriptions in the Mine Data Retrieval System).

OSHA is correct, of course, that the "experience of [the Mine Safety and Health Administration] and other federal and state agencies with collecting and publishing similar data … does not mean OSHA is *required* to collect the data from Forms 300 and 301." 84 Fed. Reg. at 387 (emphasis added). But the question here is

32

not whether OSHA was required to collect the information, but whether it provided a reasoned explanation for reversing course. As this Court has explained, "the baseline for measuring the impact of a change or rescission of a final rule is the requirements of the rule itself, not the world as it would have been had the rule never been promulgated." *Air All. Houston v. EPA*, 906 F.3d 1049, 1068 (D.C. Cir. 2018).

**b.** As justification for the Rollback Rule, OSHA claimed to be concerned about a risk that information other than PII may lead to the "re-identification" of certain workers. That purported concern did not provide a sound basis for rescinding the reporting requirements. Indeed, longstanding OSHA regulations *require* employers to release the data at issue to employees, former employees, or employee representatives, upon request. *See* 29 C.F.R. § 1904.35(b)(2)(v). Thus, as OSHA itself has noted, "[e]mployees or their representatives can also obtain and make public most of the information from these records at any time, if they wish." 81 Fed. Reg. at 29,684. In the Rollback Rule, OSHA tried to minimize the significance of this longstanding disclosure requirement by arguing that it is limited to those with a "need to know." *See* 84 Fed. Reg. at 383. But the category of requesters entitled to the data is broader than OSHA's framing suggests: It includes *all* employees, former employees, and their representatives, not only those directly involved in an incident. Accordingly, to the extent that OSHA is concerned about employees learning private information about their injured co-workers from the de-identified sections of Forms

33

300 and 301, such a risk was neither created nor exacerbated by the Electronic Reporting Rule, and OSHA has offered no evidence that the existing mandatory disclosure regime has had any negative effect on worker privacy.

Moreover, when it issued the Electronic Reporting Rule, OSHA concluded that the risk of reidentification is low. OSHA explained that "the final rule requires only establishments with 250 or more employees to submit information from all three OSHA recordkeeping forms," and that "it is less likely that employees in such large establishments will be identified based on the posted recordkeeping data." 81 Fed. Reg. at 29,662. In issuing the Rollback Rule, OSHA failed to explain its change in position or to acknowledge that "an agency withholding records on the ground that they might be connected to a particular individual must show 'threats to privacy interests more palpable than mere possibilities.'" *Pub. Cit. Health Rsch. Grp.*, 363 F. Supp. 3d at 16 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 380 n.19 (1976)).

In addition, OSHA's explanation ignored the mechanisms in the Electronic Reporting Rule and long-existing regulations to address "privacy concern cases"— defined in 29 C.F.R. § 1904.29(b)(7) as those involving: "(i) an injury or illness to an intimate body part or the reproductive system; (ii) an injury or illness resulting from a sexual assault; (iii) a mental illness; (iv) a work-related HIV infection, hepatitis case, or tuberculosis case; (v) needlestick injuries and cuts from sharp

34

objects that are contaminated with another person's blood or other potentially infectious material, or (vi) any other illness, if the employee independently and voluntarily requests that his or her name not be entered on the log." For "privacy concern cases," 29 C.F.R. § 1904.29(b)(6) instructs employers that they "may not enter the employee's name on the OSHA 300 Log." At the time such regulations were issued in 2001, OSHA believed that "[b]y excluding the name of the injured or ill employee throughout the recordkeeping process, employee privacy *is assured*." 66 Fed. Reg. 5915, 5999 (Jan. 19, 2001) (emphasis added). In the Electronic Reporting Rule, OSHA outlined an additional layer of protection by promising to "conduct a special review of submitted privacy concern case information to ensure that the identity of the employee is protected." 81 Fed. Reg. at 29,664.

In issuing the Rollback Rule, OSHA focused on the possibility that "sensitive information about workers" could be included in the narrative sections of Form 301, 84 Fed. Reg. at 385, but OSHA failed to acknowledge the special oversight for privacy concern cases that it previously determined was adequate to protect sensitive de-identified data. Moreover, OSHA relied on speculation about a small number of special cases as a basis to rescind the reporting requirement for *all* worker injury data, no matter how mundane, although privacy interests vary depending on the nature of the injury. *See Prison Legal News v. Samuels*, 787 F.3d 1142, 1150 (D.C. Cir. 2015). But the agency provided "no factual findings supporting the reality of

35

the threat." *Sorenson Commc'ns Inc.*, 755 F.3d at 706. "Speculation is an inadequate replacement for the agency's duty to undertake an examination of the relevant data and reasoned analysis[.]" *Horsehead Resource Dev. Co., Inc. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994); *see also NRDC v. U.S. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988) (finding that "mere speculation" does not provide "adequate grounds upon which to sustain an agency's action").

Finally, OSHA asserted that data from Forms 300 and 301 submitted under the Electronic Reporting Rule could contain "sensitive" information that should not be disclosed even if it cannot be linked to a particular worker. *See* 84 Fed. Reg. at 383, 385. OSHA did not adequately substantiate this concern, and it does not provide a reasoned basis for rescinding the reporting requirements of the Electronic Report Rule.

**c.** Although OSHA claims that its about-face on reporting is motivated by a desire to protect worker privacy, workers and their advocates supported the Electronic Reporting Rule and opposed the Rollback Rule. For example, the International Brotherhood of Teamsters commented that it found the privacy assertions by OSHA "incredulous, frivolous, and unfounded." JA1121. The union continued: "As stated in our 2014 comments, we are satisfied with OSHA's statements about the information pertaining to employee privacy concerns that would be included and excluded from the forms (300A, 300, and 301) covered by

36

this proposed rule. With these protective provisions in place, and given our own experiences with access to personal information, we are not concerned and do not anticipate any concerns by our members about their privacy." JA1123. Other groups opposing the rollback—and calling the concerns about worker privacy unfounded or even cynical—included the AFL-CIO, the United Food and Commercial Workers International Union, and the United Steelworkers Union. *See* JA1713; JA0777; JA1639.

In a section of the Rollback Rule preamble focusing on privacy concerns for needlestick injuries and other potential blood-contamination events, *see* 84 Fed. Reg. at 386, OSHA framed the American Nurses Association comment as "concern[ed] about potential disclosure of sensitive worker information." Yet OSHA acknowledged that the nurses' union wrote in *support* of the Electronic Reporting Rule, which it believed provided "important" case-level data and included adequate protections for worker privacy. *Id*. All OSHA offered in response was a repeated invocation of the remote "possibility of personal information being reported to OSHA inadvertently … despite the prohibition against recording names." *Id.*

**B.    The Rollback Rule is arbitrary and capricious because OSHA failed to consider the benefits of collecting Form 300 and 301 data for purposes other than OSHA enforcement.**

When it issued the Electronic Reporting Rule, OSHA recited a litany of benefits that would flow from the collection of Form 300 and 301 data. *See* 81 Fed.

37

Reg. at 29,629–32. For example, OSHA found that the data would allow workers to access case-specific information anonymously and make cross-industry comparisons, *id*. at 28,730; improve safety by reputational effect, because establishments will want to be regarded as safe workplaces by their employees, potential employees, investors, and consumers, *id*. at 29,629–631; move the labor market toward a focus on establishment safety, as jobseekers could gain more complete information on the safety records of their potential employers, *id*. at 29,631; and provide researchers and public health officials with the information necessary to identify hazards and develop solutions, *id*. at 29,631. In the notice of proposed rulemaking for the Rollback Rule, OSHA acknowledged that "more effective identification and targeting of workplace hazards by OSHA and better evaluations of OSHA interventions" are only "two of the benefits of the [Electronic Reporting] rule." 83 Fed. Reg. at 36,498.

When it issued the final Rollback Rule, however, OSHA wrote off benefits that were a central foundation for the Electronic Reporting Rule in just a few sentences, contending "that many of the benefits discussed by commenters would not materialize" because OSHA "would not make the data public even if collected." 84 Fed. Reg. at 391. As explained above, however, if collected, much of the Form 300 and 301 data will be subject to release under FOIA. OSHA explicitly acknowledged this form of access in the 2016 rule, and it failed to explain in 2019

38

the basis for its change in position regarding disclosure under FOIA. When an agency changes position, it must at the very least demonstrate "awareness that it is changing position." *Encino Motorcars*, 579 U.S. at 221 (quoting *Fox*, 556 U.S. at 515). It must explain either how circumstances have changed such that the new position is consistent with its original reasoning or why it is now choosing to "disregard[] facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515–16. Because OSHA "entirely failed to consider" many of the benefits it previously identified, the Rollback Rule is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Further, although OSHA in the Rollback Rule "acknowledge[d] that the 300 and 301 data would have benefits for occupational safety and health research," it discounted this benefit on the basis "that researchers already have access to [Bureau of Labor Statistics] data and severe injury data." 84 Fed. Reg. at 391. Those data sources, however, are not substitutes for the research that could be produced using the timely, case-specific data produced on Forms 300 and 301. As OSHA acknowledged in issuing the Electronic Reporting Rule, the Survey of Occupational Injuries and Illnesses, which is the main data set produced by the Bureau of Labor Statistics, "provides annual rates and numbers of work-related injuries and illnesses, but the Bureau is prohibited from releasing establishment-specific data to OSHA or the general public." 81 Fed. Reg. at 29,627. And the "severe injury reports" similarly

provide far less usable data to researchers, because even though 29 C.F.R. § 1904.39 requires incident-specific reporting of fatalities and other severe injuries, the "reports do not include the establishment's injury and illness records unless OSHA also collects these records during a subsequent inspection." 81 Fed. Reg. at 29,628–29. Without this contextualizing data, the one-off and "fortunately rare" reports, *id.* at 29,628, are far less useful for researchers.

**C.    The Rollback Rule is arbitrary and capricious because OSHA failed to consider and respond to major substantive comments.**

As this Court has "frequently held," an agency decision is "arbitrary or capricious where the agency has failed to respond to major substantive comments." *Sierra Club v. EPA*, 863 F.3d 834, 838 (D.C. Cir. 2017) (citing *Pub. Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *NRDC v. EPA*, 859 F.2d 156, 188–89 (D.C. Cir. 1988)). Although agencies are not required to respond to every issue raised by commenters, they must respond to "those comments that are relevant and significant," *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 225 (D.C. Cir. 2007), particularly "comments which, if true, would require a change in the proposed rule," *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003) (cleaned up). This requirement allows reviewing courts to "see what major issues of policy were ventilated and why the agency reacted to them as it did." *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (cleaned up). "An agency's failure to respond to relevant and significant public

40

comments generally 'demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) (quoting *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)).

In issuing the Rollback Rule, OSHA did not meaningfully address commenters' numerous substantive objections and proposed alternatives to the rescission. This failure renders the agency's decision to revoke the Form 300 and 301 reporting requirements arbitrary and capricious.

> **1.  OSHA did not provide a sufficient justification for disregarding the additional benefits of data collection for enforcement, compliance, and training as articulated by federal and state government partners.**

OSHA claimed in the Rollback Rule that "the extent of any incremental benefits of collecting the data from Forms 300 and 301 for OSHA enforcement and compliance assistance activities is uncertain." 84 Fed. Reg. at 381. That claim ignores the numerous examples of clear, non-speculative enforcement and compliance benefits that commenters put forward. Because OSHA's response to these examples was cursory at best—merely reiterating the refrain that the benefits were "uncertain"—the agency has not fulfilled its obligation to respond to relevant and significant comments.

Commenters outlined concrete examples of the benefits that OSHA *itself* has already derived from pilot projects involving the widespread collection of Forms

300 and 301, beyond those gathered during the inspection process. Particularly notable is the comment by David Michaels, a former Assistant Secretary of Labor for Occupational Safety and Health, Jordan Barab, a former Deputy Assistant Secretary of Labor for Occupational Safety and Health, and Gregory Wagner, a former Deputy Assistant Secretary for Mine Safety and Health. *See* JA0598–99. These commenters—all involved in the development and promulgation of the Electronic Reporting Rule—drew OSHA's attention to two test projects in which the agency had used data from Forms 300 and 301, or comparable information, to further its enforcement and compliance mission. *See* Comment of Michaels, Barab, and Wagner, JA0600-01.

First, the commenters pointed to the agency's existing use of detailed severe injury reports, which contain "data comparable to those included in Forms 300 and 301," to "better understand injury causation, and to develop and target compliance assistance materials based on this understanding." JA0600. In one instance, the commenters explained, such information had enabled OSHA to identify an increase in reports of amputations among workers operating food slicers in grocery store delis, after which it prepared a fact sheet to "help[] employers and workers prevent finger amputations." *Id.* Because "OSHA inspectors rarely visit grocery stores or delicatessens," widespread data collection was the only way the agency could "learn[] about the extent of the problem." *Id.*; *see also* Comment of NIOSH, JA0503

42

(describing a 2016 OSHA report outlining how "collection of [severe injury] data enabled it to observe a concentration of a very particular type of injury in specific industries").

Second, the former officials described the success of a pilot program in the Texas Area office, where staff "collected Forms 300 and 301 and analyzed three years of injury data" for injuries in mobile home manufacturing. JA0601. Using this data alone—aggregated "by hand" at the local office—OSHA staff were able to "identify the five types of injuries that accounted for 80 percent of all injuries in these establishments," encourage the creation of specific safety and health programs, and establish regular check-ins with these establishments to track improvements. *Id.* As a result, "injury rates dropped in these establishments," leading to estimated savings of $2 million in workers' compensation costs. *Id.*

Although the examples discussed in the comment belie OSHA's claim that it "has no prior experience using the case-specific data collected on Forms 300 and 301 for … compliance assistance," 84 Fed. Reg. at 388, the agency's only response was to state that it "agrees that data from Forms 300 and 301 and similar data can be helpful, but disagrees that its past experience justifies the broad collection envisioned in 2016," *id*. at 392. OSHA's "wan responses to these comments," which it mentioned only obliquely in the preamble, prevents the Court from "see[ing] what major issues of policy were ventilated ... and why the agency reacted to them as it

43

did." *Del. Dep't of Nat. Res. & Envtl. Control*, 785 F.3d at 15 (citation omitted). This "fail[ure] to respond to major substantive comments," *Sierra Club*, 863 F.3d at 838, renders the Rollback Rule arbitrary and capricious.

In addition, OSHA failed to explain its decision to entirely disregard the myriad direct enforcement and compliance benefits, in addition to targeting decisions, that federal and state partners articulated in their comments. For example, the National Institute for Occupational Safety and Health (NIOSH), the OSHA counterpart within the Centers for Disease Control, told OSHA that the benefit of the data would not be "speculative and uncertain" because NIOSH had both the "experience and capacity" and "interest in using th[e] data" to further their shared interests in compliance support and enforcement. *See* Comment of NIOSH, JA0501. NIOSH outlined the concrete ways that it has, through state partnerships, used analogous narrative text data from workers' compensation systems—data "not easy to obtain or access" through states, organizations, and insurance companies—to "summariz[e] claims by industry and cause, and to suggest prevention activities." JA0503–04. NIOSH offered to use this existing capacity to help OSHA develop a program to leverage the data for its own enforcement programs. JA0501.

Similarly, the Washington State Department of Labor and Industries outlined its experience using case-level data to improve compliance, enforcement, and prevention efforts. The agency had used "similar data to data gathered on the OSHA

Form 301[] to determine the primary causes of injury to truckers" and "develop[] … training materials determined to be of high value to the trucking industry." Comment of David Bonauto, Washington Dep't of Labor and Industries, JA0489. It had similarly identified the emerging threat of hop-dust related respiratory disease by looking at several years of individualized workers' compensation data. *Id.*

OSHA offered little in response to these concrete examples and future plans for using the OSHA Form 300 and 301 data for enforcement and compliance activities. With regard to the comments from NIOSH, OSHA merely expressed an "appreciat[ion for] the value of interagency efforts to achieve the shared goals of preventing occupational injuries and illnesses," but repeated its professed concern about "the burden on OSHA to collect the data." 84 Fed. Reg. at 389. The response to the examples of state-level enforcement and compliance efforts, like in Washington State, was likewise cursory: OSHA stated that the states' use of worker compensation data demonstrated that there was no need for centralized federal collection of OSHA incident forms. *Id.* at 394. Although OSHA acknowledged that the "costs" of such decentralized collections would be high, OSHA justified its reversal on the value of a centralized database by again arguing that the costs to the agency would not outweigh the "uncertain" benefits. *Id.*

Over and over, commenters provided examples of real-world benefits generated by initiatives like the Forms 300 and 301 reporting requirements. And

45

over and over, OSHA responded by returning to its unquantified cost-benefit analysis—stating that it continued to believe the benefits were "uncertain," even in the face of evidence to the contrary. These comments articulating benefits, "if true, would … cast doubt on the reasonableness of [the] position taken by the agency." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (citation omitted). Rather than respond in full, however, OSHA continued to repeat that the benefits were "uncertain"—preordaining its conclusion that the costs would outweigh the benefits. In fact, several commenters pushed the agency to provide an explanation of why it had "re-evaluated" the benefits of the Forms 300 and 301 requirements that, in 2016, it had found "significantly exceed the annual costs." *See* Comment of Michaels, Barab, and Wagner, JA0610 (explaining that OSHA did not provide "even the tiniest bit of information about the methods employed for this re-evaluation"); 81 Fed. Reg. at 29,674. OSHA offered no response.

### 2. OSHA did not adequately address the comments stating that the agencies' findings contradicted the conclusions of the National Academies of Sciences' report.

To survive a challenge that a rule is arbitrary and capricious, an agency must demonstrate that it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Under this standard, "an agency cannot

46

ignore evidence contradicting its position.'" *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (quoting *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)). In promulgating the Rollback Rule, OSHA ignored an obvious and significant category of contradictory evidence: a National Academy of Sciences, Engineering, and Medicine report that the agency itself had requested, in concert with NIOSH and Bureau of Labor Statistics.

In January 2018—just six months before OSHA issued the proposed Rollback Rule—the National Academy of Sciences committee published a detailed, consensus report, after "more than a year of deliberations," advocating for "[occupational health and safety] surveillance as a national priority." *See* Attachment to Comment of Celeste Monforton, American Public Health Association, JA0157, JA0179 (Report at ix, 8). The study, *A Smarter National Surveillance System for Occupational Safety and Health in the 21st Century*, concluded that OSHA's "targeting and priority-setting efforts have been hindered by a lack of data, particularly establishment-level information, to evaluate the hazards and risks at individual worksites." JA0348 (Report at 176). In a five-page subsection applauding the Electronic Reporting Rule, the committee concluded that the new regulation would "serve a key role by providing data essential for injury and illness surveillance." JA0351 (Report at 179). The report had clear relevance for the agency's decision in proposing the Rollback Rule: The agency itself had requested

the report, together with NIOSH and the Bureau of Labor Statistics, *see* 84 Fed. Reg. at 391 n.6; and the President's then nominee for Assistant Secretary of Labor, Scott Mugno, signed off on its conclusions, *see* JA0152(Report at v); Comment of Michaels, Barab, and Wagner, JA0604. Nonetheless, OSHA only mentioned the report once in the entire notice of proposed rulemaking: It cited it *approvingly* for a point about the Rollback Rule's EIN-reporting requirement, *see* 83 Fed. Reg. at 36,500, but "inexplicably ignor[ed] the most recent best available evidence" offering divergent findings on the benefits of the Electronic Reporting Rule. *See* Comment of Peg Seminario, AFL-CIO, JA1788.

Unsurprisingly, then, the report and its contrary conclusions formed the centerpiece of several commenters' responses in opposition to the agency's proposal. Several organizations entered the full report into the administrative record and pointed the agency to specific areas where it directly contradicted the justification offered for the Rollback Rule. *See*, *e.g.*, JA0146 (American Public Health Ass'n); JA1319 (International Brotherhood of Teamsters). Even a group that ultimately agreed with rescission of the Electronic Reporting Rule's Form 300 and 301 requirements took OSHA to task for not acknowledging this significant set of conclusions and recommendations. *See* Comment of ORCHSE Strategies, JA0765 (noting "[n]or is there any reference to a recent study by the National Academy of Sciences").

Commenters pointed to several assertions in the proposed rule that directly contradicted the findings of the National Academy's report. For instance, the report concluded that the Electronic Reporting Rule would "provide[] a much-enhanced source of injury and illnesses data that can be used for effective targeting of interventions and prevention efforts as well as compliance activity," and noted that "these data are not currently available to agencies or the public from other surveys." JA0348 (Report at 176). These findings undercut OSHA's assertion in the proposed rule—reiterated in the final rule—that "[c]ollection of the summary data gives OSHA the information it needs to identify and target establishments with high rates of work-related injuries and illnesses." 83 Fed. Reg. at 36,498; *see also* 84 Fed. Reg. at 381 (final rule).

Similarly, commenters pointed to the National Academy's report's careful consideration of the privacy concerns at stake in any data-collection system. Although the committee considered "protecting data" to be a "guiding principle" of its work, so too was "disseminat[ing] widely" any data set collected, to allow "the use of surveillance information for action by all stakeholders." JA0203 (Report at 32). As the three former Department of Labor officials noted, the report contained "extensive examination of worker privacy issues" but "d[id] not raise privacy concerns about OSHA collecting and posting on the web the Form 300, 301 and 300A data." *See* Comment of Michaels, Barab, and Wagner, JA0606. Finally, OSHA

49

received comments pointing out that its newfound determination that the supposed privacy risks outweighed any benefits to dissemination directly contradicted several of the key recommendations of the Report, which encouraged OSHA, NIOSH, and the Bureau of Labor Statistics to develop a publicly available and easily searchable injury and illness database and provide ongoing analysis and dissemination of the data. *See*, *e.g.*, Comment of Peg Seminario, AFL-CIO, JA1790. As commenters explained, OSHA "would be rejecting [these recommendations] if it eliminates the requirement that large establishments electronically submit data from Forms 300 and 301." Comment of Michaels, Barab, and Wagner, JA0606.

OSHA's limited response to these points by commenters and in the National Academy report does not meet the basic standards for rational decisionmaking. In the final rule, OSHA stated that it would address the National Academy's findings only as specifically mentioned by commenters, 84 Fed. Reg. at 391 n.6, even though commenters had taken the agency to task for proposing a rule in direct contravention of the National Academy report's foundational findings. *See* Comment of Michaels, Barab, and Wagner, JA0606 ("[T]he recent study … concluded that the requirement that large establishments electronically submit Form 300 and 301 will enhance worker safety and health. Given all this, it would be arbitrary and capricious for OSHA to rescind a significant component of that requirement without consideration of [the National Academy's] recommendations or without having conducted any

50

meaningful analysis of the effects of that rescission."). Moreover, the responses that OSHA provided reiterated the erroneous assertion that the agency could ignore the benefits of data collection to other federal government agencies, states, and researchers because "OSHA would not make the data public even if collected." 84 Fed. Reg. at 391. Yet OSHA did not explain why its conclusions about the risks and benefits of publicity so strongly contradict the findings of the National Academy report. As to the benefits for researchers, OSHA "acknowledge[d] that the 300 and 301 data would have benefits for occupational safety and health research," but it "note[d] that researchers already have access to [Bureau of Labor Statistics] data and severe injury data." *Id*. This argument contradicts the report's finding that "[t]he OSHA electronic reporting rule will serve a key role by providing data essential for injury and illness surveillance not available from the" Bureau of Labor Statistics' survey of occupational injuries and illnesses. JA0351 (Report at 179).

The National Academy report offered a substantive description of the benefits of developing robust information gathering and processing systems. OSHA's failure to address head on the findings of the report render its decision to rescind the Form 300 and 301 reporting requirements arbitrary and capricious. Courts have long noted the special status of findings from the National Academy of Sciences, a group that "serves as the federal government's scientific adviser, convening distinguished scholars to address scientific and technical issues confronting society." *Nuclear*

51

*Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1267 (D.C. Cir. 2004). Although National

Academy reports are not binding on OSHA, this Court has expressed "concern" at

an agency's "refusal without reasons to accept a [National Academy of Sciences –

National Research Council] panel's recommendations." *Holland-Rantos Co. v. U.S.

Dep't of Health, Educ. & Welfare*, 587 F.2d 1173, 1175 (D.C. Cir. 1978) (per

curiam).

　　　More generally, this Court has found that "[c]onclusory explanations for

matters involving a central factual dispute where there is considerable evidence in

conflict do not suffice to meet the deferential standards of our review." *Int'l Union,

United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C.

Cir. 2010). Here, OSHA offered only conclusory explanations, spending less than

one page of the preamble tackling a more than 300-page report that offers

conclusions about the value of the Electronic Reporting Rule that conflict with

OSHA's decision in the Rollback Rule. Because the agency has "rel[ied] on portions

of studies in the record that support its position, while ignoring cross sections in

those studies that do not," its action was arbitrary and capricious. *Genuine Parts Co.*,

890 F.3d at 313.

　　　**D.　　OSHA's assertions regarding cost savings do not justify rescinding
　　　　　　the reporting requirements of the Electronic Reporting Rule.**

　　　In an attempt to justify the Rollback Rule, OSHA described various additional

costs of the Electronic Reporting Rule and then pointed to what it calculated as $16

million in cost savings from rescinding the rule's requirements. 84 Fed. Reg. at 381. Because OSHA has entirely discounted the benefits of collecting workplace injury and illness data, any cost-benefit analysis—even using the faulty and inflated estimates in the preamble to the Rollback Rule—fails the APA's requirement of reasoned decision making.

First, OSHA has overstated the costs to the agency to implement the Electronic Reporting Rule. The web portal for submission of Form 300 and 301 data was nearly complete, as demonstrated by OSHA's estimate of the remaining cost. *See* 84 Fed. Reg. at 400. Further, although in the Rollback Rule OSHA estimated that completing the portal would cost $450,000, *id.*, just weeks later it lowered the estimate to $318,000. *See* Def.'s Mot. for Stay & Memo. in Opp'n to Pl.'s Mot. at 13, *Pub. Citizen Health Rsch. Grp.*, No. 18-cv-1729 (D.D.C. Mar. 4, 2019), ECF 26.

Second, OSHA overestimated the ongoing cost of responding to FOIA requests for the data submitted under the Electronic Reporting Rule by assuming that every information field will need to undergo two rounds of manual review. *See* 84 Fed. Reg. at 400. In fact, many fields that would be submitted are extremely unlikely to contain any PII, and OSHA previously acknowledged that software can handle most redaction tasks. 81 Fed. Reg. at 29,662. Instead of identifying any shortcomings of the existing software solutions, OSHA merely reset the bar to an impossibly high level: perfection. *See* 84 Fed. Reg. at 385 ("Although OSHA

53

previously thought to address this issue with software, de-identification software is not 100% effective, and OSHA believes that some PII could be released even after being processed through the software.").

## CONCLUSION

This Court should reverse the district court's order dismissing the public health organizations' claim for lack of standing, hold that OSHA's issuance of the Rollback Rule violated the APA, vacate the Rollback Rule, and reinstate the Electronic Reporting Rule.

Dated: May 15, 2023    Respectfully submitted,

*/s/ Michael T. Kirkpatrick*

Michael T. Kirkpatrick
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
mkirkpatrick@citizen.org

*Counsel for Public Citizen Health Research Group, American Public Health Association, and Council of State and Territorial Epidemiologists*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), it contains 12,755 words. This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared using fourteen-point Times New Roman font.

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick

55

## CERTIFICATE OF SERVICE

I certify that on May 15, 2023, I caused the foregoing to be filed with the Clerk of the Court through the Court's ECF system, which will serve notice of the filing on all filers registered in this case.

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick

# ADDENDUM

**RELEVANT STATUES AND REGULATIONS**

# TABLE OF CONTENTS

5 U.S.C. § 553 ................................................................. ADD-1

5 U.S.C. § 706 ................................................................. ADD-3

29 U.S.C. § 651 ............................................................... ADD-4

29 U.S.C. § 657 ............................................................... ADD-6

29 U.S.C. § 673 ............................................................... ADD-8

29 C.F.R. § 1904.7 .......................................................... ADD-9

29 C.F.R. § 1904.29 ...................................................... ADD-18

29 C.F.R. § 1904.32 ...................................................... ADD-21

29 C.F.R. § 1904.41 ...................................................... ADD-23

# 5 U.S.C. § 553

Title 5 – Government Organization and Employees
Part I – The Agencies Generally
Chapter 5 – Administrative Procedure
Subchapter II. Administrative Procedure

## § 651. Rule Making.

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

> (1) a military or foreign affairs function of the United States; or
> (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

> (1) a statement of the time, place, and nature of public rule making proceedings;
> (2) reference to the legal authority under which the rule is proposed; and
> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

> Except when notice or hearing is required by statute, this subsection does not apply—
> > (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
> > (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the

ADD-1

rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title [5 USCS §§ 556 and 557] apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

> (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
> (2) interpretative rules and statements of policy; or
> (3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

# 5 U.S.C. § 706

Title 5 – Government Organization and Employees
Part I – The Agencies Generally
Chapter 7 – Judicial Review

## § 706. Scope of Review.

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

# 29 U.S.C. § 651

Title 29 – Labor
Chapter 15 – Occupational Safety and Health

## § 651. Congressional statement of findings and declaration of purpose and policy.

\* \* \*

(b) The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources—

(1) by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions;

(2) by providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions;

(3) by authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce, and by creating an Occupational and Health Review Commission for carrying out adjudicatory functions under the Act;

(4) by building upon advances already made through employer and employee initiative for providing safe and healthful working conditions;

(5) by providing for research in the field of occupational safety and health, including the psychological factors involved, and by developing innovative methods, techniques, and approaches for dealing with occupational safety and health problems;

(6) by exploring ways to discover latent diseases, establishing causal connections between diseases and work in environmental conditions, and conducting other research relating to health problems, in recognition of the fact that occupational health standards present problems often different from those involved in occupational safety;

(7) by providing medical criteria which will assure insofar as practicable that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience;

(8) by providing for training programs to increase the number and competence of personnel engaged in the field of occupational safety and health;

(9) by providing for the development and promulgation of occupational safety and health standards;

(10) by providing an effective enforcement program which shall include a prohibition against giving advance notice of any inspection and sanctions for any individual violating this prohibition;

(11) by encouraging the States to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws by providing grants to the States to assist in identifying their needs and responsibilities in the area of occupational safety and health, to develop plans in accordance with the provisions of this Act, to improve the administration and enforcement of State occupational safety and health laws, and to conduct experimental and demonstration projects in connection therewith;

(12) by providing for appropriate reporting procedures with respect to occupational safety and health which procedures will help achieve the objectives of this Act and accurately describe the nature of the occupational safety and health problem;

(13) by encouraging joint labor-management efforts to reduce injuries and disease arising out of employment.

**29 U.S.C. § 657**

Title 29 – Labor
Chapter 15 – Occupational Safety and Health

## § 657. Inspections, investigations, and recordkeeping

\* \* \*

(c) Maintenance, preservation, and availability of records; issuance of regulations; scope of records; periodic inspections by employer; posting of notices by employer; notification of employee of corrective action.

(1) Each employer shall make, keep and preserve, and make available to the Secretary or the Secretary of Health, Education, and Welfare, such records regarding his activities relating to this Act as the Secretary, in cooperation with the Secretary of Health, Education, and Welfare, may prescribe by regulation as necessary or appropriate for the enforcement of this Act or for developing information regarding the causes and prevention of occupational accidents and illnesses. In order to carry out the provisions of this paragraph such regulations may include provisions requiring employers to conduct periodic inspections. The Secretary shall also issue regulations requiring that employers, through posting of notices or other appropriate means, keep their employees informed of their protections and obligations under this Act, including the provisions of applicable standards.

(2) The Secretary, in cooperation with the Secretary of Health, Education, and Welfare, shall prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job.

(3) The Secretary, in cooperation with the Secretary of Health, Education, and Welfare, shall issue regulations requiring employers to maintain accurate records of employee exposures to potentially toxic materials or harmful physical agents which are required to be monitored or measured under section 6 [29 USCS § 655]. Such regulations shall provide employees or their representatives with an opportunity to observe such monitoring or measuring,

ADD-6

and to have access to the records thereof. Such regulations shall also make appropriate provision for each employee or former employee to have access to such records as will indicate his own exposure to toxic materials or harmful physical agents. Each employer shall promptly notify any employee who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels which exceed those prescribed by an applicable occupational safety and health standard promulgated under section 6 [29 USCS § 655], and shall inform any employee who is being thus exposed of the corrective action being taken.

\* \* \*

## 29 U.S.C. § 673

Title 29 – Labor
Chapter 15 – Occupational Safety and Health

### § 673. Statistics

(a) Development and maintenance of program of collection, compilation, and analysis; employments subject to coverage; scope. In order to further the purposes of this Act, the Secretary, in consultation with the Secretary of Health, Education, and Welfare, shall develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics. Such program may cover all employments whether or not subject to any other provisions of this Act but shall not cover employments excluded by section 4 of the Act [29 USCS § 653]. The Secretary shall compile accurate statistics on work injuries and illnesses which shall include all disabling, serious, or significant injuries and illnesses, whether or not involving loss of time from work, other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job.

\* \* \*

(e) Reports by employers. On the basis of the records made and kept pursuant to section 8(c) of this Act [29 USCS § 657(c)], employers shall file such reports with the Secretary as he shall prescribe by regulation, as necessary to carry out his functions under this Act.

\* \* \*

## 29 C.F.R. § 1904.7

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart C – Recordkeeping Forms and Recording Criteria

### § 1904.7. General recording criteria.

(a) Basic requirement. You must consider an injury or illness to meet the general recording criteria, and therefore to be recordable, if it results in any of the following: death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, or loss of consciousness. You must also consider a case to meet the general recording criteria if it involves a significant injury or illness diagnosed by a physician or other licensed health care professional, even if it does not result in death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness.

(b) Implementation –

(1) How do I decide if a case meets one or more of the general recording criteria? A work-related injury or illness must be recorded if it results in one or more of the following:

(i) Death. See § 1904.7(b)(2).

(ii) Days away from work. See § 1904.7(b)(3).

(iii) Restricted work or transfer to another job. See § 1904.7(b)(4).

(iv) Medical treatment beyond first aid. See § 1904.7(b)(5).

(v) Loss of consciousness. See § 1904.7(b)(6).

(vi) A significant injury or illness diagnosed by a physician or other licensed health care professional. See § 1904.7(b)(7).

ADD-9

(2) How do I record a work-related injury or illness that results in the employee's death? You must record an injury or illness that results in death by entering a check mark on the OSHA 300 Log in the space for cases resulting in death. You must also report any work-related fatality to OSHA within eight (8) hours, as required by § 1904.39.

(3) How do I record a work-related injury or illness that results in days away from work? When an injury or illness involves one or more days away from work, you must record the injury or illness on the OSHA 300 Log with a check mark in the space for cases involving days away and an entry of the number of calendar days away from work in the number of days column. If the employee is out for an extended period of time, you must enter an estimate of the days that the employee will be away, and update the day count when the actual number of days is known.

(i) Do I count the day on which the injury occurred or the illness began? No, you begin counting days away on the day after the injury occurred or the illness began.

(ii) How do I record an injury or illness when a physician or other licensed health care professional recommends that the worker stay at home but the employee comes to work anyway? You must record these injuries and illnesses on the OSHA 300 Log using the check box for cases with days away from work and enter the number of calendar days away recommended by the physician or other licensed health care professional. If a physician or other licensed health care professional recommends days away, you should encourage your employee to follow that recommendation. However, the days away must be recorded whether the injured or ill employee follows the physician or licensed health care professional's recommendation or not. If you receive recommendations from two or more physicians or other licensed health care professionals, you may make a decision as to which recommendation is the most authoritative, and record the case based upon that recommendation.

(iii) How do I handle a case when a physician or other licensed health care professional recommends that the worker return to work but the employee stays at home anyway? In this situation, you must end the count of days away from work on the date the physician or other licensed health care professional recommends that the employee return to work.

ADD-10

(iv) How do I count weekends, holidays, or other days the employee would not have worked anyway? You must count the number of calendar days the employee was unable to work as a result of the injury or illness, regardless of whether or not the employee was scheduled to work on those day(s). Weekend days, holidays, vacation days or other days off are included in the total number of days recorded if the employee would not have been able to work on those days because of a work-related injury or illness.

(v) How do I record a case in which a worker is injured or becomes ill on a Friday and reports to work on a Monday, and was not scheduled to work on the weekend? You need to record this case only if you receive information from a physician or other licensed health care professional indicating that the employee should not have worked, or should have performed only restricted work, during the weekend. If so, you must record the injury or illness as a case with days away from work or restricted work, and enter the day counts, as appropriate.

(vi) How do I record a case in which a worker is injured or becomes ill on the day before scheduled time off such as a holiday, a planned vacation, or a temporary plant closing? You need to record a case of this type only if you receive information from a physician or other licensed health care professional indicating that the employee should not have worked, or should have performed only restricted work, during the scheduled time off. If so, you must record the injury or illness as a case with days away from work or restricted work, and enter the day counts, as appropriate.

(vii) Is there a limit to the number of days away from work I must count? Yes, you may "cap" the total days away at 180 calendar days. You are not required to keep track of the number of calendar days away from work if the injury or illness resulted in more than 180 calendar days away from work and/or days of job transfer or restriction. In such a case, entering 180 in the total days away column will be considered adequate.

(viii) May I stop counting days if an employee who is away from work because of an injury or illness retires or leaves my company? Yes, if the employee leaves your company for some reason unrelated to the injury or illness, such as retirement, a plant closing, or to take another job, you may stop counting days away from work or days of restriction/job transfer. If the

employee leaves your company because of the injury or illness, you must estimate the total number of days away or days of restriction/job transfer and enter the day count on the 300 Log.

(ix) If a case occurs in one year but results in days away during the next calendar year, do I record the case in both years? No, you only record the injury or illness once. You must enter the number of calendar days away for the injury or illness on the OSHA 300 Log for the year in which the injury or illness occurred. If the employee is still away from work because of the injury or illness when you prepare the annual summary, estimate the total number of calendar days you expect the employee to be away from work, use this number to calculate the total for the annual summary, and then update the initial log entry later when the day count is known or reaches the 180-day cap.

(4) How do I record a work-related injury or illness that results in restricted work or job transfer? When an injury or illness involves restricted work or job transfer but does not involve death or days away from work, you must record the injury or illness on the OSHA 300 Log by placing a check mark in the space for job transfer or restriction and an entry of the number of restricted or transferred days in the restricted workdays column.

(i) How do I decide if the injury or illness resulted in restricted work? Restricted work occurs when, as the result of a work-related injury or illness:

(A) You keep the employee from performing one or more of the routine functions of his or her job, or from working the full workday that he or she would otherwise have been scheduled to work; or

(B) A physician or other licensed health care professional recommends that the employee not perform one or more of the routine functions of his or her job, or not work the full workday that he or she would otherwise have been scheduled to work.

(ii) What is meant by "routine functions"? For recordkeeping purposes, an employee's routine functions are those work activities the employee regularly performs at least once per week.

(iii) Do I have to record restricted work or job transfer if it applies only to the day on which the injury occurred or the illness began? No, you do not have to record restricted work or job transfers if you, or the physician or other licensed

ADD-12

health care professional, impose the restriction or transfer only for the day on which the injury occurred or the illness began.

(iv) If you or a physician or other licensed health care professional recommends a work restriction, is the injury or illness automatically recordable as a "restricted work" case? No, a recommended work restriction is recordable only if it affects one or more of the employee's routine job functions. To determine whether this is the case, you must evaluate the restriction in light of the routine functions of the injured or ill employee's job. If the restriction from you or the physician or other licensed health care professional keeps the employee from performing one or more of his or her routine job functions, or from working the full workday the injured or ill employee would otherwise have worked, the employee's work has been restricted and you must record the case.

(v) How do I record a case where the worker works only for a partial work shift because of a work-related injury or illness? A partial day of work is recorded as a day of job transfer or restriction for recordkeeping purposes, except for the day on which the injury occurred or the illness began.

(vi) If the injured or ill worker produces fewer goods or services than he or she would have produced prior to the injury or illness but otherwise performs all of the routine functions of his or her work, is the case considered a restricted work case? No, the case is considered restricted work only if the worker does not perform all of the routine functions of his or her job or does not work the full shift that he or she would otherwise have worked.

(vii) How do I handle vague restrictions from a physician or other licensed health care professional, such as that the employee engage only in "light duty" or "take it easy for a week"? If you are not clear about the physician or other licensed health care professional's recommendation, you may ask that person whether the employee can do all of his or her routine job functions and work all of his or her normally assigned work shift. If the answer to both of these questions is "Yes," then the case does not involve a work restriction and does not have to be recorded as such. If the answer to one or both of these questions is "No," the case involves restricted work and must be recorded as a restricted work case. If you are unable to obtain this additional information from the physician or other licensed health care professional who recommended the restriction, record the injury or illness as a case involving restricted work.

ADD-13

(viii) What do I do if a physician or other licensed health care professional recommends a job restriction meeting OSHA's definition, but the employee does all of his or her routine job functions anyway? You must record the injury or illness on the OSHA 300 Log as a restricted work case. If a physician or other licensed health care professional recommends a job restriction, you should ensure that the employee complies with that restriction. If you receive recommendations from two or more physicians or other licensed health care professionals, you may make a decision as to which recommendation is the most authoritative, and record the case based upon that recommendation.

(ix) How do I decide if an injury or illness involved a transfer to another job? If you assign an injured or ill employee to a job other than his or her regular job for part of the day, the case involves transfer to another job. Note: This does not include the day on which the injury or illness occurred.

(x) Are transfers to another job recorded in the same way as restricted work cases? Yes, both job transfer and restricted work cases are recorded in the same box on the OSHA 300 Log. For example, if you assign, or a physician or other licensed health care professional recommends that you assign, an injured or ill worker to his or her routine job duties for part of the day and to another job for the rest of the day, the injury or illness involves a job transfer. You must record an injury or illness that involves a job transfer by placing a check in the box for job transfer.

(xi) How do I count days of job transfer or restriction? You count days of job transfer or restriction in the same way you count days away from work, using § 1904.7(b)(3)(i) to (viii), above. The only difference is that, if you permanently assign the injured or ill employee to a job that has been modified or permanently changed in a manner that eliminates the routine functions the employee was restricted from performing, you may stop the day count when the modification or change is made permanent. You must count at least one day of restricted work or job transfer for such cases.

(5) How do I record an injury or illness that involves medical treatment beyond first aid? If a work-related injury or illness results in medical treatment beyond first aid, you must record it on the OSHA 300 Log. If the injury or illness did not involve death, one or more days away from work, one or more days of restricted work, or one or more days of job transfer, you enter a check mark in the box for cases where the employee received medical treatment but remained at work and was not transferred or restricted.

(i) What is the definition of medical treatment? "Medical treatment" means the management and care of a patient to combat disease or disorder. For the purposes of Part 1904, medical treatment does not include:

(A) Visits to a physician or other licensed health care professional solely for observation or counseling;

(B) The conduct of diagnostic procedures, such as x-rays and blood tests, including the administration of prescription medications used solely for diagnostic purposes (e.g., eye drops to dilate pupils); or

(C) "First aid" as defined in paragraph (b)(5)(ii) of this section.

(ii) What is "first aid"? For the purposes of Part 1904, "first aid" means the following:

(A) Using a non-prescription medication at nonprescription strength (for medications available in both prescription and non-prescription form, a recommendation by a physician or other licensed health care professional to use a non-prescription medication at prescription strength is considered medical treatment for recordkeeping purposes);

(B) Administering tetanus immunizations (other immunizations, such as Hepatitis B vaccine or rabies vaccine, are considered medical treatment);

(C) Cleaning, flushing or soaking wounds on the surface of the skin;

(D) Using wound coverings such as bandages, Band-Aids<TM>, gauze pads, etc.; or using butterfly bandages or Steri-Strips<TM> (other wound closing devices such as sutures, staples, etc., are considered medical treatment);

(E) Using hot or cold therapy;

(F) Using any non-rigid means of support, such as elastic bandages, wraps, non-rigid back belts, etc. (devices with rigid stays or other systems designed to immobilize parts of the body are considered medical treatment for recordkeeping purposes);

(G) Using temporary immobilization devices while transporting an accident victim (e.g., splints, slings, neck collars, back boards, etc.).

(H) Drilling of a fingernail or toenail to relieve pressure, or draining fluid from a blister;

(I) Using eye patches;

(J) Removing foreign bodies from the eye using only irrigation or a cotton swab;

(K) Removing splinters or foreign material from areas other than the eye by irrigation, tweezers, cotton swabs or other simple means;

(L) Using finger guards;

(M) Using massages (physical therapy or chiropractic treatment are considered medical treatment for recordkeeping purposes); or

(N) Drinking fluids for relief of heat stress.

(iii) Are any other procedures included in first aid? No, this is a complete list of all treatments considered first aid for Part 1904 purposes.

(iv) Does the professional status of the person providing the treatment have any effect on what is considered first aid or medical treatment? No, OSHA considers the treatments listed in § 1904.7(b)(5)(ii) of this Part to be first aid regardless of the professional status of the person providing the treatment. Even when these treatments are provided by a physician or other licensed health care professional, they are considered first aid for the purposes of Part 1904. Similarly, OSHA considers treatment beyond first aid to be medical treatment even when it is provided by someone other than a physician or other licensed health care professional.

(v) What if a physician or other licensed health care professional recommends medical treatment but the employee does not follow the recommendation? If a physician or other licensed health care professional recommends medical treatment, you should encourage the injured or ill employee to follow that recommendation. However, you must record the case even if the injured or ill

ADD-16

employee does not follow the physician or other licensed health care professional's recommendation.

(6) Is every work-related injury or illness case involving a loss of consciousness recordable? Yes, you must record a work-related injury or illness if the worker becomes unconscious, regardless of the length of time the employee remains unconscious.

(7) What is a "significant" diagnosed injury or illness that is recordable under the general criteria even if it does not result in death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness? Work-related cases involving cancer, chronic irreversible disease, a fractured or cracked bone, or a punctured eardrum must always be recorded under the general criteria at the time of diagnosis by a physician or other licensed health care professional.

Note to § 1904.7: OSHA believes that most significant injuries and illnesses will result in one of the criteria listed in § 1904.7(a): death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness. However, there are some significant injuries, such as a punctured eardrum or a fractured toe or rib, for which neither medical treatment nor work restrictions may be recommended. In addition, there are some significant progressive diseases, such as byssinosis, silicosis, and some types of cancer, for which medical treatment or work restrictions may not be recommended at the time of diagnosis but are likely to be recommended as the disease progresses. OSHA believes that cancer, chronic irreversible diseases, fractured or cracked bones, and punctured eardrums are generally considered significant injuries and illnesses, and must be recorded at the initial diagnosis even if medical treatment or work restrictions are not recommended, or are postponed, in a particular case.

## 29 C.F.R. § 1904.29

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart C – Recordkeeping Forms and Recording Criteria

### § 1904.29. Forms.

(a) Basic requirement. You must use OSHA 300, 300-A, and 301 forms, or equivalent forms, for recordable injuries and illnesses. The OSHA 300 form is called the Log of Work-Related Injuries and Illnesses, the 300-A is the Summary of Work-Related Injuries and Illnesses, and the OSHA 301 form is called the Injury and Illness Incident Report.

(b) Implementation–

(1) What do I need to do to complete the OSHA 300 Log? You must enter information about your business at the top of the OSHA 300 Log, enter a one or two line description for each recordable injury or illness, and summarize this information on the OSHA 300-A at the end of the year.

(2) What do I need to do to complete the OSHA 301 Incident Report? You must complete an OSHA 301 Incident Report form, or an equivalent form, for each recordable injury or illness entered on the OSHA 300 Log.

(3) How quickly must each injury or illness be recorded? You must enter each recordable injury or illness on the OSHA 300 Log and 301 Incident Report within seven (7) calendar days of receiving information that a recordable injury or illness has occurred.

(4) What is an equivalent form? An equivalent form is one that has the same information, is as readable and understandable, and is completed using the same instructions as the OSHA form it replaces. Many employers use an insurance form instead of the OSHA 301 Incident Report, or supplement an insurance form by adding any additional information required by OSHA.

ADD-18

(5) May I keep my records on a computer? Yes, if the computer can produce equivalent forms when they are needed, as described under §§ 1904.35 and 1904.40, you may keep your records using the computer system.

(6) Are there situations where I do not put the employee's name on the forms for privacy reasons? Yes, if you have a "privacy concern case," you may not enter the employee's name on the OSHA 300 Log. Instead, enter "privacy case" in the space normally used for the employee's name. This will protect the privacy of the injured or ill employee when another employee, a former employee, or an authorized employee representative is provided access to the OSHA 300 Log under § 1904.35(b)(2). You must keep a separate, confidential list of the case numbers and employee names for your privacy concern cases so you can update the cases and provide the information to the government if asked to do so.

(7) How do I determine if an injury or illness is a privacy concern case? You must consider the following injuries or illnesses to be privacy concern cases:

> (i) An injury or illness to an intimate body part or the reproductive system;

> (ii) An injury or illness resulting from a sexual assault;

> (iii) Mental illnesses;

> (iv) HIV infection, hepatitis, or tuberculosis;

> (v) Needlestick injuries and cuts from sharp objects that are contaminated with another person's blood or other potentially infectious material (see § 1904.8 for definitions); and

> (vi) Other illnesses, if the employee voluntarily requests that his or her name not be entered on the log.

(8) May I classify any other types of injuries and illnesses as privacy concern cases? No, this is a complete list of all injuries and illnesses considered privacy concern cases for Part 1904 purposes.

(9) If I have removed the employee's name, but still believe that the employee may be identified from the information on the forms, is there anything else that I can do to further protect the employee's privacy? Yes, if you have a reasonable basis to believe that information describing the privacy concern case may be personally

identifiable even though the employee's name has been omitted, you may use discretion in describing the injury or illness on both the OSHA 300 and 301 forms. You must enter enough information to identify the cause of the incident and the general severity of the injury or illness, but you do not need to include details of an intimate or private nature. For example, a sexual assault case could be described as "injury from assault," or an injury to a reproductive organ could be described as "lower abdominal injury."

(10) What must I do to protect employee privacy if I wish to provide access to the OSHA Forms 300 and 301 to persons other than government representatives, employees, former employees or authorized representatives? If you decide to voluntarily disclose the Forms to persons other than government representatives, employees, former employees or authorized representatives (as required by §§ 1904.35 and 1904.40), you must remove or hide the employees' names and other personally identifying information, except for the following cases. You may disclose the Forms with personally identifying information only:

> (i) to an auditor or consultant hired by the employer to evaluate the safety and health program;

> (ii) to the extent necessary for processing a claim for workers' compensation or other insurance benefits; or

> (iii) to a public health authority or law enforcement agency for uses and disclosures for which consent, an authorization, or opportunity to agree or object is not required under Department of Health and Human Services Standards for Privacy of Individually Identifiable Health Information, 45 CFR 164.512.

# 29 C.F.R. § 1904.32

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart D – Other OSHA Injury and Illness Recordkeeping Requirements

## § 1904.32. Annual summary.

(a) Basic requirement. At the end of each calendar year, you must:

(1) Review the OSHA 300 Log to verify that the entries are complete and accurate, and correct any deficiencies identified;

(2) Create an annual summary of injuries and illnesses recorded on the OSHA 300 Log;

(3) Certify the summary; and

(4) Post the annual summary

(b) Implementation—

(1) How extensively do I have to review the OSHA 300 Log entries at the end of the year? You must review the entries as extensively as necessary to make sure that they are complete and correct.

(2) How do I complete the annual summary? You must:

(i) Total the columns on the OSHA 300 Log (if you had no recordable cases, enter zeros for each column total); and

(ii) Enter the calendar year covered, the company's name, establishment name, establishment address, annual average number of employees covered by the OSHA 300 Log, and the total hours worked by all employees covered by the OSHA 300 Log.

ADD-21

(iii) If you are using an equivalent form other than the OSHA 300-A summary form, as permitted under § 1904.29(b)(4), the summary you use must also include the employee access and employer penalty statements found on the OSHA 300-A Summary form.

(3) How do I certify the annual summary? A company executive must certify that he or she has examined the OSHA 300 Log and that he or she reasonably believes, based on his or her knowledge of the process by which the information was recorded, that the annual summary is correct and complete.

(4) Who is considered a company executive? The company executive who certifies the log must be one of the following persons:

(i) An owner of the company (only if the company is a sole proprietorship or partnership);

(ii) An officer of the corporation;

(iii) The highest ranking company official working at the establishment; or

(iv) The immediate supervisor of the highest ranking company official working at the establishment.

(5) How do I post the annual summary? You must post a copy of the annual summary in each establishment in a conspicuous place or places where notices to employees are customarily posted. You must ensure that the posted annual summary is not altered, defaced or covered by other material.

(6) When do I have to post the annual summary? You must post the summary no later than February 1 of the year following the year covered by the records and keep the posting in place until April 30.

ADD-22

## 29 C.F.R. § 1904.41

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart E – Reporting Fatality, Injury and Illness Information to the Government

[The Rollback Rule listed in the right-hand column is currently in effect]

| 2016 Rule (81 Fed. Reg. 29,624) | Rollback Rule (84 Fed. Reg. 380)[1] |
| --- | --- |
| **§ 1904.41. Electronic submission of injury and illness records to OSHA.** | **§ 1904.41. Electronic submission of Employer Identification Number (EIN) and injury and illness records to OSHA.** |
| (a) Basic requirements— | (a) Basic requirements — |
| (1) Annual electronic submission of part 1904 records by establishments with 250 or more employees. If your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must electronically submit information from the three recordkeeping forms that you keep under this part (OSHA Form 300A Summary of Work-Related Injuries and Illnesses, OSHA Form 300 Log of Work-Related Injuries and Illnesses, and OSHA Form 301 Injury and Illness Incident Report) to OSHA or OSHA's designee. You must submit the information once a year, no later than | (1) Annual electronic submission of OSHA Form 300A Summary of Work-Related Injuries and Illnesses by establishments with 250 or more employees. If your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must electronically submit information from OSHA Form 300A Summary of Work-Related Injuries and Illnesses to OSHA or OSHA's designee. You must submit the information once a year, no later than the date listed in paragraph (c) of this section of the year after the calendar year covered by the form (for example, 2019 for the 2018 form). |

[1] The Rollback Rule revised Section 1904.41's heading, paragraph (a)(1), and paragraph (b). It also added paragraph (a)(4) to Section 1904.41.

ADD-23

| | |
|---|---|
| the date listed in paragraph (c) of this section of the year after the calendar year covered by the forms. | |
| (2) Annual electronic submission of OSHA Form 300A Summary of Work-Related Injuries and Illnesses by establishments with 20 or more employees but fewer than 250 employees in designated industries. If your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to subpart E of this part, then you must electronically submit information from OSHA Form 300A Summary of Work-Related Injuries and Illnesses to OSHA or OSHA's designee. You must submit the information once a year, no later than the date listed in paragraph (c) of this section of the year after the calendar year covered by the form. | (2) Annual electronic submission of OSHA Form 300A Summary of Work-Related Injuries and Illnesses by establishments with 20 or more employees but fewer than 250 employees in designated industries. If your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to subpart E of this part, then you must electronically submit information from OSHA Form 300A Summary of Work-Related Injuries and Illnesses to OSHA or OSHA's designee. You must submit the information once a year, no later than the date listed in paragraph (c) of this section of the year after the calendar year covered by the form. |
| (3) Electronic submission of part 1904 records upon notification. Upon notification, you must electronically submit the requested information from your part 1904 records to OSHA or OSHA's designee. | (3) Electronic submission of part 1904 records upon notification. Upon notification, you must electronically submit the requested information from your part 1904 records to OSHA or OSHA's designee. |
| | (4) Electronic submission of the Employer Identification Number (EIN). For each establishment that is subject to these reporting requirements, you must provide the EIN used by the establishment. |
| (b) Implementation— | (b) Implementation— |

ADD-24

(1) Does every employer have to routinely submit information from the injury and illness records to OSHA? No, only two categories of employers must routinely submit information from their injury and illness records. First, if your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must submit the required Form 300A, 300, and 301 information to OSHA once a year. Second, if your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to subpart E of this part, then you must submit the required Form 300A information to OSHA once a year. Employers in these two categories must submit the required information by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form or forms (for example, 2017 for the 2016 forms). If you are not in either of these two categories, then you must submit information from the injury and illness records to OSHA only if OSHA notifies you to do so for an individual data collection.

(2) If I have to submit information under paragraph (a)(1) of this section, do I have to submit all of the information from the recordkeeping form? No, you are required to submit all of the

(1) Does every employer have to routinely submit this information to OSHA? No, only two categories of employers must routinely submit this information. First, if your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must submit the required information to OSHA once a year. Second, if your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to this subpart, then you must submit the required information to OSHA once a year. Employers in these two categories must submit the required information by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form (for example, 2019 for the 2018 form). If you are not in either of these two categories, then you must submit the information to OSHA only if OSHA notifies you to do so for an individual data collection.

| | |
|---|---|
| information from the form except the following:<br>(i) Log of Work-Related Injuries and Illnesses (OSHA Form 300): Employee name (column B).<br>(ii) Injury and Illness Incident Report (OSHA Form 301): Employee name (field 1), employee address (field 2), name of physician or other health care professional (field 6), facility name and address if treatment was given away from the worksite (field 7). | |
| (3) Do part-time, seasonal, or temporary workers count as employees in the criteria for number of employees in paragraph (a) of this section? Yes, each individual employed in the establishment at any time during the calendar year counts as one employee, including full-time, part-time, seasonal, and temporary workers. | (2) Do part-time, seasonal, or temporary workers count as employees in the criteria for number of employees in paragraph (a) of this section? Yes, each individual employed in the establishment at any time during the calendar year counts as one employee, including full-time, part-time, seasonal, and temporary workers. |
| (4) How will OSHA notify me that I must submit information from the injury and illness records as part of an individual data collection under paragraph (a)(3) of this section? OSHA will notify you by mail if you will have to submit information as part of an individual data collection under paragraph (a)(3). OSHA will also announce individual data collections through publication in the Federal Register and the OSHA newsletter, and announcements on the OSHA Web site. If you are an employer who must routinely submit the information, then OSHA will not notify you about your routine submittal. | (3) How will OSHA notify me that I must submit information as part of an individual data collection under paragraph (a)(3) of this section? OSHA will notify you by mail if you will have to submit information as part of an individual data collection under paragraph (a)(3). OSHA will also announce individual data collections through publication in the Federal Register and the OSHA newsletter, and announcements on the OSHA website. If you are an employer who must routinely submit the information, then OSHA will not notify you about your routine submittal. |

| | |
|---|---|
| (5) How often do I have to submit the information from the injury and illness records? If you are required to submit information under paragraph (a)(1) or (2) of this section, then you must submit the information once a year, by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form or forms. If you are submitting information because OSHA notified you to submit information as part of an individual data collection under paragraph (a)(3) of this section, then you must submit the information as often as specified in the notification. | (4) When do I have to submit the information? If you are required to submit information under paragraph (a)(1) or (2) of this section, then you must submit the information once a year, by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form (for example, 2019 for the 2018 form). If you are submitting information because OSHA notified you to submit information as part of an individual data collection under paragraph (a)(3) of this section, then you must submit the information as specified in the notification. |
| (6) How do I submit the information? You must submit the information electronically. OSHA will provide a secure Web site for the electronic submission of information. For individual data collections under paragraph (a)(3) of this section, OSHA will include the Web site's location in the notification for the data collection. | (5) How do I submit the information? You must submit the information electronically. OSHA will provide a secure website for the electronic submission of information. For individual data collections under paragraph (a)(3) of this section, OSHA will include the website's location in the notification for the data collection. |
| (7) Do I have to submit information if my establishment is partially exempt from keeping OSHA injury and illness records? If you are partially exempt from keeping injury and illness records under §§ 1904.1 and/or 1904.2, then you do not have to routinely submit part 1904 information under paragraphs (a)(1) and (2) of this section. You will have to submit information under paragraph (a)(3) of this section if OSHA informs you in writing that it will collect | (6) Do I have to submit information if my establishment is partially exempt from keeping OSHA injury and illness records? If you are partially exempt from keeping injury and illness records under §§ 1904.1 and/or 1904.2, then you do not have to routinely submit information under paragraphs (a)(1) and (2) of this section. You will have to submit information under paragraph (a)(3) of this section if OSHA informs you in writing that it will collect injury |

ADD-27

| | |
|---|---|
| injury and illness information from you. If you receive such a notification, then you must keep the injury and illness records required by this part and submit information as directed. | and illness information from you. If you receive such a notification, then you must keep the injury and illness records required by this part and submit information as directed. |
| (8) Do I have to submit information if I am located in a State Plan State? Yes, the requirements apply to employers located in State Plan States. | (7) Do I have to submit information if I am located in a State Plan State? Yes, the requirements apply to employers located in State Plan States. |
| (9) May an enterprise or corporate office electronically submit part 1904 records for its establishment(s)? Yes, if your enterprise or corporate office had ownership of or control over one or more establishments required to submit information under paragraph (a)(1) or (2) of this section, then the enterprise or corporate office may collect and electronically submit the information for the establishment(s). | (8) May an enterprise or corporate office electronically submit information for its establishment(s)? Yes, if your enterprise or corporate office had ownership of or control over one or more establishments required to submit information under paragraph (a) of this section, then the enterprise or corporate office may collect and electronically submit the information for the establishment(s). |
| * * * | * * * |