## ORAL ARGUMENT NOT SCHEDULED
## Case No. 21-5016
## (consolidated with No. 21-5018)

_____

In The United States Court of Appeals
for the District of Columbia Circuit

_____

STATE OF NEW JERSEY, et al.,

*Appellants*, and


PUBLIC CITIZEN HEALTH RESEARCH GROUP, et al.,

*Appellants*,

v.

JULIE A. SU, in her official capacity as Acting Secretary of the
United States Department of Labor, et al.,

*Appellees*.

_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

## OPENING BRIEF OF STATE APPELLANTS

_____

|  |  |
|---|---|
| | MATTHEW J. PLATKIN |
| | *Attorney General of New Jersey* |
| | JEREMY M. FEIGENBAUM |
| | *Solicitor General* |
| | MAYUR P. SAXENA |
| | *Assistant Attorney General* |
| *(Counsel for Additional Appellants Listed Below on Signature Page)* | TIM SHEEHAN |
| | ANDREW H. YANG |
| | AMANDA I. MOREJÓN |
| | ASHLEIGH B. SHELTON |
| | *Deputy Attorneys General* |
| | 124 Halsey Street, 5th Floor |
| | Newark, New Jersey 07101 |
| | (973) 877-1280 |
| | Mayur.Saxena@law.njoag.gov |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

A.     *Parties and Amici*

Plaintiffs below in Civil Action No. 19-621 and Appellants here are: The State of New Jersey, the State of Illinois, the State of Maryland, the Commonwealth of Massachusetts, the State of Minnesota, and the State of New York.

Plaintiffs below in Civil Action No. 19-166 and Appellants here are: Public Citizen Health Research Group, American Public Health Association, and Council of State and Territorial Epidemiologists.

Defendants in both district court actions were: R. Alexander Acosta, in his official capacity as U.S. Secretary of Labor; Patrick Pizzella, in his official capacity as Acting U.S. Secretary of Labor; Eugene Scalia, in his official capacity as U.S. Secretary of Labor;[1] the U.S. Department of Labor; and the Occupational Safety and Health Administration. Loren Sweatt, in her official capacity as Acting Assistant Secretary of Labor for Occupational Safety and Health, was an additional defendant in Civil Action No. 19-621.

---

[1] Each Secretary or Acting Secretary was substituted for his predecessor under Fed. R. Civ. P. 25(d).

i

The Appellees in this Court are Julie A. Su, in her official capacity as Acting Secretary of Labor;[2] Douglas L. Parker, in his official capacity as Assistant Secretary of Labor for Occupational Safety and Health; the U.S. Department of Labor; and the Occupational Safety and Health Administration.

No amici curiae or intervenors have appeared in the district court.

B.     *Ruling Under Review*

The rulings under review are the order and memorandum opinion entered by the U.S. District Court for the District of Columbia on January 11, 2021, granting defendants' motion for summary judgment in No. 19-621 and defendants' motion to dismiss in No. 19-166, and denying plaintiffs' motions for summary judgment in both cases. The memorandum opinion is available on Westlaw. *See Public Citizen Health Research Group v. Pizzella*, 513 F. Supp. 3d 10 (D.D.C. 2021). The order and opinion under review are included in the joint appendix.

C.     *Related Cases*

This consolidated appeal arises from the district court's entry of the same order and opinion in two separate cases: *State of New Jersey v. Pizzella*, No. 19-621, and *Public Citizen Health Research Group v. Pizzella*, No. 19-166. These cases have

---

[2] Under Fed. R. App. P. 43(c)(2), Acting Secretary Julie A. Su and Assistant Secretary of Labor Douglas L. Parker are automatically substituted as appellees in this action.

not previously come before this court. The undersigned are not aware of any other

related cases currently pending in any court.

/s/ Mayur P. Saxena
Mayur P. Saxena
Assistant Attorney General
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
 (973) 877-1280
Mayur.Saxena@law.njoag.gov
*Counsel for State Appellants*

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES .............i

    A.  PARTIES AND AMICI ....................................................................i

    B.  RULING UNDER REVIEW ...........................................................ii

    C.  RELATED CASES ..........................................................................ii

TABLE OF AUTHORITIES ...........................................................................vi

GLOSSARY ................................................................................................... ix

PRELIMINARY STATEMENT ........................................................................1

JURISDICTIONAL STATEMENT ...................................................................5

STATUTES AND REGULATIONS ..................................................................5

STATEMENT OF ISSUES ...............................................................................5

STATEMENT OF THE CASE ..........................................................................5

    I.       The Occupational Safety and Health Act........................................5

    II.     OSHA's 2016 Rule .......................................................................7

    III.   OSHA Delays The 2016 Rule's Electronic Reporting
         Requirements ............................................................................... 10

    IV.   OSHA's Rollback Rule................................................................. 11

    V.    Procedural History....................................................................... 15

STANDARD OF REVIEW.............................................................................. 18

SUMMARY OF THE ARGUMENT................................................................ 18

iv

ARGUMENT

  I. THE ROLLBACK RULE'S REASONING IS ARBITRARY BECAUSE IT IS INTERNALLY INCONSISTENT ..................... 20

  II. THE ROLLBACK RULE IS NOT A LOGICAL OUTGROWTH OF OSHA'S PROPOSAL ......................................................... 30

CONCLUSION ......................................................................................... 38

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .............. 42

CERTIFICATE OF SERVICE .................................................................... 43

ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

<u>**Pages**</u>

<u>Cases</u>

*Air Transp. Ass'n of Am. v. Dep't of Transp.,*
 119 F.3d 38 (D.C. Cir. 1997) ..................................................... 21

*Allina Health Servs. v. Sebelius,*
 746 F.3d 1102 (D.C. Cir. 2014).............................................. 31, 34

*AM. Radio Relay League, Inc. v. FCC,*
 524 F.3d 227 (D.C. Cir. 2008) .................................................... 34

*Castlewood Prods., LLC v. Norton,*
 365 F.3d 1076 (D.C. Cir. 2004)................................................... 18

*Chamber of Commerce v. SEC,*
 443 F.3d 890 (D.C. Cir. 2006) .............................................. 33, 38

*CSX Transp., Inc. v. Surface Transp. Bd.,*
 584 F.3d 1076 (D.C. Cir. 2009)....................................... 31, 32, 36

*Eagle Pharms., Inc. v. Azar,*
 952 F.3d 323 (D.C. Cir. 2020) .................................................... 18

*Encino Motorcars, LLC v. Navarro,*
 579 U.S. 211 (2016) .................................................................... 21

*Env't Integrity Project v. E.P.A.,*
 425 F.3d 992 (D.C. Cir. 2005) .................................................... 37

*Idaho Farm Bureau Fed'n v. Babbitt,*
 58 F.3d 1392 (9th Cir. 1995)....................................................... 33

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
 407 F.3d 1250  (D.C. Cir. 2005)................................................... 37

*Michigan v. EPA,*
 576 U.S. 743 (2015) .................................................................... 28

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................ 29

*Natural Res. Def. Council v. U.S. Nuclear Regulatory Comm'n*,
   879 F.3d 1202 (D.C. Cir. 2018)................................................ 19, 21

*Ne. Md. Waste Disposal Auth. v. EPA*,
   358 F.3d 936 (D.C. Cir. 2004) ................................................ 31

*Ober v. EPA*,
   84 F.3d 304 (9th Cir. 1996) .................................................. 33

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier*
   *Safety Admin.*,
   494 F.3d 188, 201 (D.C. Cir. 2007) .......................................... 33

*Public Citizen Health Research Group v. Pizzella*,
   613 F.3d 10 (D.D.C. 2021)................................................... ii

*Small Refiner Lead Phase-Down Task Force v. EPA*,
   705 F.2d 506 (D.C. Cir. 1983) ............................................... 36

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943)........................................................... 28

*Solite Corp. v. EPA*,
   952 F.2d 473 (D.C. Cir. 1991) ............................................... 34

Rules

Federal Rule of Civil Procedure 25(d) .............................................. i

Federal Rule of Appellate Procedure 32(a)(5).................................... 42

Federal Rule of Appellate Procedure 32(a)(6).................................... 42

Federal Rule of Appellate Procedure 32(a)(7)(B)(i)............................. 42

Federal Rule of Appellate Procedure 32(f) ....................................... 42

Federal Rule of Appellate Procedure 43(c)(2)..................................... ii

Statutes and Regulations

29 C.F.R. § 1904.7..................................................................7

29 C.F.R. § 1904.29 ...............................................................7

29 C.F.R. § 1904.32 ...............................................................7

5 U.S.C. § 553(b)..................................................................31

5 U.S.C. § 553(c)..................................................................31

5 U.S.C. § 706(2)(A)..............................................................18

5 U.S.C. § 706(2)(D)..............................................................18

28 U.S.C. § 1291 ....................................................................5

28 U.S.C. § 1331 ....................................................................5

29 U.S.C. § 651(b)............................................................... 5, 6

29 U.S.C. § 673(a) ..................................................................6

29 U.S.C. § 673(e) ..................................................................6

29 U.S.C. § 657(c)(2)..............................................................6

Improve Tracking of Workplace Injuries and Illnesses,
   81 Fed. Reg. 29,624 (May 12, 2016)................................... 1, 7, 8, 9, 10, 23, 35

Improve Tracking of Workplace Injuries and Illnesses: Proposed
   Delay of Compliance Date,
   82 Fed. Reg. 29,261 (August 1, 2017)........................................................... 10

Improve Tracking of Workplace Injuries & Illnesses: Proposed
   Delay of Compliance Date,
   82 Fed. Reg. 55,761 (November 24, 2017) ................................................... 11

Tracking of Workplace Injuries and Illnesses,
   83 Fed. Reg. 36,494 (July 30, 2018).............................. 1, 11, 12, 14, 31, 32, 36

Tracking of Workplace Injuries and Illnesses,
   84 Fed. Reg. 380 (Jan 25, 2019). 1, 2, 13, 14, 15, 22, 23, 24, 26, 27, 28, 30, 32, 35

Improve Tracking of Workplace Injuries and Illnesses,
  87 Fed. Reg. 18,528 (Mar. 30, 2022) ........................................................... 18

<u>Other Authorities</u>

OSHA, *Injury & Illness Recordkeeping Forms - 300, 300A, 301*,
  https://www.osha.gov/recordkeeping/RKforms.html
  (last visited May 15, 2023).............................................................................7

# **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| JA | Joint Appendix |
| NPRM | Notice of Proposed Rulemaking |
| OSH Act | Occupational Safety and Health Act |
| OSHA | Occupational Safety and Health Administration |
| PII | Personally Identifiable Information |
| Public Health Appellants | Public Citizen Health Research Group, American Public Health Association, and Council of State and Territorial Epidemiologists. |
| Rollback Rule (or 2019 Rule) | "Tracking of Workplace Injuries and Illnesses," 84 Fed. Reg. 380 (Jan. 25, 2019) |
| State Appellants (or "States") | New Jersey, Illinois, Maryland, Massachusetts, Minnesota, and New York. |
| 2016 Rule | "Improve Tracking of Workplace Injuries and Illnesses," 81 Fed. Reg. 29,624 (May 12, 2016) |

## PRELIMINARY STATEMENT

In 2016, the Occupational Safety and Health Administration ("OSHA") issued a final rule requiring all large employers to submit information annually from three workplace injury and illness tracking forms that employers were already required to maintain. *See* Improve Tracking of Workplace Injuries and Illnesses, 81 Fed. Reg. 29,624 (May 12, 2016) ("2016 Rule"). OSHA recognized that the collection of this information would help both the agency and the States better target their workplace safety enforcement programs to the worst offenders; encourage employers to abate workplace hazards in the first place; empower workers to identify risks and demand improvements; and provide more accurate information to researchers who specialize in occupational safety and health. When it promulgated the 2016 Rule, OSHA stated that it would make the data publicly available on its website for these purposes, while ensuring workers' personally identifiable information ("PII") was not released.

Two years later, OSHA sharply reversed course—announcing that OSHA would not collect the information regarding workplace injury and illness incidents after all. Tracking of Workplace Injuries & Illnesses, 83 Fed. Reg. 36,494 (July 30, 2018) (proposed rule); 84 Fed. Reg. 380 (Jan 25, 2019) ("Rollback Rule"). OSHA offered one reason for this about-face: that the costs associated with removing PII from the workplace data would outweigh the benefits of its collection—including the benefits associated with more effectively targeting federal and state workplace

1

safety enforcement programs. But the agency violated the Administrative Procedure Act in reaching that conclusion, as OSHA's assessment of the costs and benefits of collecting this safety information was internally inconsistent.

The inconsistency stems from OSHA's use of different premises to calculate the costs and benefits associated with collecting workplace injury and illness forms. In calculating costs, OSHA made a critical assumption—that the 775,000 datasets collected annually would be subject to court-ordered disclosure and thus released publicly. Because the risk of public disclosure was sufficiently high, OSHA found that it would need to manually scrub PII from *all* workplace injury and illness forms that the agency collected. And OSHA reasoned that to do so, it would need to devote inordinate resources—at a cost of $7.5 million per year—to review each submission in order to safeguard workers' PII. But when it came to the benefits, OSHA made precisely the opposite assumption: that the various benefits of collecting these forms, including to States and to workers, "would not materialize" at all "[b]ecause OSHA has determined publishing the data would do more harm than good." 84 Fed. Reg. at 391. In other words, because OSHA decided *not* to publish these forms, it refused to consider benefits flowing from their public disclosure—including the benefits that would come from precisely the same court-ordered disclosure that OSHA had assumed would exist for purposes of assessing costs.

2

The inconsistency is apparent on its face: OSHA assumed that the data would *not* be made public in assessing benefits, but OSHA assumed that the same data would *always* be subject to disclosure when calculating the costs. An agency is, of course, entitled to deference when it comes to cost-benefit analyses, but such an internally inconsistent analysis is textbook arbitrariness. Indeed, such an explanation is by definition both illogical and unreasoned, and it raises serious concerns that the justifications given reflect an effort to achieve a pre-determined result. That concern is magnified for a cost-benefit analysis, because if the agency's premises for each side are inconsistent, a court should not have confidence in the final balance. That is what happened here—and while the district court upheld OSHA's reasoning, the district court provided inadequate justification for this inconsistency. Because the inconsistency skewed OSHA's comparison of benefits and costs, the rule must be vacated.

Beyond its own inconsistency, the agency violated the APA in a second way: the final Rollback Rule is not a logical outgrowth of the Notice of Proposed Rulemaking ("NPRM"). In the NPRM, OSHA raised concerns regarding disclosure of workers' PII and explained the need to use automated software to remove such PII, to the tune of $53,000 to $64,000 in costs. But in the final Rollback Rule, for the first time, OSHA announced that its only choices were to stop collecting workplace injury and illness information from these forms altogether, or to use a

two-tiered manual review process for scrubbing PII—meaning, two individual reviewers for each form—that would cost OSHA *$7,499,387* every year, a hundred-fold increase from the NPRM. Although the costs associated with manual review were key to OSHA's final justifications for not collecting workplace injury and illness data, the agency had never indicated that it was considering manual review at all—both the NPRM and the 2016 Rule discussed automated review alone. That deprived commenters of a chance to explain why two-tiered manual review was unnecessary. The district court attempted to justify OSHA's approach by positing that the NPRM generally solicited feedback on alternatives to protect privacy, but if a request for feedback on alternatives writ large were enough, the logical-outgrowth rule would be dead letter. The APA is deferential, not toothless.

OSHA's errors have a significant impact. By declining to collect information about workplace injuries and illnesses, the Rollback Rule makes it more difficult for the agency and States to target workplace safety enforcement against the worst offenders, eliminates an incentive for employers to make their workplaces safer, and removes a useful tool for workers to protect their rights. Because OSHA relied on inconsistent reasoning and deprived the public of fair notice, this Court should

reverse the grant of summary judgment to OSHA, order the grant of summary judgment to Appellants,[1] and vacate the Rollback Rule.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331. The State Appellants timely filed a Notice of Appeal on January 22, 2021. Joint Appendix (JA) 2163. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

The relevant statutes and regulations are reproduced in the Addendum to this brief.

## STATEMENT OF ISSUES

I.    Whether the Rollback Rule is arbitrary and capricious because OSHA's analysis of the costs and benefits was internally inconsistent.

II.    Whether the Rollback Rule was a logical outgrowth of the NPRM.

## STATEMENT OF THE CASE

**I.    The Occupational Safety and Health Act.**

OSHA's authorizing statute, the Occupational Safety and Health Act of 1970, was enacted to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Congress

---

[1] The States incorporate by reference the Public Health Appellants' merits challenges to the Rollback Rule, laid out in Part II of their separate brief.

intended that the OSH Act would accomplish this goal by, *inter alia*, "encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment," "providing for research in the field of occupational safety and health," "developing innovative methods, techniques, and approaches for dealing with occupation safety and health problems," "exploring ways to discover latent diseases, establishing causal connections between diseases and work in environmental conditions, and conducting other research relating to health problems," and "providing for appropriate reporting procedures with respect to occupational safety and health." *Id.*

The Act accordingly directs the Secretary of Labor to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries." 29 U.S.C. § 657(c)(2). The Act further requires that the Secretary "develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics" and "shall compile accurate statistics on work injuries and illnesses, which shall include all disabling, serious, or significant injuries and illnesses ... other than minor injuries." *Id.* § 673(a). Similarly, the Act directs that employers "shall file such reports with the Secretary as he shall prescribe by regulation, as necessary to carry out his functions under [the] Act." *Id.* § 673(e).

6

## II.    OSHA's 2016 Rule.

OSHA regulations have required employers to record work-related injuries and illnesses since 1971. *See* 81 Fed. Reg. at 29,625; 29 C.F.R. § 1904.7. Under these longstanding regulations, most employers with more than ten employees must maintain a log of all work-related injuries and illnesses using OSHA Form 300, and these same employers must record incident reports with additional details about each case on Form 301. *See* 81 Fed. Reg. at 29,624; 29 C.F.R. § 1904.29. Employers must also prepare an annual summary of all workplace injuries and illnesses using Form 300A. 29 C.F.R. § 1904.32; *see also* OSHA, *Injury & Illness Recordkeeping Forms - 300, 300A, 301*, https://www.osha.gov/recordkeeping/RKforms.html (last visited May 15, 2023). But while employers are obligated to maintain these records, *see* 81 Fed. Reg. at 29,625, OSHA historically only accessed these records during the agency's on-site facility inspections, *see* 81 Fed. Reg. at 29,627-29.[2] As a result, even as employers were amassing a wealth of information about workplace illnesses and injuries, the agency itself—as well as States, public health researchers, and the

---

[2] From 1997 to 2012, OSHA also collected Form 300A data from approximately 1% of establishments nationwide pursuant to the OSHA Data Initiative, but this program has been discontinued. *See* 81 Fed. Reg. at 29,627-29.

general public—"ha[d] very limited information about the injury/illness risk facing workers in specific establishments." 81 Fed. Reg. at 29,629.

To address that limitation, OSHA completed a thorough rulemaking in 2016 to require employers with 250 or more employees to annually submit information from Forms 300, 301, and 300A to OSHA electronically. *See* Improve Tracking of Workplace Injuries and Illnesses, 81 Fed. Reg. 29,624 (May 12, 2016) ("2016 Rule"). As OSHA explained, the 2016 Rule was designed to allow both the agency and public to "obtain a much larger data set of more timely, establishment-specific information about injuries and illnesses in the workplace." 81 Fed. Reg. at 29,629. OSHA predicted that this data would enhance its understanding of "the injury/illness risks facing workers in specific establishments" and "increase[] [OSHA's] ability to target those workplaces where workers are at greatest risk." *Id*. In other words, such data collection would allow OSHA to better prioritize enforcement resources.

When it issued the 2016 Rule, OSHA planned to make this injury and illness data publicly available via an online database after ensuring the removal of PII (*e.g.*, names and social security numbers). 81 Fed. Reg. at 29,625, 29,632. OSHA found that a range of benefits would flow from this public access, including encouraging employers "to abate hazards and thereby prevent workplace injuries and illnesses, without OSHA having to conduct onsite inspection," 81 Fed. Reg. at 29,629; allowing workers to "better identify hazards within their own workplace and take

8

actions to have the hazards abated," 81 Fed. Reg. at 29,630; enabling researchers to "identify patterns of injuries and illnesses that are masked by the aggregation of injury/illness data" and "conduct rigorous studies that will increase our understanding of injury causation, prevention, and consequences," 81 Fed. Reg. at 29,631; assisting state "institutions charged with injury and illness surveillance" in better understanding emerging occupational hazards and in targeting their programs, *id.*; and allowing contracting entities and other commercial actors to consider a company's safety record in deciding which companies to work with, *id.*

As part of the 2016 rulemaking, OSHA carefully considered comments on the privacy implications of collecting and publishing information from Forms 300 and 301. In response to comments, OSHA decided not to collect data from certain fields (employee names from Form 300, and names and addresses of employees, treating physicians, and medical facilities from Form 301), which it determined would create a risk of release of sensitive information without helping users identify workplace hazards. 81 Fed. Reg. at 29,660-61. OSHA also addressed commenters' concern that employees of small employers might be identified based on other information (*e.g.*, job title or date of injury) by concluding that only establishments with 250 or more employees would be required to report detailed information. 81 Fed. Reg. at 29,662 (reasoning that "it is less likely that employees in such large establishments will be identified based on the posted recordkeeping data").

Importantly, in response to some concerns that employers could accidentally include PII in descriptions of accidents and illnesses, OSHA determined that it could reduce the likelihood of such errors by instructing employers not to include such identifying information, and further mitigate the risk of any inadvertent disclosure by segregating data it receives in encrypted format behind a firewall until the data is reviewed using "software that will search for, and de-identify, personally identifiable information." 81 Fed. Reg. at 29,662-63. OSHA made other adjustments to the 2016 Rule in response to industry comments, including requiring annual instead of quarterly reporting to reduce the burden on employers. 81 Fed. Reg. at 29,634. Overall, the agency assured all commenters that it "has effective safeguards in place to prevent the disclosure of personal or confidential information contained in the recordkeeping forms and submitted to OSHA." 81 Fed. Reg. at 29,661.

## III.  OSHA Delays The 2016 Rule's Electronic Reporting Requirements.

Under the 2016 Rule, employers were supposed to submit the summary data from Form 300A to OSHA by July 1, 2017, and the more detailed information from Forms 300 and 301 by July 1, 2018. 81 Fed. Reg. at 29,640. However, on June 28, 2017, days before the first electronic submission deadline, OSHA proposed delaying submission of Form 300A entirely. *See* Improve Tracking of Workplace Injuries and Illnesses: Proposed Delay of Compliance Date, 82 Fed. Reg. 29,261 (proposed rule). On November 24, 2017, OSHA published a final rule delaying the deadline for filing

Form 300A to December 15, 2017. *See* Improve Tracking of Workplace Injuries & Illnesses: Proposed Delay of Compliance Date, 82 Fed. Reg. 55,761 (final rule). This rule did not alter any other deadlines established by the 2016 Rule.

Then, in May 2018, OSHA announced on its website, without posting a notice in the Federal Register, that it was suspending the requirement to submit Forms 300 and 301 and would not accept these submissions, and that it would issue an NPRM to revise or reconsider the 2016 Rule. JA2139 (Op. 4).

## IV.   OSHA's Rollback Rule.

On July 30, 2018, OSHA issued an NPRM which proposed to rescind the 2016 Rule's requirement to submit information from Forms 300 and 301, but maintain the requirement that employers submit the summary information from Form 300A. *See* Tracking of Workplace Injuries & Illnesses, 83 Fed. Reg. 36,494. OSHA stated that the proposal was based on what it deemed the limited usefulness of the more detailed workplace injury and illness information, as well as OSHA's concern that forced or inadvertent disclosure of sensitive PII from Forms 300 and 301 could compromise worker privacy. *See id*. OSHA discussed how automated de-identification software could be used to remove PII from the forms, but nevertheless asserted that the costs would outweigh the benefits. *See* 83 Fed. Reg. at 36,498. Noting that its proposal would now go through a public comment period, OSHA generally solicited comments on a series of questions, including asking how the agency could make

11

"risks to worker privacy … less likely, and what resources would be required"; and asking broadly how "other agencies and organizations in the public and private sectors use automated de-identification systems to remove PII from text data before making the data available to the public" and asking about "challenges … they faced in using those systems to keep PII protected." *Id.* at 36,500.

OSHA received 1,880 comments on the proposed rule, including a comment filed on September 28, 2018, by Attorneys General of seven states (including most of the State Appellants). Of the 1,880 comments, only approximately 45 supported OSHA's proposal to rescind submission of data from Forms 300 and 301. Moreover, despite OSHA's asserted concerns about worker privacy, all the workers' advocacy organizations who submitted comments supported the 2016 Rule and opposed the agency's proposal to scale back the reporting requirements.[3] Many of the comments opposing the rollback provided detailed examples of how access to data from Forms 300 and 301 would aid workers, advocates, and researchers in improving workplace safety and health, and how the proposal would have the opposite effect.[4]

---

[3] *See, e.g.*, JA0134; JA0139; JA0467; JA0475; JA0479; JA0484; JA0491; JA0532; JA0667; JA0717; JA0756; JA0776; JA0792; JA0865; JA0870; JA0874; JA0889; JA0893; JA0902; JA0906; JA0911; JA0984; JA0988; JA0992; JA1008; JA1019; JA1024; JA1028; JA1034; JA1043; JA1047; JA1053; JA1076; JA1083; JA1095; JA1107; JA1195; JA1435; JA1638; JA1674; JA1712.

[4] *See, e.g.*, JA0487; JA0532; JA0667; JA0717; JA0756; JA0776; JA0792; JA0998; JA1091; JA1095; JA1638; JA1712.

The agency published the final rule on January 25, 2019. *See* Tracking of Workplace Injuries and Illnesses, 84 Fed. Reg. 380 ("Rollback Rule"). The Rollback Rule adopted the core proposal to rescind the requirement of electronic submission of Forms 300 and 301 but leave in place the requirement to submit Form 300A. *Id.* OSHA's primary justification for the policy was that the costs of this data collection would outweigh the benefits. The costs OSHA cited were not tied to data *collection*, but instead to the risk that OSHA would ultimately be forced to *publish* any data it collected from these employers pursuant to court orders in FOIA cases. *See* 84 Fed. Reg. at 400. Because OSHA determined that the 775,000 datasets it collected were sufficiently subject to public disclosure, the agency concluded that it would have to expend $7,499,387 annually every year to manually scrub all such forms of PII. *Id.* In other words, OSHA's core assumption in assessing costs was that collected forms could become public and require PII scrubbing.

But OSHA took a very different approach to benefits. Although OSHA calculated costs based on an assumption that this data could ultimately be published, including as a result of FOIA requests, *see id.*, the agency assessed the *benefits* of collecting Forms 300 and 301 based on the opposite assumption: that the agency "would *not* make the data public even if collected," because "OSHA has determined publishing the data would do more harm than good," *Id.* at 391 (emphasis added). That decision had consequences. While the agency in 2016 had concluded that

13

publication of Forms 300 and 301 would have tremendous benefits to the States, workers, researchers, and other members of the public, in the Rollback Rule OSHA now declined to quantify *any* of these benefits as "[]certain"—because it no longer wished to make this information available to the public at all. *Id.* at 402. In other words, when it came to the benefits, OSHA assumed publication would not occur— or at least was too uncertain to justify inclusion in the agency's analysis. It did not acknowledge, let alone explain, the different premises regarding publication for costs and benefits anywhere in the final Rollback Rule.

OSHA's assessment of the costs was also a surprise in a second respect. The agency's NPRM had explained only that software review would not "guarantee the non-release of PII." 83 Fed. Reg. 36,498. In assessing these costs in the final rule, however, OSHA laid out a significant change from its proposal: it concluded that because it believed the automated software systems referenced in the NPRM were inadequate, OSHA could safeguard worker privacy *only* by having two OSHA employees *manually* review submissions to remove PII. *See* 84 Fed. Reg. at 400. OSHA estimated that this manual review would cost $7,499,387 annually—a more than hundred-fold increase over the $53,000 to $64,000 in costs the NPRM stated OSHA would incur based on the use of automated PII-scrubbing software. *Compare* 84 Fed. Reg. at 400, *with* 83 Fed. Reg. at 36,502. The NPRM did not indicate that OSHA was considering this alternative—or that it was considering any alternatives

14

to automated PII-scrubbing software. And the Rollback Rule identifies not one comment out of the 1,880 it received that discussed the costs or the level of detail[5] of the proposed two-tiered manual review process, or compared the manual review process to a software review process.

## V.    Procedural History.

On the same day that OSHA published the Rollback Rule, the Public Health Appellants filed their complaint in Case No. 19-166. JA2057. On March 6, 2019, the State Appellants filed their complaint in Case No. 19-621. JA2081. Both complaints challenge the Rollback Rule as procedurally unlawful and arbitrary and capricious in violation of the Administrative Procedure Act ("APA") and ask the court to vacate the Rule. The State Appellants noticed this action as related to the Public Health Appellants' case, and the district court entered a combined briefing schedule. JA2116. The parties thereafter filed cross-motions for summary judgment. JA2142 (Op. 7).

---

[5] In the Rollback Rule, OSHA described, for the first time, a two-tiered manual review process that was dependent on two OSHA employees, with "the first level of review" being "done by a GS–12, Step 5 Analyst (on the Washington, DC locality GS pay scale) and that analyst's work would be reviewed by a GS–14, Step 5 Supervisor (also on the Washington, DC locality pay scale)." 84 Fed. Reg. at 400. The final rule goes on to break down the "government hourly labor costs for the work of these employees," providing a full mathematical explanation for determining hour wages. *Id.*

On January 11, 2021, the district court denied plaintiffs' motions for summary judgment and granted OSHA's cross-motion. JA2133, 2135. The district court rejected the State Appellants' challenges to OSHA's reasoning underlying its calculation of the costs and benefits of collecting the Form 300 and 301 data. As relevant to this appeal, the district court disagreed that OSHA's assessment of the costs and benefits was internally inconsistent. JA2161 (Op. 26). In its opinion, the court reasoned that because OSHA decided it would "not voluntarily provide the data to the public," the agency "did not need to consider the benefits of voluntarily disclosing the information to the public, or even those benefits that could accrue if outside entities successfully sued for it under FOIA." *Id*. But, the decision below continued, "even if OSHA did not voluntarily disclose the data to the public, it had to weigh the possibility—perhaps even the likelihood—that these outside entities might successfully sue to obtain the Form 300 and 301 data, so it had to consider the more ascertainable costs of reducing the privacy risk to the point it found acceptable." *Id.* The district court thus held that OSHA did have to consider the costs, but not the benefits, of court-ordered disclosure, but did not provide any further explanation for why. The district court also stated—without any additional detail—that "even if" OSHA did have to consider the benefits associated with public disclosure, the agency did so. *Id.*

16

The district court also disagreed with the States' view that the Rollback Rule was not a logical outgrowth of the NPRM based on its introduction of a new two-tiered manual review process to remove PII. JA2156-58 (Op. 21-23). The Court held that OSHA did enough to warn parties that it was "assessing the proposed automated review of the forms to determine whether that review was adequate to protect PII," even if the NPRM did not indicate two-tier manual review as one such alternative. JA2157 (Op. 22). The court stated that "asking for comment" regarding the adequacy of automated review—that is, asking generally what risks are presented by automatic review, and broadly asking how other public and private entities had handled similar automated processes—was "enough to put interested parties on notice that OSHA was reconsidering its approach and weighing alternatives." *Id.* The court found that the logical-outgrowth requirement demanded nothing more. *Id.* (holding that the Rollback Rule "is a logical outgrowth of the proposed rule with respect to the methods OSHA proposed to protect PII").

This appeal followed. This Court initially granted OSHA's motion to hold the appeal in abeyance for 60 days to allow the agency to evaluate whether to rescind the Rollback Rule, and granted two subsequent motions to continue the abeyance. After this Court terminated the abeyance and set a briefing schedule for the appeal, OSHA issued an NPRM on March 30, 2022, proposing to reinstate the requirement to electronically submit Forms 300 and 301 for certain large employers. *See* Improve

17

Tracking of Workplace Injuries and Illnesses, 87 Fed. Reg. 18,528 (Mar. 30, 2022). OSHA has stated that a draft final rule is pending at the Office of Information and Regulatory Affairs, but OSHA has not published any final rule to date.

## STANDARD OF REVIEW

This Court "review[s] de novo the District Court's grant of summary judgment, which means that we review the agency's decision on our own." *Castlewood Prods., LLC v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004); *see also Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 329-30 (D.C. Cir. 2020) (same). This Court thus reviews OSHA's rule under the familiar standards of the APA, which requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are otherwise promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order and hold the Rollback Rule unlawful under the APA because it is arbitrary and capricious and violates the APA's notice requirement, either of which is a sufficient basis to invalidate the Rule.

I.    The Rule is arbitrary and capricious because it rests on an internally inconsistent analysis of the costs and benefits of collecting Form 300 and 301 data. A rule is necessarily arbitrary and capricious if the agency's reasoning is "internally

18

inconsistent," because internally inconsistent reasoning is illogical and undermines confidence in the conclusion. *Natural Res. Def. Council v. U.S. Nuclear Regulatory Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018). OSHA's central premise for the Rule was a lopsided cost-benefit analysis that tallied millions in costs against zero materialized benefits, resting on inconsistent assumptions about whether the data would be publicly disclosed. OSHA calculated the costs associated with collection of workplace injury and illness forms based on an assumption that *every one* of the 775,000 datasets the agency would collect every year would be subject to court-ordered disclosure. But it refused to consider any of the benefits from that same public disclosure, stating that such benefits would not materialize because OSHA was not going to voluntarily publish the information.

Nothing in the district court's opinion justifies the inherent inconsistency. The court focused instead on the fact that it is possible for OSHA to both decide not to publish the data as a policy matter and be ordered to disclose data in particular FOIA lawsuits. But that misses the point, which is that after OSHA deemed court-ordered disclosure likely enough to factor in *costs* associated with such disclosure, it needed to also consider the *benefits* of that same disclosure to remain consistent—and to ensure its balancing of the two was both fair and accurate. The district court's separate assertion that OSHA did in fact weigh those benefits is refuted by the Rule itself, which instead confirms that OSHA assumed away all of the benefits. Nor do

19

any of the arguments that Appellees advanced below resolve the inconsistency at the heart of OSHA's cost-benefit analysis.

II.     The Rollback Rule was also not a logical outgrowth of the NPRM. An agency must provide "adequate notice and opportunity for comment" on a new rule, which requires any changes made to the final rule be the "logical outgrowth" of the proposal. Here, the NPRM discussed using automated software to remove PII from the workplace safety forms—the practice the 2016 Rule used, and one with modest costs. But the Final Rule announced for the first time that OSHA would instead need to conduct a multi-million-dollar manual review to remove PII from the forms. Nothing in the NPRM warned the public that OSHA was considering the need for a new manual process that incurred a *hundred-fold* increase in costs, to which no commenter could respond. Nor did a series of broad questions in the NPRM, which generally alluded to the possibility of alternatives, provide any notice that the agency was considering *this* change. The questions nowhere identified manual review and if anything reinforced the expectation that OSHA would rely on the same automated systems that it had highlighted in the NPRM and 2016 Rule.

## **ARGUMENT**

## I.     **THE ROLLBACK RULE'S REASONING IS ARBITRARY BECAUSE IT IS INTERNALLY INCONSISTENT.**

The Rollback Rule is unlawful because OSHA assumed the Form 300 and 301 data would be publicly disclosed whenever it supported eliminating the data-

collection requirement, but assumed the same data would *not* be disclosed when it did not support the agency's desired result. These irreconcilable assumptions were the foundation for OSHA's conclusion that the costs associated with collecting data on workplace illnesses and injuries outweigh the benefits, rendering the rulemaking arbitrary and capricious. This inconsistency requires vacatur of the Rule.

The relevant legal principles are familiar. An agency is "free to change [its] existing policies" if it provides "a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). That said, in providing that explanation, it is "arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" *Natural Res. Def. Council v. U.S. Nuclear Regulatory Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018); *see, e.g.*, *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C. Cir. 1997) (courts "cannot accept" agency's internally inconsistent explanations). Indeed, an inconsistent explanation is illogical and unreasoned, and raises serious concerns that the justifications given reflect an effort to achieve a pre-determined result, rather than a good faith analysis of the evidence. That concern is magnified when the agency conducts a cost-benefit analysis. If the agency's premises for each side of the scale are inconsistent, a court should not have confidence in the final balance between the two. Where an agency relies on inconsistent reasoning, a court is "obliged therefore to vacate the rule and remand" to the agency to reconsider the issue. *Air Transp.*, 119 F.3d at 43.

21

That is what happened here. A central premise of OSHA's concerns regarding the costs associated with collecting workplace injury and illness information was its conclusion that these forms would later be subject to public disclosure. *See* 84 Fed. Reg. at 384 (finding that the agency could not "guarantee" that these forms "would be protected from disclosure"); *see also id.* at 400 (explaining "a court could require OSHA to release the data as a result of a FOIA request"). Because OSHA feared that the submissions would inadvertently include workers' personal information, *see id.* (finding it is "foreseeable that, despite instructions not to include such information, some employers would submit PII inadvertently in Forms 300 and 301"), that meant the PII could likewise be inadvertently subject to public disclosure.

This purported risk of public disclosure was the sole reason OSHA decided it would have to expend $7.5 million annually on a two-tier manual review process to ensure all PII is removed before any such public release. *See* 84 Fed. Reg. at 400 (noting this process entails two OSHA employees manually reviewing the same form). As OSHA explained, "a court could require OSHA to release the data as a result of a FOIA request," and as long as that was a possibility, "OSHA would need to manually review the data to be released—from approximately 775,000 cases annually—to remove PII and other information that could allow re-identification of ill or injured workers." *Id.*; *see also* 84 Fed. Reg. at 389, 392 (noting that 775,000 refers to the total number of forms OSHA expects to collect annually); *id.* at 400

(confirming the agency's "estimat[es] that all records would need to be reviewed."). OSHA thus factored in "annual costs for case-by-case review" of each of the 775,210 records collected. *Id.* at 400. In short, OSHA calculated its costs based on an assumption that the data from all 775,000 submissions would be subject to public disclosure. Had OSHA concluded that the 775,000 submissions would *not* later be subject to public disclosure, there would have been no risk of disclosing PII to the public, and no need to incur any sum—let alone $7.5 million every year—to scrub the PII from the workplace injury and illness forms.

But OSHA refused to weigh any benefits from that same public disclosure. OSHA's 2016 Rule had extensively discussed the benefits that workers, researchers, States, and other stakeholders would reap from access to the Form 300 and 301 data. *See* 81 Fed. Reg. at 29,629-32 & 29,647-48. And again in the Rollback Rule, OSHA acknowledged comments describing the ways that this information would improve workplace safety. *See* 84 Fed. Reg. at 391-93; *see also supra* at 9-10 (describing record of benefits from public access to the injury data). As the agency recognized, the commenters, "*assuming the data would be published*, suggested that employees would use publicly available information to analyze whether their employers are underreporting, to identify hazards and prevent injuries, and to determine where they may want to work, and that employers would use the data to benchmark effectively,

and to identify injury trends in the industry to prevent incidents before they occur."

84 Fed. Reg. at 391 (emphasis added).[6]

Responding to these claims that the information would benefit workers and employers, OSHA disputed the premise itself—arguing the data would *not* be public after all. The agency was clear on this point, reasoning:

> OSHA begins by noting that many of the benefits discussed by commenters would not materialize. Because OSHA has determined publishing the data would do more harm than good for reasons described more fully below and in the privacy discussion above, OSHA would not make the data public even if collected. In addition, as noted above, OSHA has already taken the position that data from Form 300A is exempt from disclosure under FOIA and that OSHA will not make such data public for at least the approximately four years after its receipt that OSHA intends to use the data for enforcement purposes. Therefore, the benefits some commenters ascribed to publication of the data would not be realized. Without publication, the research benefits claimed by many commenters also fall away.

*Id.* In OSHA's words, benefits that could flow from public access to the data should not be considered because the information will not be available to the public.

The inconsistency in the agency's reasoning is apparent. On the one hand, OSHA assumed that every one of the 775,000 datasets would be subject to disclosure in order to factor in $7.5 million in costs for OSHA to manually review these data to redact PII. On the other hand, OSHA assumed that the public would never have

---

[6] Examples of such comments can be found at JA0487; JA0507; JA0532; JA0667; JA0717; JA0756; JA0776; JA0792; JA0879; JA0984; JA0998; JA1038; JA1091; JA1095; JA1638; JA1674; JA1712.

access to these data to justify its dismissal of the benefits that would come with such public access. Put differently, OSHA's calculation of costs rests on an assumption that *every* dataset will someday be released (because disclosure will be mandated by FOIA), while its calculation of benefits rests on an assumption that the datasets will *never* be released (because OSHA made a policy determination not to publish it and believes the same information "is exempt from disclosure under FOIA"). OSHA's inconsistency has serious consequences: If OSHA's findings regarding costs were accurate—that court-ordered disclosure was so likely as to require assessment of costs based on the assumption that *100%* of the 775,000 workplace injury and illness forms need PII scrubbing—then myriad benefits from court-ordered disclosure were likewise sufficiently likely to "materialize" and had to be considered. But if OSHA's finding is right that disclosure would not "materialize," then there is no basis for its $7.5 million estimate of annual costs.

Although the district court found OSHA was justified in treating costs and benefits differently, nothing in its opinion resolves this internal inconsistency. The district court reasoned that because OSHA decided that it would "not voluntarily provide the data to the public," the agency "did not need to consider the benefits of voluntarily disclosing the information to the public, or even those benefits that could accrue if outside entities successfully sued for it under FOIA." JA2161 (Op. 26). But, the district court continued, "even if OSHA did not voluntarily disclose the data

25

to the public, it had to weigh the possibility—perhaps even the likelihood—that these outside entities might successfully sue to obtain the Form 300 and 301 data, so it had to consider the more ascertainable costs of reducing the privacy risk to the point it found acceptable." *Id.* But that simply *repeats* the inconsistency. It means an agency can simultaneously consider the "costs" of "outside entities … successfully su[ing]" for certain information, but ignore the "benefits that could accrue if outside entities successfully sued for it." *Id*. In its analysis, the court offered no basis for *why* it was appropriate to consider the costs associated with a successful FOIA suit that produces public access to workplace injury and illness information, but not the benefits associated with that very same lawsuit.[7]

The court also erred in emphasizing that OSHA could easily "simultaneously claim" that it would not voluntarily make the data public but still had to account for the meaningful risk of public disclosure, because the former discussed what OSHA would do *voluntarily*, and the latter addressed what might follow from a *court order* under FOIA. JA2161 (Op. 26) (citing 84 Fed. Reg. at 391, 383). That misses the point. The States have never argued that there is an inconsistency between finding

---

[7] To be clear, for the purposes of the States' argument, this Court need not actually decide how likely disclosure of the workplace injury and illness information would be. To prevail, the States need only show that after OSHA decides FOIA-mandated disclosure is probable enough to factor in the costs associated with such disclosure, OSHA must also weigh the benefits of that very same disclosure to satisfy the APA's requirement of reasoned decision-making.

that OSHA would engage in no voluntary disclosure but that there may be mandatory disclosure; those statements are easily squared. (Indeed, the whole premise of FOIA is that an agency may need to disclose something it is not otherwise making available voluntarily.) The States' point has instead always been that if the agency sees the risk of such a mandatory court order as sufficiently likely to justify considering the costs of public disclosure, the risk of the same court order must also be sufficiently likely to justify considering the benefits of the same disclosure.

Nor does the district court's other explanation solve the issue. As a fallback, after rejecting the notion that OSHA needed "to consider … those benefits that could accrue if outside entities successfully sued for it under FOIA," the court said: "even if [OSHA] had to do [so], it did." JA2161 (Op. 26) (citing 84 Fed. Reg. at 393). The court offered no analysis to support this claim, which the record easily refutes. The sole relevant passage in the entire Rollback Rule lists the benefits of collecting and/or publishing workplace safety information but briefly dismisses them because the benefits were never quantified and "the scope of any such benefits is uncertain." *See* 84 Fed. Reg. at 393 ("Although OSHA identified these potential benefits, OSHA never quantified them. This final rule does not ignore … the possibility that benefits could result from collecting the data, but concludes that the scope of any such benefits is uncertain."). But far from an independent holding, OSHA's own inability to quantify the benefits—and uncertainty about their reach—is intertwined with the

agency's underlying assumption that the information would not be disclosed. Indeed, as the overall rule and repeated references to "uncertainty" make clear, the agency's belief that the lack of public disclosure made the benefits "uncertain" permeated its analysis. *E.g.*, 84 Fed. Reg. at 383, 389-92, 397, 402.

Nor can OSHA's primary justification below—which the district court did not address—salvage its inconsistent treatment of costs and benefits. In the district court, OSHA argued that the agency did have to consider "the costs of having to scrub the records for sensitive information" because they "fall directly within the agency's purview," but did not have to consider the benefits of that disclosure because uses by States, workers, employers, or public health researchers are "outside the agency's purview and control." ECF 21 at 34-35. But the agency did not cite this so-called "agency-purview theory" during the rulemaking process as a reason not to consider benefits. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (refusing, under *Chenery*, to consider a justification for failure to calculate costs that the agency did not provide). It did not cite any precedent in its brief below that supports this particular theory. And when considered on its face, the agency-purview theory fails in general and as applied to this case.

As a general matter, the agency-purview distinction finds no support in either law or logic. OSHA's argument appears to mean that the APA would never require an agency to consider costs or benefits when they turn on third-party actions, because

that would mean the costs or benefits would fall "outside the agency's purview and control." But agencies routinely consider costs and benefits based on third-party actions. Every federal regulation that includes a disclosure requirement like Food and Drug Administration labeling rests on the concept that providing third parties information yields cognizable benefits, even if the way the information is ultimately used lies outside the agency's control. But under the theory OSHA advanced below (though not one the district court adopted), it is difficult to see how any agency could justify such a rule: the agency would have to consider all of its internal costs of collecting and publishing the information, but could not then consider benefits to third-party recipients of that now-published information. Refusing *even to consider* benefits that flow from public access to the data (from SEC disclosures to workplace safety information) itself ignores an "important aspect" of an agency's decision and is arbitrary decision-making. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That is why OSHA cited no case that supports this distinction, and why the States have likewise found none.

Even leaving aside that OSHA's agency-purview distinction is unprecedented and would have ramifications far beyond this case, the distinction makes no sense in this very case. OSHA posited that the FOIA-related costs OSHA needed to concern itself with were wholly internal and did not turn on third-party actions. But the only reason OSHA would need to "scrub the records for sensitive information" is *because*

of perceived third-party actions. After all, the Rollback Rule rests on a finding that even if all PII is removed from the data, "in many circumstances it may be possible to combine data points to identify specific workers who reported injuries or illnesses along with personal details about their conditions." 84 Fed. Reg. at 384. The actions driving OSHA's costs, as much as the claimed benefits, turn on "[w]hat happens to the information after a FOIA request"—that is, the acts of the third parties, who fall "outside the agency's purview and control," seeking to identify those workers. Thus, the costs OSHA has to bear are not strictly internal but are themselves a function of what third parties beyond its control might do with the data—meaning the "agency-purview distinction" is no distinction at all here. Whatever the merits of that theory in the abstract, it does not address the flaws with this Rule.

Ultimately, OSHA and the district court alike have no answer to the fact that the Rollback Rule assumes a high likelihood of court-ordered public disclosure when calculating the costs of collecting the data, but refuses to consider the benefits that would accrue from the same disclosure. OSHA's cost-benefit analysis was logically inconsistent, resulting in arbitrary and capricious decision-making.

## II.   THE ROLLBACK RULE IS NOT A LOGICAL OUTGROWTH OF OSHA'S PROPOSAL.

The Rollback Rule is also unlawful because OSHA's ultimate justifications were not a logical outgrowth of its proposal—depriving the States and Public Health Appellants of meaningful participation as to a critical part of OSHA's final analysis.

30

It is beyond dispute that agencies must provide "adequate notice and opportunity to comment" before promulgating a final rule. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110-11 (D.C. Cir. 2014); *see also* 5 U.S.C. § 553(b), (c). While agencies may make changes in response to comments on a proposed rule, a final rule must be a "logical outgrowth" of the proposal to satisfy the APA's notice requirement. *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004). A final rule is a logical outgrowth if interested parties "'should have anticipated' that the change was possible" from the NPRM, *id.* at 952—as "where the NPRM expressly asked for comments on a particular issue or otherwise made clear that the agency was contemplating a particular change." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). But a rule fails this test where parties "would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the Agency's proposal." *Id.* at 1081. If a final rule diverges to too great a degree, parties lose their full and fair opportunity to participate—and the agency loses the ability to fully and fairly consider the issues.

Here, the NPRM provided no notice that OSHA would determine the costs of collecting Forms 300 and 301 based on a *manual* review process to scrub PII—much less one that produces a more than hundred-fold increase in its previously-projected costs. The NPRM exclusively contemplated using "automated systems … to scrub PII from the data," 83 Fed. Reg. at 36,498, and even solicited comments specifically

about using such "automated de-identification systems to remove PII from text data before making the data available to the public." 83 Fed. Reg. at 36,500. OSHA thus estimated that it would save $53,000 to $64,000 per year from not collecting these forms. 83 Fed. Reg. at 36,503. OSHA did not solicit comments about the costs that manual review would generate. Unsurprisingly, the Rollback Rule identifies not one comment out of the 1,880 comments that OSHA received discussing the costs associated with manual review of data. *See CSX Transp., Inc.*, 584 F.3d at 1081 (finding failure to provide notice and observing that "not one commenter" gleaned the import of the final rule from the proposal).

But in the final rule, OSHA changed course and for the first time announced it would need to "manually review" this data—a possibility nowhere mentioned in the NPRM—reasoning that "software cannot guarantee full scrubbing of PII and has no ability to judge re-identifiable information." 84 Fed. Reg. at 400. And OSHA concluded that the cost of this new two-tiered manual review process would be *$7.5 million every year*—a more than hundred-fold increase in costs above the NPRM's estimate. Nothing in the NPRM put the public on notice that OSHA was considering the two-tiered manual review process as categorically necessary to sufficiently scrub PII, that it would find its own 2016 Rule actually worked a hundred-fold increase in costs from what it had repeatedly calculated, or that interested parties should submit comments on the cost of or need for this undisclosed manual review. Accordingly,

neither the States nor the Public Health Appellants had any meaningful notice or opportunity to address either the use of the two-tiered manual review process or the extraordinary costs the agency calculated.

This is precisely the sort of change on which the States and interested parties were entitled to comment before finalization of the Rollback Rule. Where an agency significantly changes the methodology it is using to justify its regulation, and did not properly warn commenters of that change, additional comment period is "typically required" if the new methodology is critical to the Final Rule. *See, e.g.*, *Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) ("By requiring the 'most critical factual material' used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to support their positions, and thereby to enhance the quality of judicial review."); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 201 (D.C. Cir. 2007) (raising identical concerns when agency "methodology did *not* remain constant" in calculating costs and benefits from proposal to final rule). Said another way, when an agency "relie[s] on" new justifications that are "critical" to its final decision, its "justifications should have been available for public comment *before*" finalizing the rule. *Ober v. EPA*, 84 F.3d 304, 314 (9th Cir. 1996); *see also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d

33

1392, 1403-04 (9th Cir. 1995). Otherwise, an agency could rely on "controversial and uncommented upon data and calculations," *AM. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008), that prevent any interested parties from "offer[ing] new and different criticisms which the agency might find convincing," *Solite Corp. v. EPA*, 952 F.2d 473, 499 (D.C. Cir. 1991).

Here, the change in OSHA's cost-benefit analysis—specifically, its reliance on and calculations of the costs associated with two-tier manual review to remove PII was too fundamental to the agency's reasoning to have been withheld from public comment. OSHA's undisclosed (and thus unexamined) decision to adopt a two-tiered manual review process transformed a proposed rule that achieved relatively minute annual cost savings into a final rule that purported to achieve far more significant cost savings, more than a hundred-fold increase. Said another way, the financial impact of the change is substantial and is thus not "only ostensibly a detail" in OSHA's. *Allina Health Servs.*, 746 F.3d at 1109 (holding agency's rule changing calculation in a Medicare formula was not a permitted logical outgrowth because "a reasonable member of the regulated class—even a good lawyer—[could not] anticipate that such a volte-face with enormous financial implications would follow the . . . proposed rule"). And this change is particularly important here because the entire justification for the Rollback Rule, and subsequent defense of the Rule before the district court, ultimately rested on OSHA's cost-benefit analysis and the costs of

34

manual review. 84 Fed. Reg. at 383, 400, 402. Concealing such an important part of an agency rulemaking cannot be squared with the policy of public transparency and participation underlying the APA.

The history of this rule further confirms the unfair surprise that OSHA worked from proposal to final rule. The NPRM's focus on using automated de-identification systems to remove PII from text data before making the data available to the public was no surprise: that proposal itself built on and addressed the 2016 Rule's position that OSHA would ultimately be "us[ing] software that will search for and de-identify personally identifiable information." 81 Fed. Reg. at 29,632. And the 2016 Rule—the subject of the Rollback Rule—never mentioned any sort of manual review, let alone a specific two-tiered manual review process. This is all further evidence that no interested party had any reason to understand the NPRM to mean that OSHA was considering abandoning its prior approach of using computer software to remove PII in favor of a two-tiered manual review process.

The district court never rebutted that OSHA had worked a significant change in its methodology and justifications, but relied on two questions the agency included in the NPRM in ultimately deciding that the Final Rule was a logical outgrowth "with respect to the methods OSHA proposed to use to protect PII." JA2157 (Op. 22).

Specifically, the cited questions asked:

- "What risks to worker privacy are posed by the electronic collection of information from Forms 300 and 301[?] How could OSHA make [these risks] less likely, and what resources would be required?"

- "[W]hat other agencies and organizations in the public and private sectors use automated de-identification systems to remove PII from text data before making the data available to the public? What challenges have they faced in using those systems to keep PII protected?"

*Id.* (quoting 83 Fed. Reg. at 36,500). To the district court, including these questions showed that "OSHA was reconsidering its approach and weighing alternatives to the automated review process." *Id.* But the court read too much into the questions.

OSHA was free to "describe [a] range of alternatives being considered" in the Questions section, but it had to do so "with reasonable specificity" so that interested parties understood that alternatives *within that range* were on the table. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). Were the rule otherwise, an agency "could issue broad NPRMs 'only to justify *any* rule it might be able to devise by whimsically picking and choosing within the four corners of a lengthy [NPRM],'" which "would hardly promote the purposes of the APA's notice requirement." *CSX Transp., Inc.*, 584 F.3d 1076 at 1082 (quoting *Env't Integrity Project v. E.P.A.*, 425 F.3d 992, 998 (D.C. Cir. 2005)) (holding that "mere mention" of a method of resolving certain rate sampling disputes in a NPRM is insufficient to provide notice that the agency is considering changing the existing method to that method). Absent "reasonable specificity," any generalized request for input or comments would render the logical outgrowth doctrine a nullity.

36

There is no reasonable specificity here. OSHA did solicit comments on ways to improve worker privacy, and it did solicit comments on how other governmental or private entities safeguard privacy interests. But nothing in those vague requests at all suggested OSHA was considering *manual* review. *See Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005) (finding inadequate notice and observing "an unexpressed intention cannot convert a final rule into a logical outgrowth that the public should have anticipated" (cleaned up)). If anything, the second question underscores that OSHA anticipated it would continue to rely on "automated de-identification systems to remove PII"— just as the NPRM and 2016 Rule did—meaning that the range of potential alternative methods did *not* include manual review. The questions did not describe the possibility of two-tiered manual review at all, or the exorbitant costs that process would incur, or the way those costs would drive OSHA to conclude it could not even collect crucial workplace injury and illness information. No one could reasonably have anticipated from the questions that OSHA was considering a two-tiered manual review process at a hundred-fold increase in projected costs over its initial proposal. Indeed, the Rollback Rule identifies not one comment out of the 1,880 comments OSHA received indicating commenters knew that this detailed proposal was forthcoming. And the sudden change was prejudicial—OSHA found automatic PII scrubbing sufficient in 2016, which means that commenters likely would have had

comments and arguments to provide as to whether a costly two-tiered manual review process was preferential.

The district court's reasoning, taken to its logical conclusion, eliminates any force behind the logical outgrowth rule. An agency can always ask some form of the question: "What are other ways to reduce the policy drawback" (whether privacy or economic or environmental harms) and "What do other agencies and organizations in the public and private sectors do" to address the policy problem on hand. But it strains credulity that such a generalized solicitation puts States and other interested parties on any kind of meaningful notice as to what specific alternatives are actually being considered by the agency to address the problem. See *Chamber of Commerce*, 443 F.3d at 904 (finding "bare request for information on costs" insufficient to put parties on notice of alternatives or new data). Commenters had no such notice here— and thus did not have the opportunity to discuss the agency's ultimate justification, let alone build a record to allow for meaningful judicial review. While deferential, the logical outgrowth doctrine is not toothless. The district court erred by finding sufficient the agency's abstract request regarding alternatives writ large.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court's grant of summary judgment.

38

Dated:    Newark, New Jersey
          May 15, 2023

                         Respectfully submitted,

                         MATTHEW J. PLATKIN
                         Attorney General of New Jersey

                         */s/ Mayur P. Saxena*
                         Mayur P. Saxena
                         Assistant Attorney General
                         124 Halsey Street, 5th Floor
                         Newark, NJ 07101
                         Tel: (973) 877-1280
                         Mayur.Saxena@law.njoag.gov
                         *Attorneys for Appellant*
                         *State of New Jersey*

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois

s/ *Sarah A. Hunger*
SARAH A. HUNGER
Deputy Solicitor General
LYDIA COLUNGA-MERCHANT
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, IL 60601
(312) 814-5202
Sarah.Hunger@ilag.gov
*Attorneys for Plaintiff-Appellant*
*State of Illinois*

FOR THE STATE OF MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

s/ *Amy L. Goyer*
AMY L. GOYER
Assistant Attorney General
Fair Labor Division
Office of Attorney General Andrea
Campbell
700 Pleasant St., Suite 310
New Bedford, MA 02740
(617) 963-2319
Amy.Goyer@mass.gov
*Attorneys for Plaintiff-Appellant*
*Commonwealth of Massachusetts*

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General of Maryland

s/ *Steven M. Sullivan*
STEVEN M. SULLIVAN
Solicitor General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6427
ssullivan@oag.state.md.us
*Attorneys for Plaintiff-Appellant*
*State of Maryland*

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General of Minnesota

s/ *Martha J. Casserly*
MARTHA J. CASSERLY
Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2127
(651) 757-1412
stacey.person@ag.state.mn.us
*Attorneys for Plaintiff-Appellant*
*State of Minnesota*

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

s/ *Judith Vale*
JUDITH VALE
Deputy Solicitor General
KAREN CACACE
Bureau Chief, Labor Bureau
AMY SCHNEIDER
Assistant Attorney General
28 Liberty St., 23rd Floor
New York, NY 10005
(212) 416-8020
Judith.Vale@ag.ny.gov
*Attorneys for Plaintiff-Appellants*
*State of New York*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

**The undersigned attorney, Mayur P. Saxena, hereby certifies:**

1.      This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and this Court's briefing schedule order dated April 4, 2023. According to the word processing system used in this office, this document, exclusive of the sections excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), contains 9,768 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman.

/s/ *Mayur P. Saxena*
Mayur P. Saxena

42

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 15, 2023, the foregoing Opening Brief of State Appellants was electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system, which effected service upon counsel of record through the Court's system.

/s/ <i>Mayur P. Saxena</i>
Mayur P. Saxena

# ADDENDUM

**RELEVANT STATUES AND REGULATIONS**

# TABLE OF CONTENTS

5 U.S.C. § 553.................................................................................ADD-1

5 U.S.C. § 706.................................................................................ADD-3

29 U.S.C. § 651...............................................................................ADD-4

29 U.S.C. § 657...............................................................................ADD-6

29 U.S.C. § 673...............................................................................ADD-8

29 C.F.R. § 1904.7...........................................................................ADD-9

29 C.F.R. § 1904.29.......................................................................ADD-18

29 C.F.R. § 1904.32.......................................................................ADD-21

29 C.F.R. § 1904.41.......................................................................ADD-23

i

## 5 U.S.C. § 553

Title 5 – Government Organization and Employees
Part I – The Agencies Generally
Chapter 5 – Administrative Procedure
Subchapter II. Administrative Procedure

## § 651. Rule Making.

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

> (1) a military or foreign affairs function of the United States; or
> (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

> (1) a statement of the time, place, and nature of public rule making proceedings;
> (2) reference to the legal authority under which the rule is proposed; and
> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

> Except when notice or hearing is required by statute, this subsection does not apply—
>> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
>> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After

ADD-1

consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title [5 USCS §§ 556 and 557] apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

> (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
> (2) interpretative rules and statements of policy; or
> (3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

# 5 U.S.C. § 706

Title 5 – Government Organization and Employees
Part I – The Agencies Generally
Chapter 7 – Judicial Review

## § 706. Scope of Review.

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   (B) contrary to constitutional right, power, privilege, or immunity;
   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
   (D) without observance of procedure required by law;
   (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or
   (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

ADD-3

# 29 U.S.C. § 651

Title 29 – Labor
Chapter 15 – Occupational Safety and Health

## § 651. Congressional statement of findings and declaration of purpose and policy.

\* \* \*

(b) The Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources—

(1) by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions;

(2) by providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions;

(3) by authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce, and by creating an Occupational and Health Review Commission for carrying out adjudicatory functions under the Act;

(4) by building upon advances already made through employer and employee initiative for providing safe and healthful working conditions;

(5) by providing for research in the field of occupational safety and health, including the psychological factors involved, and by developing innovative methods, techniques, and approaches for dealing with occupational safety and health problems;

(6) by exploring ways to discover latent diseases, establishing causal connections between diseases and work in environmental conditions, and conducting other research relating to health problems, in recognition of the fact that occupational health standards present problems often different from those involved in occupational safety;

(7) by providing medical criteria which will assure insofar as practicable that no employee will suffer diminished health, functional capacity, or life expectancy as a result of his work experience;

(8) by providing for training programs to increase the number and competence of personnel engaged in the field of occupational safety and health;

(9) by providing for the development and promulgation of occupational safety and health standards;

(10) by providing an effective enforcement program which shall include a prohibition against giving advance notice of any inspection and sanctions for any individual violating this prohibition;

(11) by encouraging the States to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws by providing grants to the States to assist in identifying their needs and responsibilities in the area of occupational safety and health, to develop plans in accordance with the provisions of this Act, to improve the administration and enforcement of State occupational safety and health laws, and to conduct experimental and demonstration projects in connection therewith;

(12) by providing for appropriate reporting procedures with respect to occupational safety and health which procedures will help achieve the objectives of this Act and accurately describe the nature of the occupational safety and health problem;

(13) by encouraging joint labor-management efforts to reduce injuries and disease arising out of employment.

**29 U.S.C. § 657**

Title 29 – Labor
Chapter 15 – Occupational Safety and Health

## § 657. Inspections, investigations, and recordkeeping

\* \* \*

(c) Maintenance, preservation, and availability of records; issuance of regulations; scope of records; periodic inspections by employer; posting of notices by employer; notification of employee of corrective action.

(1) Each employer shall make, keep and preserve, and make available to the Secretary or the Secretary of Health, Education, and Welfare, such records regarding his activities relating to this Act as the Secretary, in cooperation with the Secretary of Health, Education, and Welfare, may prescribe by regulation as necessary or appropriate for the enforcement of this Act or for developing information regarding the causes and prevention of occupational accidents and illnesses. In order to carry out the provisions of this paragraph such regulations may include provisions requiring employers to conduct periodic inspections. The Secretary shall also issue regulations requiring that employers, through posting of notices or other appropriate means, keep their employees informed of their protections and obligations under this Act, including the provisions of applicable standards.

(2) The Secretary, in cooperation with the Secretary of Health, Education, and Welfare, shall prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job.

(3) The Secretary, in cooperation with the Secretary of Health, Education, and Welfare, shall issue regulations requiring employers to maintain accurate records of employee exposures to potentially toxic materials or harmful physical agents which are required to be monitored or measured under section 6 [29 USCS § 655]. Such regulations shall provide employees or their representatives with an opportunity to observe such monitoring or measuring,

ADD-6

and to have access to the records thereof. Such regulations shall also make appropriate provision for each employee or former employee to have access to such records as will indicate his own exposure to toxic materials or harmful physical agents. Each employer shall promptly notify any employee who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels which exceed those prescribed by an applicable occupational safety and health standard promulgated under section 6 [29 USCS § 655], and shall inform any employee who is being thus exposed of the corrective action being taken.

* * *

# 29 U.S.C. § 673

Title 29 – Labor
Chapter 15 – Occupational Safety and Health

## § 673. Statistics

(a) Development and maintenance of program of collection, compilation, and analysis; employments subject to coverage; scope. In order to further the purposes of this Act, the Secretary, in consultation with the Secretary of Health, Education, and Welfare, shall develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics. Such program may cover all employments whether or not subject to any other provisions of this Act but shall not cover employments excluded by section 4 of the Act [29 USCS § 653]. The Secretary shall compile accurate statistics on work injuries and illnesses which shall include all disabling, serious, or significant injuries and illnesses, whether or not involving loss of time from work, other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job.

* * *

(e) Reports by employers. On the basis of the records made and kept pursuant to section 8(c) of this Act [29 USCS § 657(c)], employers shall file such reports with the Secretary as he shall prescribe by regulation, as necessary to carry out his functions under this Act.

* * *

ADD-8

**29 C.F.R. § 1904.7**

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart C – Recordkeeping Forms and Recording Criteria

## § 1904.7. General recording criteria.

(a) Basic requirement. You must consider an injury or illness to meet the general recording criteria, and therefore to be recordable, if it results in any of the following: death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, or loss of consciousness. You must also consider a case to meet the general recording criteria if it involves a significant injury or illness diagnosed by a physician or other licensed health care professional, even if it does not result in death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness.

(b) Implementation –

(1) How do I decide if a case meets one or more of the general recording criteria? A work-related injury or illness must be recorded if it results in one or more of the following:

(i) Death. See § 1904.7(b)(2).

(ii) Days away from work. See § 1904.7(b)(3).

(iii) Restricted work or transfer to another job. See § 1904.7(b)(4).

(iv) Medical treatment beyond first aid. See § 1904.7(b)(5).

(v) Loss of consciousness. See § 1904.7(b)(6).

(vi) A significant injury or illness diagnosed by a physician or other licensed health care professional. See § 1904.7(b)(7).

ADD-9

(2) How do I record a work-related injury or illness that results in the employee's death? You must record an injury or illness that results in death by entering a check mark on the OSHA 300 Log in the space for cases resulting in death. You must also report any work-related fatality to OSHA within eight (8) hours, as required by § 1904.39.

(3) How do I record a work-related injury or illness that results in days away from work? When an injury or illness involves one or more days away from work, you must record the injury or illness on the OSHA 300 Log with a check mark in the space for cases involving days away and an entry of the number of calendar days away from work in the number of days column. If the employee is out for an extended period of time, you must enter an estimate of the days that the employee will be away, and update the day count when the actual number of days is known.

(i) Do I count the day on which the injury occurred or the illness began? No, you begin counting days away on the day after the injury occurred or the illness began.

(ii) How do I record an injury or illness when a physician or other licensed health care professional recommends that the worker stay at home but the employee comes to work anyway? You must record these injuries and illnesses on the OSHA 300 Log using the check box for cases with days away from work and enter the number of calendar days away recommended by the physician or other licensed health care professional. If a physician or other licensed health care professional recommends days away, you should encourage your employee to follow that recommendation. However, the days away must be recorded whether the injured or ill employee follows the physician or licensed health care professional's recommendation or not. If you receive recommendations from two or more physicians or other licensed health care professionals, you may make a decision as to which recommendation is the most authoritative, and record the case based upon that recommendation.

(iii) How do I handle a case when a physician or other licensed health care professional recommends that the worker return to work but the employee stays at home anyway? In this situation, you must end the count of days away from work on the date the physician or other licensed health care professional recommends that the employee return to work.

ADD-10

(iv) How do I count weekends, holidays, or other days the employee would not have worked anyway? You must count the number of calendar days the employee was unable to work as a result of the injury or illness, regardless of whether or not the employee was scheduled to work on those day(s). Weekend days, holidays, vacation days or other days off are included in the total number of days recorded if the employee would not have been able to work on those days because of a work-related injury or illness.

(v) How do I record a case in which a worker is injured or becomes ill on a Friday and reports to work on a Monday, and was not scheduled to work on the weekend? You need to record this case only if you receive information from a physician or other licensed health care professional indicating that the employee should not have worked, or should have performed only restricted work, during the weekend. If so, you must record the injury or illness as a case with days away from work or restricted work, and enter the day counts, as appropriate.

(vi) How do I record a case in which a worker is injured or becomes ill on the day before scheduled time off such as a holiday, a planned vacation, or a temporary plant closing? You need to record a case of this type only if you receive information from a physician or other licensed health care professional indicating that the employee should not have worked, or should have performed only restricted work, during the scheduled time off. If so, you must record the injury or illness as a case with days away from work or restricted work, and enter the day counts, as appropriate.

(vii) Is there a limit to the number of days away from work I must count? Yes, you may "cap" the total days away at 180 calendar days. You are not required to keep track of the number of calendar days away from work if the injury or illness resulted in more than 180 calendar days away from work and/or days of job transfer or restriction. In such a case, entering 180 in the total days away column will be considered adequate.

(viii) May I stop counting days if an employee who is away from work because of an injury or illness retires or leaves my company? Yes, if the employee leaves your company for some reason unrelated to the injury or illness, such as retirement, a plant closing, or to take another job, you may stop counting days away from work or days of restriction/job transfer. If the

employee leaves your company because of the injury or illness, you must estimate the total number of days away or days of restriction/job transfer and enter the day count on the 300 Log.

(ix) If a case occurs in one year but results in days away during the next calendar year, do I record the case in both years? No, you only record the injury or illness once. You must enter the number of calendar days away for the injury or illness on the OSHA 300 Log for the year in which the injury or illness occurred. If the employee is still away from work because of the injury or illness when you prepare the annual summary, estimate the total number of calendar days you expect the employee to be away from work, use this number to calculate the total for the annual summary, and then update the initial log entry later when the day count is known or reaches the 180-day cap.

(4) How do I record a work-related injury or illness that results in restricted work or job transfer? When an injury or illness involves restricted work or job transfer but does not involve death or days away from work, you must record the injury or illness on the OSHA 300 Log by placing a check mark in the space for job transfer or restriction and an entry of the number of restricted or transferred days in the restricted workdays column.

(i) How do I decide if the injury or illness resulted in restricted work? Restricted work occurs when, as the result of a work-related injury or illness:

(A) You keep the employee from performing one or more of the routine functions of his or her job, or from working the full workday that he or she would otherwise have been scheduled to work; or

(B) A physician or other licensed health care professional recommends that the employee not perform one or more of the routine functions of his or her job, or not work the full workday that he or she would otherwise have been scheduled to work.

(ii) What is meant by "routine functions"? For recordkeeping purposes, an employee's routine functions are those work activities the employee regularly performs at least once per week.

(iii) Do I have to record restricted work or job transfer if it applies only to the day on which the injury occurred or the illness began? No, you do not have to record restricted work or job transfers if you, or the physician or other licensed

ADD-12

health care professional, impose the restriction or transfer only for the day on which the injury occurred or the illness began.

(iv) If you or a physician or other licensed health care professional recommends a work restriction, is the injury or illness automatically recordable as a "restricted work" case? No, a recommended work restriction is recordable only if it affects one or more of the employee's routine job functions. To determine whether this is the case, you must evaluate the restriction in light of the routine functions of the injured or ill employee's job. If the restriction from you or the physician or other licensed health care professional keeps the employee from performing one or more of his or her routine job functions, or from working the full workday the injured or ill employee would otherwise have worked, the employee's work has been restricted and you must record the case.

(v) How do I record a case where the worker works only for a partial work shift because of a work-related injury or illness? A partial day of work is recorded as a day of job transfer or restriction for recordkeeping purposes, except for the day on which the injury occurred or the illness began.

(vi) If the injured or ill worker produces fewer goods or services than he or she would have produced prior to the injury or illness but otherwise performs all of the routine functions of his or her work, is the case considered a restricted work case? No, the case is considered restricted work only if the worker does not perform all of the routine functions of his or her job or does not work the full shift that he or she would otherwise have worked.

(vii) How do I handle vague restrictions from a physician or other licensed health care professional, such as that the employee engage only in "light duty" or "take it easy for a week"? If you are not clear about the physician or other licensed health care professional's recommendation, you may ask that person whether the employee can do all of his or her routine job functions and work all of his or her normally assigned work shift. If the answer to both of these questions is "Yes," then the case does not involve a work restriction and does not have to be recorded as such. If the answer to one or both of these questions is "No," the case involves restricted work and must be recorded as a restricted work case. If you are unable to obtain this additional information from the physician or other licensed health care professional who recommended the restriction, record the injury or illness as a case involving restricted work.

ADD-13

(viii) What do I do if a physician or other licensed health care professional recommends a job restriction meeting OSHA's definition, but the employee does all of his or her routine job functions anyway? You must record the injury or illness on the OSHA 300 Log as a restricted work case. If a physician or other licensed health care professional recommends a job restriction, you should ensure that the employee complies with that restriction. If you receive recommendations from two or more physicians or other licensed health care professionals, you may make a decision as to which recommendation is the most authoritative, and record the case based upon that recommendation.

(ix) How do I decide if an injury or illness involved a transfer to another job? If you assign an injured or ill employee to a job other than his or her regular job for part of the day, the case involves transfer to another job. Note: This does not include the day on which the injury or illness occurred.

(x) Are transfers to another job recorded in the same way as restricted work cases? Yes, both job transfer and restricted work cases are recorded in the same box on the OSHA 300 Log. For example, if you assign, or a physician or other licensed health care professional recommends that you assign, an injured or ill worker to his or her routine job duties for part of the day and to another job for the rest of the day, the injury or illness involves a job transfer. You must record an injury or illness that involves a job transfer by placing a check in the box for job transfer.

(xi) How do I count days of job transfer or restriction? You count days of job transfer or restriction in the same way you count days away from work, using § 1904.7(b)(3)(i) to (viii), above. The only difference is that, if you permanently assign the injured or ill employee to a job that has been modified or permanently changed in a manner that eliminates the routine functions the employee was restricted from performing, you may stop the day count when the modification or change is made permanent. You must count at least one day of restricted work or job transfer for such cases.

(5) How do I record an injury or illness that involves medical treatment beyond first aid? If a work-related injury or illness results in medical treatment beyond first aid, you must record it on the OSHA 300 Log. If the injury or illness did not involve death, one or more days away from work, one or more days of restricted work, or one or more days of job transfer, you enter a check mark in the box for cases where the employee received medical treatment but remained at work and was not transferred or restricted.

(i) What is the definition of medical treatment? "Medical treatment" means the management and care of a patient to combat disease or disorder. For the purposes of Part 1904, medical treatment does not include:

> (A) Visits to a physician or other licensed health care professional solely for observation or counseling;

> (B) The conduct of diagnostic procedures, such as x-rays and blood tests, including the administration of prescription medications used solely for diagnostic purposes (e.g., eye drops to dilate pupils); or

> (C) "First aid" as defined in paragraph (b)(5)(ii) of this section.

(ii) What is "first aid"? For the purposes of Part 1904, "first aid" means the following:

> (A) Using a non-prescription medication at nonprescription strength (for medications available in both prescription and non-prescription form, a recommendation by a physician or other licensed health care professional to use a non-prescription medication at prescription strength is considered medical treatment for recordkeeping purposes);

> (B) Administering tetanus immunizations (other immunizations, such as Hepatitis B vaccine or rabies vaccine, are considered medical treatment);

> (C) Cleaning, flushing or soaking wounds on the surface of the skin;

> (D) Using wound coverings such as bandages, Band-Aids<TM>, gauze pads, etc.; or using butterfly bandages or Steri-Strips<TM> (other wound closing devices such as sutures, staples, etc., are considered medical treatment);

> (E) Using hot or cold therapy;

> (F) Using any non-rigid means of support, such as elastic bandages, wraps, non-rigid back belts, etc. (devices with rigid stays or other systems designed to immobilize parts of the body are considered medical treatment for recordkeeping purposes);

ADD-15

(G) Using temporary immobilization devices while transporting an accident victim (e.g., splints, slings, neck collars, back boards, etc.).

(H) Drilling of a fingernail or toenail to relieve pressure, or draining fluid from a blister;

(I) Using eye patches;

(J) Removing foreign bodies from the eye using only irrigation or a cotton swab;

(K) Removing splinters or foreign material from areas other than the eye by irrigation, tweezers, cotton swabs or other simple means;

(L) Using finger guards;

(M) Using massages (physical therapy or chiropractic treatment are considered medical treatment for recordkeeping purposes); or

(N) Drinking fluids for relief of heat stress.

(iii)  Are any other procedures included in first aid? No, this is a complete list of all treatments considered first aid for Part 1904 purposes.

(iv) Does the professional status of the person providing the treatment have any effect on what is considered first aid or medical treatment? No, OSHA considers the treatments listed in § 1904.7(b)(5)(ii) of this Part to be first aid regardless of the professional status of the person providing the treatment. Even when these treatments are provided by a physician or other licensed health care professional, they are considered first aid for the purposes of Part 1904. Similarly, OSHA considers treatment beyond first aid to be medical treatment even when it is provided by someone other than a physician or other licensed health care professional.

(v) What if a physician or other licensed health care professional recommends medical treatment but the employee does not follow the recommendation? If a physician or other licensed health care professional recommends medical treatment, you should encourage the injured or ill employee to follow that recommendation. However, you must record the case even if the injured or ill

employee does not follow the physician or other licensed health care professional's recommendation.

(6) Is every work-related injury or illness case involving a loss of consciousness recordable? Yes, you must record a work-related injury or illness if the worker becomes unconscious, regardless of the length of time the employee remains unconscious.

(7) What is a "significant" diagnosed injury or illness that is recordable under the general criteria even if it does not result in death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness? Work-related cases involving cancer, chronic irreversible disease, a fractured or cracked bone, or a punctured eardrum must always be recorded under the general criteria at the time of diagnosis by a physician or other licensed health care professional.

Note to § 1904.7: OSHA believes that most significant injuries and illnesses will result in one of the criteria listed in § 1904.7(a): death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness. However, there are some significant injuries, such as a punctured eardrum or a fractured toe or rib, for which neither medical treatment nor work restrictions may be recommended. In addition, there are some significant progressive diseases, such as byssinosis, silicosis, and some types of cancer, for which medical treatment or work restrictions may not be recommended at the time of diagnosis but are likely to be recommended as the disease progresses. OSHA believes that cancer, chronic irreversible diseases, fractured or cracked bones, and punctured eardrums are generally considered significant injuries and illnesses, and must be recorded at the initial diagnosis even if medical treatment or work restrictions are not recommended, or are postponed, in a particular case.

## 29 C.F.R. § 1904.29

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart C – Recordkeeping Forms and Recording Criteria

### § 1904.29. Forms.

(a) Basic requirement. You must use OSHA 300, 300-A, and 301 forms, or equivalent forms, for recordable injuries and illnesses. The OSHA 300 form is called the Log of Work-Related Injuries and Illnesses, the 300-A is the Summary of Work-Related Injuries and Illnesses, and the OSHA 301 form is called the Injury and Illness Incident Report.

(b) Implementation–

(1) What do I need to do to complete the OSHA 300 Log? You must enter information about your business at the top of the OSHA 300 Log, enter a one or two line description for each recordable injury or illness, and summarize this information on the OSHA 300-A at the end of the year.

(2) What do I need to do to complete the OSHA 301 Incident Report? You must complete an OSHA 301 Incident Report form, or an equivalent form, for each recordable injury or illness entered on the OSHA 300 Log.

(3) How quickly must each injury or illness be recorded? You must enter each recordable injury or illness on the OSHA 300 Log and 301 Incident Report within seven (7) calendar days of receiving information that a recordable injury or illness has occurred.

(4) What is an equivalent form? An equivalent form is one that has the same information, is as readable and understandable, and is completed using the same instructions as the OSHA form it replaces. Many employers use an insurance form instead of the OSHA 301 Incident Report, or supplement an insurance form by adding any additional information required by OSHA.

(5) May I keep my records on a computer? Yes, if the computer can produce equivalent forms when they are needed, as described under §§ 1904.35 and 1904.40, you may keep your records using the computer system.

(6) Are there situations where I do not put the employee's name on the forms for privacy reasons? Yes, if you have a "privacy concern case," you may not enter the employee's name on the OSHA 300 Log. Instead, enter "privacy case" in the space normally used for the employee's name. This will protect the privacy of the injured or ill employee when another employee, a former employee, or an authorized employee representative is provided access to the OSHA 300 Log under § 1904.35(b)(2). You must keep a separate, confidential list of the case numbers and employee names for your privacy concern cases so you can update the cases and provide the information to the government if asked to do so.

(7) How do I determine if an injury or illness is a privacy concern case? You must consider the following injuries or illnesses to be privacy concern cases:

      (i) An injury or illness to an intimate body part or the reproductive system;

      (ii) An injury or illness resulting from a sexual assault;

      (iii) Mental illnesses;

      (iv) HIV infection, hepatitis, or tuberculosis;

      (v) Needlestick injuries and cuts from sharp objects that are contaminated with another person's blood or other potentially infectious material (see § 1904.8 for definitions); and

      (vi) Other illnesses, if the employee voluntarily requests that his or her name not be entered on the log.

(8) May I classify any other types of injuries and illnesses as privacy concern cases? No, this is a complete list of all injuries and illnesses considered privacy concern cases for Part 1904 purposes.

(9) If I have removed the employee's name, but still believe that the employee may be identified from the information on the forms, is there anything else that I can do to further protect the employee's privacy? Yes, if you have a reasonable basis to believe that information describing the privacy concern case may be personally

ADD-19

identifiable even though the employee's name has been omitted, you may use discretion in describing the injury or illness on both the OSHA 300 and 301 forms. You must enter enough information to identify the cause of the incident and the general severity of the injury or illness, but you do not need to include details of an intimate or private nature. For example, a sexual assault case could be described as "injury from assault," or an injury to a reproductive organ could be described as "lower abdominal injury."

(10) What must I do to protect employee privacy if I wish to provide access to the OSHA Forms 300 and 301 to persons other than government representatives, employees, former employees or authorized representatives? If you decide to voluntarily disclose the Forms to persons other than government representatives, employees, former employees or authorized representatives (as required by §§ 1904.35 and 1904.40), you must remove or hide the employees' names and other personally identifying information, except for the following cases. You may disclose the Forms with personally identifying information only:

    (i) to an auditor or consultant hired by the employer to evaluate the safety and health program;

    (ii) to the extent necessary for processing a claim for workers' compensation or other insurance benefits; or

    (iii) to a public health authority or law enforcement agency for uses and disclosures for which consent, an authorization, or opportunity to agree or object is not required under Department of Health and Human Services Standards for Privacy of Individually Identifiable Health Information, 45 CFR 164.512.

# 29 C.F.R. § 1904.32

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of
Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart D – Other OSHA Injury and Illness Recordkeeping Requirements

## § 1904.32. Annual summary.

(a) Basic requirement. At the end of each calendar year, you must:

> (1) Review the OSHA 300 Log to verify that the entries are complete and accurate, and correct any deficiencies identified;

> (2) Create an annual summary of injuries and illnesses recorded on the OSHA 300 Log;

> (3) Certify the summary; and

> (4) Post the annual summary

(b) Implementation—

(1) How extensively do I have to review the OSHA 300 Log entries at the end of the year? You must review the entries as extensively as necessary to make sure that they are complete and correct.

(2) How do I complete the annual summary? You must:

> (i) Total the columns on the OSHA 300 Log (if you had no recordable cases, enter zeros for each column total); and

> (ii) Enter the calendar year covered, the company's name, establishment name, establishment address, annual average number of employees covered by the OSHA 300 Log, and the total hours worked by all employees covered by the OSHA 300 Log.

(iii)  If you are using an equivalent form other than the OSHA 300-A summary form, as permitted under § 1904.29(b)(4), the summary you use must also include the employee access and employer penalty statements found on the OSHA 300-A Summary form.

(3) How do I certify the annual summary? A company executive must certify that he or she has examined the OSHA 300 Log and that he or she reasonably believes, based on his or her knowledge of the process by which the information was recorded, that the annual summary is correct and complete.

(4) Who is considered a company executive? The company executive who certifies the log must be one of the following persons:

(i) An owner of the company (only if the company is a sole proprietorship or partnership);

(ii) An officer of the corporation;

(iii)  The highest ranking company official working at the establishment; or

(iv) The immediate supervisor of the highest ranking company official working at the establishment.

(5) How do I post the annual summary? You must post a copy of the annual summary in each establishment in a conspicuous place or places where notices to employees are customarily posted. You must ensure that the posted annual summary is not altered, defaced or covered by other material.

(6) When do I have to post the annual summary? You must post the summary no later than February 1 of the year following the year covered by the records and keep the posting in place until April 30.

**29 C.F.R. § 1904.41**

Title 29 – Labor
Subtitle B – Regulations Relating to Labor
Chapter XVII – Occupational Safety and Health Administration, Department of
Labor
Part 1904 – Recording and Reporting Occupational Injuries and Illnesses
Subpart E – Reporting Fatality, Injury and Illness Information to the Government

[The Rollback Rule listed in the right-hand column is currently in effect]

| 2016 Rule (81 Fed. Reg. 29,624) | Rollback Rule (84 Fed. Reg. 380)[1] |
| --- | --- |
| **§ 1904.41. Electronic submission of injury and illness records to OSHA.** | **§ 1904.41. Electronic submission of Employer Identification Number (EIN) and injury and illness records to OSHA.** |
| (a) Basic requirements— | (a) Basic requirements— |
| (1) Annual electronic submission of part 1904 records by establishments with 250 or more employees. If your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must electronically submit information from the three recordkeeping forms that you keep under this part (OSHA Form 300A Summary of Work-Related Injuries and Illnesses, OSHA Form 300 Log of Work-Related Injuries and Illnesses, and OSHA Form 301 Injury and Illness Incident Report) to OSHA or OSHA's designee. You must submit the information once a year, no later than | (1) Annual electronic submission of OSHA Form 300A Summary of Work-Related Injuries and Illnesses by establishments with 250 or more employees. If your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must electronically submit information from OSHA Form 300A Summary of Work-Related Injuries and Illnesses to OSHA or OSHA's designee. You must submit the information once a year, no later than the date listed in paragraph (c) of this section of the year after the calendar year covered by the form (for example, 2019 for the 2018 form). |

[1] The Rollback Rule revised Section 1904.41's heading, paragraph (a)(1), and paragraph (b). It also added paragraph (a)(4) to Section 1904.41.

ADD-23

| | |
|---|---|
| the date listed in paragraph (c) of this section of the year after the calendar year covered by the forms.<br><br>(2) Annual electronic submission of OSHA Form 300A Summary of Work-Related Injuries and Illnesses by establishments with 20 or more employees but fewer than 250 employees in designated industries. If your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to subpart E of this part, then you must electronically submit information from OSHA Form 300A Summary of Work-Related Injuries and Illnesses to OSHA or OSHA's designee. You must submit the information once a year, no later than the date listed in paragraph (c) of this section of the year after the calendar year covered by the form.<br><br>(3) Electronic submission of part 1904 records upon notification. Upon notification, you must electronically submit the requested information from your part 1904 records to OSHA or OSHA's designee. | (2) Annual electronic submission of OSHA Form 300A Summary of Work-Related Injuries and Illnesses by establishments with 20 or more employees but fewer than 250 employees in designated industries. If your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to subpart E of this part, then you must electronically submit information from OSHA Form 300A Summary of Work-Related Injuries and Illnesses to OSHA or OSHA's designee. You must submit the information once a year, no later than the date listed in paragraph (c) of this section of the year after the calendar year covered by the form.<br><br>(3) Electronic submission of part 1904 records upon notification. Upon notification, you must electronically submit the requested information from your part 1904 records to OSHA or OSHA's designee.<br><br>(4) Electronic submission of the Employer Identification Number (EIN). For each establishment that is subject to these reporting requirements, you must provide the EIN used by the establishment. |
| (b) Implementation— | (b) Implementation— |

ADD-24

(1) Does every employer have to routinely submit information from the injury and illness records to OSHA? No, only two categories of employers must routinely submit information from their injury and illness records. First, if your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must submit the required Form 300A, 300, and 301 information to OSHA once a year. Second, if your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to subpart E of this part, then you must submit the required Form 300A information to OSHA once a year. Employers in these two categories must submit the required information by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form or forms (for example, 2017 for the 2016 forms). If you are not in either of these two categories, then you must submit information from the injury and illness records to OSHA only if OSHA notifies you to do so for an individual data collection.

(2) If I have to submit information under paragraph (a)(1) of this section, do I have to submit all of the information from the recordkeeping form? No, you are required to submit all of the

(1) Does every employer have to routinely submit this information to OSHA? No, only two categories of employers must routinely submit this information. First, if your establishment had 250 or more employees at any time during the previous calendar year, and this part requires your establishment to keep records, then you must submit the required information to OSHA once a year. Second, if your establishment had 20 or more employees but fewer than 250 employees at any time during the previous calendar year, and your establishment is classified in an industry listed in appendix A to this subpart, then you must submit the required information to OSHA once a year. Employers in these two categories must submit the required information by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form (for example, 2019 for the 2018 form). If you are not in either of these two categories, then you must submit the information to OSHA only if OSHA notifies you to do so for an individual data collection.

| | |
|---|---|
| information from the form except the following:<br>(i) Log of Work-Related Injuries and Illnesses (OSHA Form 300): Employee name (column B).<br>(ii) Injury and Illness Incident Report (OSHA Form 301): Employee name (field 1), employee address (field 2), name of physician or other health care professional (field 6), facility name and address if treatment was given away from the worksite (field 7). | |
| (3) Do part-time, seasonal, or temporary workers count as employees in the criteria for number of employees in paragraph (a) of this section? Yes, each individual employed in the establishment at any time during the calendar year counts as one employee, including full-time, part-time, seasonal, and temporary workers. | (2) Do part-time, seasonal, or temporary workers count as employees in the criteria for number of employees in paragraph (a) of this section? Yes, each individual employed in the establishment at any time during the calendar year counts as one employee, including full-time, part-time, seasonal, and temporary workers. |
| (4) How will OSHA notify me that I must submit information from the injury and illness records as part of an individual data collection under paragraph (a)(3) of this section? OSHA will notify you by mail if you will have to submit information as part of an individual data collection under paragraph (a)(3). OSHA will also announce individual data collections through publication in the Federal Register and the OSHA newsletter, and announcements on the OSHA Web site. If you are an employer who must routinely submit the information, then OSHA will not notify you about your routine submittal. | (3) How will OSHA notify me that I must submit information as part of an individual data collection under paragraph (a)(3) of this section? OSHA will notify you by mail if you will have to submit information as part of an individual data collection under paragraph (a)(3). OSHA will also announce individual data collections through publication in the Federal Register and the OSHA newsletter, and announcements on the OSHA website. If you are an employer who must routinely submit the information, then OSHA will not notify you about your routine submittal. |

(5) How often do I have to submit the information from the injury and illness records? If you are required to submit information under paragraph (a)(1) or (2) of this section, then you must submit the information once a year, by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form or forms. If you are submitting information because OSHA notified you to submit information as part of an individual data collection under paragraph (a)(3) of this section, then you must submit the information as often as specified in the notification.

(6) How do I submit the information? You must submit the information electronically. OSHA will provide a secure Web site for the electronic submission of information. For individual data collections under paragraph (a)(3) of this section, OSHA will include the Web site's location in the notification for the data collection.

(7) Do I have to submit information if my establishment is partially exempt from keeping OSHA injury and illness records? If you are partially exempt from keeping injury and illness records under §§ 1904.1 and/or 1904.2, then you do not have to routinely submit part 1904 information under paragraphs (a)(1) and (2) of this section. You will have to submit information under paragraph (a)(3) of this section if OSHA informs you in writing that it will collect

(4) When do I have to submit the information? If you are required to submit information under paragraph (a)(1) or (2) of this section, then you must submit the information once a year, by the date listed in paragraph (c) of this section of the year after the calendar year covered by the form (for example, 2019 for the 2018 form). If you are submitting information because OSHA notified you to submit information as part of an individual data collection under paragraph (a)(3) of this section, then you must submit the information as specified in the notification.

(5) How do I submit the information? You must submit the information electronically. OSHA will provide a secure website for the electronic submission of information. For individual data collections under paragraph (a)(3) of this section, OSHA will include the website's location in the notification for the data collection.

(6) Do I have to submit information if my establishment is partially exempt from keeping OSHA injury and illness records? If you are partially exempt from keeping injury and illness records under §§ 1904.1 and/or 1904.2, then you do not have to routinely submit information under paragraphs (a)(1) and (2) of this section. You will have to submit information under paragraph (a)(3) of this section if OSHA informs you in writing that it will collect injury

| | |
|---|---|
| injury and illness information from you. If you receive such a notification, then you must keep the injury and illness records required by this part and submit information as directed. | and illness information from you. If you receive such a notification, then you must keep the injury and illness records required by this part and submit information as directed. |
| (8) Do I have to submit information if I am located in a State Plan State? Yes, the requirements apply to employers located in State Plan States. | (7) Do I have to submit information if I am located in a State Plan State? Yes, the requirements apply to employers located in State Plan States. |
| (9) May an enterprise or corporate office electronically submit part 1904 records for its establishment(s)? Yes, if your enterprise or corporate office had ownership of or control over one or more establishments required to submit information under paragraph (a)(1) or (2) of this section, then the enterprise or corporate office may collect and electronically submit the information for the establishment(s). | (8) May an enterprise or corporate office electronically submit information for its establishment(s)? Yes, if your enterprise or corporate office had ownership of or control over one or more establishments required to submit information under paragraph (a) of this section, then the enterprise or corporate office may collect and electronically submit the information for the establishment(s). |
| * * * | * * * |